UNITED STATES BANKRUPTCY COURT
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

NIED OWNERSHIP LLC,                                    Case No. 6:26-bk-03232-TPG
                                                       Chapter 11

      Debtor.

_____/

**ACRE CFPORTFOLIO LLC'S MOTION TO COMPEL DEBTOR TO
ESTABLISH AND FUND A SEGREGATED CASH RESERVE PENDING A
DETERMINATION OF THE ALLOWED AMOUNT OF ITS SECURED CLAIM**

ACRE CFPortfolio LLC ("ACRE"), the Debtor's sole secured creditor, by and through

undersigned counsel, hereby files this motion (the "Motion") for entry of an order compelling Nied

Ownership LLC (the "Debtor") to establish and fund a segregated cash reserve (the "Reserve") for

the full amount of ACRE's Secured Claim (the "Allowed ACRE Secured Claim"), as that term is

defined and provided for under the Debtor's *Chapter 11 Plan of Reorganization* [Docket No. 67]

(the "Plan")[1], pending resolution of any disputed portion of that claim, and in support thereof states

as follows:

**PRELIMINARY STATEMENT**

1.      The Plan designates the Allowed ACRE Secured Claim as unimpaired under

section 1124 of the Bankruptcy Code and provides that it will be paid ***in full in cash*** from the

Refinancing Proceeds upon closing of the Refinancing Transaction.  If the amount of the Allowed

ACRE Secured Claim has not been determined by closing, the Plan requires the Debtor's

bankruptcy counsel to reserve in its trust account an amount equal to the lesser of ACRE's asserted

---

[1] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the Plan.

claim amount or such other amount as the Court may order.  Plan § 5.04(2).  As detailed on **Exhibit 1**, ACRE currently calculates its claim at approximately $97.7 million as of the Debtor's stated closing date of August 31, 2026.  The Debtor has not objected to ACRE's proof of claim, but it scheduled the claim as disputed and unliquidated and has indicated that it does not agree with ACRE's calculation.  July 16, 2026, Hr'g Tr. at 151:18–152:11.  The Debtor's principal, Michael Niederst, acknowledged that the governing documents entitle the preferred investor to costs and expenses, late charges, an exit fee, and to reimbursement of protective advances, and identified only $1,391,000 in pre-acquisition costs as an amount he disputed.  July 16, 2026, Hr'g Tr. at 114:4–114:24.

2.      The Plan's existing reserve provision does not adequately address that dispute.  By capping the Reserve at the lesser of ACRE's asserted claim amount or another amount ordered by the Court, the Plan does not leave ACRE's claim unimpaired because it does not account for the interest, fees, costs, and charges that will continue to accrue while the parties litigate or otherwise resolve the Allowed ACRE Secured Claim.  A reserve limited to ACRE's claim as of August 31, 2026 therefore will be insufficient to pay the claim in full once it is ultimately allowed by the Court.

3.      Such a result cannot be reconciled with the Plan's treatment of ACRE as an oversecured, unimpaired creditor.  Section 506(b) entitles an oversecured creditor to postpetition interest and reasonable fees, costs, and charges provided for under the governing agreements.  Section 1124, in turn, requires the Plan to leave ACRE's legal, equitable, and contractual rights unaltered if ACRE is to be treated as unimpaired and conclusively presumed to have accepted the Plan without a vote.

4.       While ACRE believes that the Plan cannot be confirmed for, among other things, the reasons set forth in the *Objection of ACRE CFPORTFOLIO LLC to Confirmation of the Debtor's Chapter 11 Plan* [Docket No. 131] and the *Supplemental Objection of ACRE CFPORTFOLIO LLC to Confirmation of the Debtor's Chapter 11 Plan* [Docket No. 156] (together, the "Confirmation Objections"), to the extent that the Court confirms the Plan, the Debtor must either pay the full amount of ACRE's claim or establish a segregated cash reserve account for ACRE's benefit in an amount of at least $97.7 million plus an additional year of interest and projected legal fees (for a total of approximately $117.9 million) to ensure that ACRE's claim remains unimpaired while the parties litigate or otherwise resolve the apparent dispute over the proper amount of ACRE's allowed claim.  Any other treatment will result in the impairment of ACRE's claim without the statutory protections of voting on the Plan or the cramdown requirements of section 1129(b)(2).

5.       ACRE does not ask the Court through this Motion to determine the Allowed ACRE Secured Claim with finality.  Rather, it asks that the Court determine, for the limited purpose of sizing the Reserve, the amount that must be segregated at closing to ensure that sufficient funds remain available to pay the Allowed ACRE Secured Claim in full once the parties' dispute is resolved.  That amount reserved should be no less than approximately $117.9 million, which consists of ACRE's approximately $97.7 million claim as of August 31, 2026, plus an amount sufficient to account for one year of continuing interest, fees, costs, and charges, including projected legal fees.[2]

---

[2] ACRE has also included estimated payoff amounts on Exhibit 1 on a quarterly basis.  If this Court enters a scheduling order to determine the amount of the Allowed ACRE Secured Claim with a final hearing scheduled on an earlier date, i.e. by November 30, 2026, such lesser amount can be used to fund the Reserve.

6.      This Motion is deliberately narrow.  ACRE separately addresses, in its *Motion to Dismiss Chapter 11 Case or, in the Alternative, for Relief from the Automatic Stay* [Docket No. 23] (the "Motion to Dismiss") and its *Pre-Trial Memorandum of Law in Support of its Motion to Dismiss Chapter 11 Case or, in the Alternative, for Relief from the Automatic Stay* [Docket No. 132], the consequences that should follow if the Debtor fails to confirm its plan and close the proposed Refinancing Transaction.  ACRE preserves all arguments and requested relief set forth in the Confirmation Objections and the Motion to Dismiss.  This Motion addresses only the amount and mechanics of the Reserve that must be funded if the Court decides that the Plan is confirmable and ACRE is not paid in full at closing.[3]

7.      Because the amount to be paid or reserved is an essential component of the Debtor's proposed treatment of ACRE's claim, the Court should adjudicate this Motion in connection with confirmation and establish in any confirmation order the minimum amount that the Debtor must pay to ACRE or place in the Reserve upon closing of the Refinancing Transaction.

### FACTUAL BACKGROUND

8.      ***The Plan's Treatment of ACRE's Claim***.  The Plan provides that the Allowed ACRE Secured Claim will be determined either "by agreement between the Debtor and ACRE" or "a Final Order of the Bankruptcy Court."  Plan § 5.04(1).  It further provides that the Allowed ACRE Secured Claim "shall be paid in full in Cash from the Refinancing Proceeds upon the closing of the Refinancing Transaction."  *Id*. § 5.04(2).  If the claim has not been adjudicated by closing, the Debtor's bankruptcy counsel must "reserve in its trust account an amount from the Refinancing Proceeds equal to the lesser of (x) ACRE's asserted claim amount and (y) such other

---

[3] ACRE files this Motion without prejudice to, and without waiving, any argument set forth in the Confirmation Objections or the Motion to Dismiss, including ACRE's position that the Plan is not confirmable for the reasons set forth therein.

amount as the Bankruptcy Court may order pending resolution of such dispute." *Id*.  Class 2 consists solely of the Allowed ACRE Secured Claim and is designated as unimpaired under the Plan.  Plan § 5.04(3).  As a result, Class 2 would be conclusively presumed to have accepted the Plan and would not be solicited to vote.  11 U.S.C. § 1126(f).

9.       ***ACRE's Asserted Claim Amount***.  ACRE's claim arises under that certain Limited Liability Company Agreement of Nied Member, LLC, dated as of March 1, 2023 (the "Operating Agreement"), a true and correct copy of which is attached hereto as **Exhibit 2** and incorporated herein by reference.  ACRE filed Proof of Claim No. 3-1 (the "Proof of Claim"), asserting a secured claim in a principal amount of no less than $80 million, together with continuing interest, fees, expenses, late charges, an exit fee, protective advances, and all other amounts recoverable under the governing documents.[4]  Based on the amounts accrued and expected to accrue through August 31, 2026, ACRE currently calculates its claim at approximately $97.7 million.  The Debtor has not objected to the Proof of Claim.  The Debtor scheduled ACRE's claim as disputed and unliquidated in the amount of approximately $89 million as of May 1, 2026.  Schedule D, Part 1, Line 2.1.  At the July 16, 2026, confirmation hearing, Mr. Niederst acknowledged that ACRE's claim was "presumably" higher than $89 million merely because additional time had passed.  July 16, 2026, Hr'g Tr. at 151:18–152:11.  Mr. Niederst also acknowledged that the governing documents entitle the preferred investor to costs and expenses, late charges, an exit fee, and protective advances, and identified only $1,391,000 in pre-acquisition costs as an amount he disputed.  *Id*. at 113:1–114:24.  He further acknowledged that the $30 million protective advance

---

[4] Based on the testimony of Michael Niederst that the value of ACRE's collateral substantially exceeds the amount of its claim, ACRE has reserved all rights with respect to its status and entitlements as an oversecured creditor under section 506(b) of the Bankruptcy Code.  Addendum to Proof of Claim ¶ 12.

component of ACRE's claim accrues interest at a rate of seventeen percent. *Id.* at 76:16–77:10, 166:24–167:2.

10.     ***The Debtor's own valuations establish that ACRE is oversecured***.[5]   The Disclosure Statement states that the Portfolio has an aggregate "as-is" appraised value of approximately $757 million against approximately $450 million in senior mortgage debt, leaving net equity of approximately $216.5 million after accounting for ACRE's asserted approximately $97.7 million claim.  Disclosure Statement at 8.  Mr. Niederst similarly testified that the Portfolio had an as-is value of approximately $757 million and approximately $450 million in senior mortgage debt, leaving, according to Mr. Niederst, an equity cushion of approximately $320 million before accounting for ACRE's claim.  July 16, 2026, Hr'g Tr. at 40:6–41:10.  Even after deducting ACRE's asserted claim, the Debtor's figures leave more than $200 million in residual equity.

## ARGUMENT

11.     For the reasons set forth below, the Court should require the Debtor either to pay ACRE in full or to fund a reserve sufficient to protect ACRE's right to full payment.

12.     Section 502(a) provides that a filed proof of claim "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the claim's validity and amount.  Fed. R. Bankr. P. 3001(f).  ACRE filed the Proof of Claim, and the Debtor has not objected.  The Reserve, therefore, should be sized using ACRE's $97.7 million calculation through

---

[5] ACRE believes that the Debtor's valuations are inflated and do not reflect market-based realities, that the Plan is not feasible, and that the Debtor will not be able to close the Refinancing Transaction on its proposed timeline. Nevertheless, for the purposes of this Motion, ACRE will assume the Debtor's valuations at face value and that, if the Plan is confirmed over its objection, ACRE must be afforded all of the protections of an oversecured creditor.

August 31, 2026, together with a reasonable cushion for the interest, fees, costs, and charges expected to accrue before the claim is finally resolved and paid.

**A.  Sections 506(b) and 1124 of the Bankruptcy Code Require Payment of Postpetition Interest, Fees, Costs, and Charges to ACRE**

13.     Section 506(b) provides that an oversecured creditor is entitled to postpetition interest on its claim and "any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."  11 U.S.C. § 506(b); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73 (1988).  Because the Debtor's own valuations establish an equity cushion substantially exceeding ACRE's claim, ACRE is entitled to all such amounts.

14.     The Plan's designation of ACRE as unimpaired supplies an independent reason why the Reserve must preserve ACRE's entitlement to full payment.  Section 1124(1) of the Bankruptcy Code provides that a claim is unimpaired only if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim...entitles the holder. . . . "  11 U.S.C. § 1124(1).  Congress defined impairment "in the broadest possible terms" such that "any alteration" of a creditor's legal, equitable, or contractual rights by a plan renders that creditor impaired.  *Ad Hoc Comm. Of Holders of Trade Claims v. Pac. Gas & Elec. Co. (In re PG&E Corp.)*, 46 F.4th 1047, 1055 (9th Cir. 2022) (citations omitted).  Unimpaired status is not a label the Debtor can affix to a claim while withholding the substance that label is supposed to guarantee.

15.     A debtor cannot obtain "the best of both worlds" by treating a class as unimpaired for voting and confirmation purposes while withholding the substantive rights that unimpaired status is supposed to preserve.  *Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*, 120 F.4th 1181, 1198 (3d Cir. 2024), *cert. denied sub nom.*, *Hertz Corp. v. Wells Fargo Bank, N.A.*, 146 S. Ct. 152 (2026); *Ultra Petrol. Corp. v. Ad Hoc Comm. of Opco Unsecured Creditors (In re*

*Ultra Petrol. Corp.)*, 51 F.4th 138, 158 (5th Cir. 2022) ("[C]reditors who are unimpaired . . . cannot be treated any worse than impaired creditors, who at least get to vote on the plan."). Because ACRE was not solicited to vote and is instead conclusively presumed to have accepted the Plan, the Plan must preserve ACRE's right to recover in full under the governing documents and applicable law.

16.     Courts have applied that principle specifically to a secured creditor's entitlement to default interest. A plan that treats a secured claim as unimpaired must provide for payment of all amounts due under the governing loan documents, including default interest. *In re Sagamore Partners, Ltd.*, 2012 Bankr. LEXIS 3224, at *4 (Bankr. S.D. Fla. July 10, 2012) (denying approval of disclosure statement where plan was "facially unconfirmable" over the secured lender's objection because it failed to provide for default interest). Interest on an unimpaired claim likewise does not cease merely because confirmation or the effective date has occurred where the claim remains unpaid and subject to further adjudication. *See United States v. Graham (In re Monclova Care Ctr., Inc.)*, 59 F. App'x 660, 664–65 (6th Cir. 2003) (holding that interest continued to accrue until full payment notwithstanding a post-confirmation dispute over the amount owed because an earlier cutoff would alter the creditor's legal right to payment). The same reasoning applies here, where Plan § 5.04(2) anticipates that ACRE's claim may remain unadjudicated as of closing and contemplates an ongoing, post-confirmation dispute over the allowed amount. Interest must therefore continue to accrue post-confirmation until ACRE's unimpaired, disputed claim is ultimately paid.

17.     To the extent the Debtor is solvent — as the Debtor's own valuations of the Portfolio purport to show, or will become upon consummation of the Refinancing Transaction — the solvent-debtor exception independently entitles ACRE to postpetition interest at the applicable

8

contract or default rate, reinforcing the result compelled by sections 506(b) and 1124. *In re Hertz Corp.*, 120 F.4th at 1198–99; *In re Ultra Petroleum Corp.*, 51 F.4th at 154–58; *In re PG&E Corp.*, 46 F.4th at 1060–64.

18.     The Plan expressly anticipates that ACRE's claim may remain unresolved after closing.  Plan § 5.04(2).  If that occurs, ACRE's entitlement to interest, fees, costs, and charges will continue while the disputed claim remains unpaid.  A reserve limited to the amount of ACRE's claim as of closing would not preserve those rights and would create a material risk that the funds available when the claim is finally allowed will be insufficient to pay it in full.  That treatment would impair ACRE's claim notwithstanding the Plan's contrary designation.

**B.  The Court Has Authority To Establish and Require Funding of the Reserve**

19.     ACRE's claim is deemed allowed pursuant to section 502(a) of the Bankruptcy Code because no party in interest has objected.  Sections 105(a), 502(c), and 1142(b) of the Bankruptcy Code give ACRE's statutory and Plan rights practical effect now, without waiting for a final adjudication of the Allowed ACRE Secured Claim.  Section 105(a) vests the Court with the equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a); see *In re Smart World Techs.*, LLC, 423 F.3d 166, 183 (2d Cir. 2005) (section 105 "grants the bankruptcy court equitable powers to implement the provisions of the Bankruptcy Code").  Section 502(c), in turn, directs the Court to "estimate[] for purpose of allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). And section 1142(b) reinforces that authority where, as here, a plan's own promises are at risk of going unfulfilled: it empowers the Court to direct a debtor "to perform any other act . . . that is necessary for the consummation of the plan". *In re Intermet Corp.*, 2009 Bankr. LEXIS 2613, at *13 (Bankr. D. Del. Sept. 2, 2009) (citation omitted).

9

20.     Taken together, those provisions permit the Court to estimate ACRE's claim for the limited purpose of determining the amount that must be reserved and to require the Debtor to fund that amount if ACRE is not paid in full at closing.  Such an estimation would not determine the Allowed ACRE Secured Claim with finality or prejudice either party's right to litigate its ultimate amount.  It would ensure only that sufficient funds remain available to satisfy the claim after that determination is made.

21.     Courts have relied on this same authority to fix reserve amounts sufficient to protect disputed or contingent claims pending final resolution and to ensure that a plan's payment promise is given practical effect.  *See In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 11, 2024), *Order Establishing the Amount of the Disputed Claims Reserve* [Doc. No. 28689] (granting the debtors' motion and establishing a $6.533 billion disputed claims reserve pursuant to sections 105(a), 502(c), and 1142(b) of the Bankruptcy Code); *In re Am. Airlines Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Aug. 9, 2013), *Order Establishing the Amount of the Disputed Claims to be Utilized for Determining Disputed Claims Reserve Under Debtors' Second Amended Joint Chapter 11 Plan and Approving Certain Procedures in Connection with Disputed Claims Reserve* [Doc. No. 9560] (fixing a disputed claims reserve of up to $700 million pursuant to sections 105(a) and 502(c) of the Bankruptcy Code).

22.     The Plan's current reserve mechanism does not provide the necessary protection. It caps the Reserve at the lesser of ACRE's asserted claim amount or a court-ordered amount and contains no provision for the interest, fees, costs, and charges that will accrue while the claim remains unpaid.  The deficiency is substantial: Mr. Niederst acknowledged that the $30 million protective-advance component of ACRE's claim accrues interest at seventeen percent, July 16, 2026, Hr'g Tr. at 76:16–77:10, and the approximately $50 million preferred-investment

component has likewise accrued interest at the default rate since July 29, 2025.[6]  ACRE also continues to incur legal fees and expenses in connection with the claim dispute and these proceedings.  Absent adjustment, the Plan's own mechanism creates a material risk that ACRE will receive less than full payment of its claim — the very impairment the Plan purports to avoid by designating Class 2 unimpaired in the first place.

23.     Accordingly, to the extent the Court confirms the Plan, it should require the Debtor, upon closing of the Refinancing Transaction, either to pay ACRE's claim in full in cash or, if the claim remains disputed, to establish and fully fund the Reserve in an amount no less than ACRE's approximately $97.7 million asserted claim as of August 31, 2026, plus an additional amount sufficient to account for one year of continuing interest accruing under the governing documents at the applicable contractual rates and one year of ACRE's reasonable legal fees and other expenses, to the extent recoverable under the governing documents and applicable law.  Any confirmation order should further make clear that it is without prejudice to ACRE's rights to seek additional amounts in the Reserve or otherwise, including, but not limited to, pursuant to Fed. R. Bankr. P. 8007(a)(1) or M.D. Fla. L.B.R. 8007-1(a), sufficient to cover the continuing interest and ACRE's reasonable legal fees and other expenses, including, but not limited to, interest, legal fees and expenses expected to accrue through final disposition of any appeal or otherwise.

24.     A Reserve in that amount is necessary to give practical effect to the Plan's promise that the Allowed ACRE Secured Claim will be paid in full and to ensure that ACRE receives the substantive treatment required by sections 506(b) and 1124.

---

[6] *See* Ex. 2, Operating Agreement §§ 7.2(a), 7.3 (providing that, during a continuing default, the return on the unreturned preferred investment is calculated at the default rate); Addendum to Proof of Claim ¶¶ 8, 10 (asserting a continuing default since July 29, 2025 and identifying the preferred-investment component as $50 million).

**RELIEF REQUESTED**

WHEREFORE, ACRE respectfully requests that the Court adjudicate this Motion in connection with confirmation of the Plan and enter an order substantially in the form attached hereto as **Exhibit 3**: (a) providing that, to the extent the Court confirms the Plan, the Debtor shall, upon closing of the Refinancing Transaction, either (i) pay ACRE's claim in full in cash or (ii), if the claim remains disputed, establish and fully fund a segregated cash Reserve in an amount no less than ACRE's approximately $97.7 million asserted claim as of August 31, 2026, plus an additional amount sufficient to account for one year of continuing interest accruing under the governing documents at the applicable contractual rates and one year of ACRE's reasonable legal fees and other expenses, to the extent recoverable under the governing documents and applicable law; (b) providing that the order is without prejudice to ACRE's rights to seek additional amounts in the Reserve or otherwise, including, but not limited to, pursuant to Fed. R. Bankr. P. 8007(a)(1) or M.D. Fla. L.B.R. 8007-1(a), sufficient to cover the continuing interest and ACRE's reasonable legal fees and other expenses, including, but not limited to, interest, legal fees and expenses expected to accrue through final disposition of any appeal or otherwise; and (c) granting ACRE such other and further relief as the Court deems just and proper.  A proposed form of order is attached hereto.

Dated: August 6, 2026.

/s/ *Lara Roeske Fernandez*
Lara Roeske Fernandez, Esq.
Florida Bar No. 88500
lfernandez@trenam.com
**TRENAM, KEMKER, SCHARF, BARKIN, FRYE, O'NEILL & MULLIS, P.A.**
101 E Kennedy Boulevard, Suite 2700
Tampa, FL 33602
Telephone: (813) 223-7474

/s/ *Charles A. Dale*
Charles A. Dale, Esq. (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110-2600
Telephone: (617) 519-9600
Email: cdale@proskauer.com

Dylan J. Marker, Esq. (admitted *pro hac vice*)
Eleven Times Square

New York, New York 10036-8299
Telephone: (212) 969-3000
Email: dmarker@proskauer.com

*Counsel for ACRE CFPortfolio LLC*

*Counsel for ACRE CFPortfolio LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2026 a true and correct copy of the foregoing has been served via CM/ECF on all CM/ECF registered participants.

/s/ Lara Roeske Fernandez
Lara Roeske Fernandez

## Exhibit 1

## Calculation of ACRE's Claim

**Estimated Calculation of ACRE's Claim**

| Claim Component | August 31, 2026 | November 30, 2026 | February 28, 2027 | May 31, 2027 | August 31, 2027 |
|---|---|---|---|---|---|
| Total Preferred Investment[1] | $50,000,000.00 | $50,000,000.00 | $50,000,000.00 | $50,000,000.00 | $50,000,000.00 |
| Protective Advance[2] | $30,000,000.00 | $30,000,000.00 | $30,000,000.00 | $30,000,000.00 | $30,000,000.00 |
| Protective Advance (Default Return)[3] | $1,897,375.00 | $3,235,833.33 | $4,559,583.33 | $5,912,750.00 | $7,265,916.67 |
| Unpaid Preferred Return[4] | $5,433,627.97 | $7,052,237.63 | $8,670,847.29 | $10,236,676.20 | $11,855,285.86 |
| Unpaid Default Return[5] | $3,215,507.74 | $4,284,952.49 | $5,477,598.30 | $6,754,579.53 | $8,206,367.04 |
| Per Diem Return[6] | $687,257.92 | $711,618.70 | $682,214.66 | $809,991.29 | $846,705.97 |
| Exit Fee[7] | $500,000.00 | $500,000.00 | $500,000.00 | $500,000.00 | $500,000.00 |
| Late Fees and Other Fees[8] | $629,950.49 | $765,571.25 | $904,663.82 | $1,053,193.16 | $1,208,548.75 |
| Legal Fees and Costs (ACRE)[9] | $4,754,215.59 | $5,429,215.59 | $6,104,215.59 | $6,779,215.59 | $7,454,215.59 |
| Legal Fees and Costs (PIMCO)[10] | $551,590.50 | $551,590.50 | $551,590.50 | $551,590.50 | $551,590.50 |
| **TOTAL — Estimated ACRE Secured Claim** | **$97,669,525.20** | **$102,531,019.49** | **$107,450,713.50** | **$112,597,996.27** | **$117,888,630.37** |

*All amounts are estimates based on currently available information and are subject to change. Interest calculations assume rates remain constant at current levels. Legal fees reflect projected amounts.*

---

[1] *See* Operating Agreement §§ 6.1(a), 9.1, 3.7(a).

[2] *Id.* at §§ 6.2(b), 8.1(c), 11.9(a).

[3] *Id.* at §§ 6.2(c), 7.3, 8.1(b)–(c)

[4] *Id.* at §§ 7.1, 7.2, 8.1(d).

[5] *Id.* at §§ 7.2(a), 7.3, 8.1(b), 11.2(c).

[6] *Id.* at §§ 7.1, 7.2; "Preferred Return" definition (§ 1.1).

[7] *Id.* at §§ 7.5, 9.4(a)–(b), 9.5(a)(iii); "Exit Fee" definition (§ 1.1).

[8] *Id.* at §§ 11.2(b), 8.1(a).

[9] *Id.* at §§ 14.20, 8.1(a), 9.5(b).

[10] *Id.* at §§ 14.20, 8.1(a); "Preferred Investment" definition (§ 1.1).

2

**Exhibit 2**

**Operating Agreement**

**EXECUTION VERSION**

**LIMITED LIABILITY COMPANY AGREEMENT OF**

**NIED MEMBER, LLC**

**As of March 1, 2023**

**THE LIMITED LIABILITY COMPANY INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. TRANSFER OR OTHER DISPOSITION OF SUCH INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.**

**TABLE OF CONTENTS**

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................ 1

    Section 1.1    Definitions ................................................................................... 1

ARTICLE 2 ORGANIZATIONAL MATTERS; PURPOSE; TERM ...................................... 23

    Section 2.1    Formation of Company ................................................................. 23
    Section 2.2    Name ........................................................................................... 23
    Section 2.3    Registered Office; Registered Agent; Principal Office ............. 23
    Section 2.4    Foreign Qualification ................................................................. 23
    Section 2.5    Purpose and Scope ..................................................................... 24
    Section 2.6    Term ........................................................................................... 24

ARTICLE 3 MEMBERSHIP; REPRESENTATIONS, WARRANTIES AND
        COVENANTS ............................................................................................... 24

    Section 3.1    Members ..................................................................................... 24
    Section 3.2    Membership Interest ................................................................... 24
    Section 3.3    Creation of Additional Membership Interests ........................... 24
    Section 3.4    Resignation ................................................................................. 24
    Section 3.5    Information ................................................................................. 24
    Section 3.6    Representations and Warranties of Common Member and the
                  Company ..................................................................................... 24
    Section 3.7    Covenants of Common Member and the Company .................... 30

ARTICLE 4 MANAGEMENT OF COMPANY ................................................................... 36

    Section 4.1    Management ................................................................................ 36
    Section 4.2    Meetings of Members ................................................................. 38
    Section 4.3    Officers ....................................................................................... 38
    Section 4.4    Compensation of Members ......................................................... 39
    Section 4.5    Transactions with Related Parties .............................................. 39
    Section 4.6    Conflicts of Interest ................................................................... 39

ARTICLE 5 FINANCIAL REPORTING; BUDGET ........................................................... 39

    Section 5.1    Annual Budget ........................................................................... 39
    Section 5.2    Reports ........................................................................................ 40

ARTICLE 6 CONTRIBUTIONS ....................................................................................... 41

    Section 6.1    Initial Preferred Investment and Additional Preferred Investments ......... 41
    Section 6.2    Additional Common Member Capital Contributions; Protective
                  Advance Investment .................................................................. 42

i

Section 6.3       Balances ........................................................................... 43

ARTICLE 7 PREFERRED RETURN; ADDITIONAL CONTRIBUTION RETURN;
        ORIGINATION FEE; EXIT FEE; UNUSED FEE ........................................... 43

Section 7.1       Funding and Distribution of Preferred Return ........................... 43
Section 7.2       Calculation of Preferred Return .............................................. 43
Section 7.3       Calculation of Default Return ................................................. 43
Section 7.4       Origination Fee ................................................................... 43
Section 7.5       Exit Fee ............................................................................. 43
Section 7.6       Unused Fee ......................................................................... 44

ARTICLE 8 REQUIRED PAYMENTS; NON-LIQUIDATION DISTRIBUTIONS;
        ALLOCATIONS ......................................................................................... 44

Section 8.1       Distributions ....................................................................... 44
Section 8.2       Excess Cash ....................................................................... 45
Section 8.3       Time and Method of Payments .............................................. 45
Section 8.4       Applications During Common Member Event of Default ......... 45
Section 8.5       Distributions ....................................................................... 45
Section 8.6       Preferred Investment Account ............................................... 46
Section 8.7       Preferred Return Rate .......................................................... 47

ARTICLE 9 MANDATORY REDEMPTION DATE ........................................................ 55

Section 9.1       Mandatory Redemption Date ................................................. 55
Section 9.2       Early Redemption ................................................................ 56
Section 9.3       Extension Options ............................................................... 56
Section 9.4       Permitted Partial Redemptions .............................................. 57
Section 9.5       Redemption Conditions ........................................................ 57

ARTICLE 10 DISPOSITIONS OF MEMBERSHIP INTERESTS ..................................... 58

Section 10.1      General Restriction .............................................................. 58
Section 10.2      Preferred Investor Transfers ................................................. 58
Section 10.3      Permitted Common Member Transfers ................................... 58
Section 10.4      Death or Incompetency of a Guarantor ................................... 60
Section 10.5      Property Sales .................................................................... 60

ARTICLE 11 COMMON MEMBER EVENTS OF DEFAULT; REMEDIES ......................... 61

Section 11.1      Common Member Events of Default ....................................... 61
Section 11.2      Remedies ........................................................................... 63
Section 11.3      Attorney-In-Fact ................................................................. 64
Section 11.4      Specific Performance ........................................................... 65
Section 11.5      Forced Sale Right ................................................................ 65
Section 11.6      Covenant of Non-Interference ............................................... 65
Section 11.7      Covenant of Cooperation ...................................................... 65

Section 11.8    Power of Attorney.................................................................................. 66
Section 11.9    Preferred Investor's Right to Cure...................................................... 66

ARTICLE 12 TAX MATTERS................................................................................................ 67

Section 12.1    Tax Treatment of Preferred Investor.................................................. 67
Section 12.2    Profits and Losses ............................................................................... 67
Section 12.3    Special Allocations ............................................................................. 67
Section 12.4    Member Nonrecourse Deductions ...................................................... 69
Section 12.5    Curative Allocations ........................................................................... 69
Section 12.6    Other Allocation Rules ....................................................................... 69
Section 12.7    Tax Allocations:  Code Section 704(c) .............................................. 70
Section 12.8    Certain Definitions.............................................................................. 70
Section 12.9    Indemnity ............................................................................................ 74

ARTICLE 13 WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND
           TERMINATION .................................................................................. 75

Section 13.1    Dissolution, Liquidation, and Termination Generally ...................... 75
Section 13.2    Liquidation and Termination .............................................................. 75
Section 13.3    Deficit Capital Accounts..................................................................... 76
Section 13.4    Cancellation of Certificate ................................................................. 76

ARTICLE 14 MISCELLANEOUS PROVISIONS.................................................................. 76

Section 14.1    Notices ................................................................................................. 76
Section 14.2    Approvals............................................................................................. 76
Section 14.3    Governing Law .................................................................................... 76
Section 14.4    Non-Exclusive Jurisdiction; Summary Proceeding ........................... 76
Section 14.5    Entireties; Amendments...................................................................... 78
Section 14.6    Waiver.................................................................................................. 78
Section 14.7    Severability .......................................................................................... 78
Section 14.8    Ownership of Property and Right of Partition ................................... 78
Section 14.9    Captions, References and Construction .............................................. 78
Section 14.10   Sole Discretion.................................................................................... 79
Section 14.11   Counterparts   79
Section 14.12   General Indemnification of Preferred Investor .................................. 79
Section 14.13   Intentionally Omitted .......................................................................... 80
Section 14.14   Time of the Essence ............................................................................ 80
Section 14.15   Estoppel Certificate............................................................................. 81
Section 14.16   Certain Waivers .................................................................................. 81
Section 14.17   Waiver of Jury Trial............................................................................ 82
Section 14.18   Cooperation of the Common Member ................................................. 82
Section 14.19   Limitation on Liability........................................................................ 82
Section 14.20   Expenses          83
Section 14.21   Fairness of Remedies .......................................................................... 83
Section 14.22   No Attorney Conflicts......................................................................... 84

iii

Section 14.23 Confidentiality ............................................................................... 84
Section 14.24 Joint and Several Liability ..........................**Error! Bookmark not defined.**

ARTICLE 15 ANTI-CORRUPTION, ANTI-MONEY LAUNDERING, AND
    INTERNATIONAL TRADE CONTROLS.................................................... 85

ARTICLE 16 INTERESTS AND CERTIFICATES ..................................................... 87


Exhibit A Ownership Chart ................................................................................. A-1

Exhibit B Intentionally Omitted......................................................................... A-1

Exhibit C Procedure for Determining Fair Market Value ................................. A-1

Exhibit D Initial Approved Annual Budget ....................................................... A-1

Exhibit E Notice Addresses ............................................................................... B-1

Exhibit F Common Member Capital Contribution and Preferred Investor Preferred
    Investment...................................................................................................... B-1

Exhibit G Sales Procedures................................................................................ B-1

Exhibit H Termination of Managing Member ................................................... B-1

Exhibit I Form of Subordination Agreement .................................................... B-1


Schedule 1  Existing Indebtedness......................................................................... 1

Schedule 2  Pre-Approved Brokers......................................................................... 2

Schedule 3  Pre-Approved Appraiser ..................................................................... 3

Schedule 4  Shared Control Subsidiaries................................................................ 4

Schedule 5  Pre-Approved Affiliate Contracts ....................................................... 5

Schedule 6  Restricted Transferees......................................................................... 6

Schedule 7  Investment Opportunity Carveout....................................................... 7

Schedule 8  Anticipated Refinance Assets.............................................................. 8

Schedule 9  Form of Certificate ............................................................................. 1

LIMITED LIABILITY COMPANY AGREEMENT OF

NIED MEMBER, LLC

This Limited Liability Company Agreement (this "**Agreement**") is entered into as of March 1, 2023, between NIED OWNERSHIP LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "**Common Member**") and PCRED II HOLDING XVIII LLC, a Delaware limited liability company (together with its successors and assigns, "**Preferred Investor**").

## ARTICLE 1
## DEFINITIONS

Section 1.1    <u>Definitions</u>.  As used in this Agreement, the following terms shall have the following meanings:

"**Acceptable Counterparty**" means a bank or other financial institution which satisfies (or provides a guarantor of its obligations under the Preferred Return Rate Agreement or Replacement Cap Agreement, as applicable, which satisfies) the following ratings criteria either:  (a) a long-term unsecured debt rating of "A-" or higher by S&P or (b) a long-term unsecured debt rating of not less than "A3" by Moody's; <u>provided</u>; that SMBC Capital Markets, Inc. ("**SMBC**") will be an Acceptable Counterparty so long as (i) if SMBC does not satisfy the ratings criteria set forth above, an Acceptable SMBC Credit Support Party guaranties all of SMBC's current and future obligations under the Cap Agreement or Replacement Cap Agreement, as applicable, pursuant to a guaranty in form and substance reasonably acceptable to Lender (which shall be in the form, scope and substance customarily provided in similar transactions by SMBC and provided any such credit support party guaranty guaranties all current and future obligations under the Cap Agreement or Replacement Cap Agreement, as applicable) and (ii) the rating of the Acceptable SMBC Credit Support Party is not downgraded, withdrawn or qualified by S&P or Moody's or from the long and short term ratings issued by such rating agencies below the lesser of the above rating (as applicable) or, in the case of SMBC Derivative Products Limited only, its ratings as of the date hereof.

"**Acceptable SMBC Credit Support Party**" means (a) SMBC Derivative Products Limited or (b) a replacement guarantor that is (x) an Affiliate of SMBC and (y) meets the rating requirements set forth in either <u>clause (a)</u> or <u>(b)</u> of the definition of "Acceptable Counterparty".

"**Accrual Period**" means each calendar month (or portion thereof) during the period beginning on the Closing Date and ending on the date that Preferred Investor receives a distribution of the entire Required Redemption Amount.

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

"**Actual Return Amount**" means, as of the relevant date of determination, the aggregate sum of distributions actually distributed to the Preferred Investor of all Preferred Return (excluding Preferred Return at the Default Return Rate and any fees paid to Preferred Investor).  The Actual

Return Amount shall be calculated by the Preferred Investor and shall be conclusive absent manifest error.

"**Additional Common Member Capital Contributions**" has the meaning set forth in Section 6.2(a) of this Agreement.

"**Additional Preferred Investment Cap**" shall mean an amount equal to (a) $100,000,000 less (b) the Initial Preferred Investment.

"**Additional Preferred Investments**" means the additional investments made by the Preferred Investor to the Company after the date hereof pursuant to and in accordance with the provisions of Section 6.1(b) in an aggregate amount not to exceed the Additional Preferred Investment Cap.

"**Adjusted Capital Account Deficit**" has the meaning set forth in Section 12.8(a) of this Agreement.

"**Affiliate**" means, as to any Person, any other Person directly or indirectly (i) Controlling, Controlled by or under common Control with such Person or (ii) that owns 50% or more of such Person.  For purposes of the Transaction Documents, all Related Parties shall be considered Affiliates of each other.

"**Affiliate Agreement**" means any agreement, contract or transaction between the Company and any Subsidiary, on the one hand, and any Common Related Party, on the other hand.

"**Affiliated Revenue Recipients**" means, each of (a) the Key Principals, (b) the Key Principal Family Trusts, (c) the Key Principal's Immediate Family Members, (d) Nied Capital LLC, an Ohio limited liability company, and (e) any Affiliate of the foregoing (a)-(d).

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation Year**" has the meaning set forth in Section 12.8(b).

"**Annual Budget**" has the meaning set forth in Section 5.1.

"**Anti-Corruption Laws**" means all applicable laws, rules, or regulations relating to anti-bribery and corruption, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the U.K. Bribery Act 2010, as amended, and any rules and regulations thereunder these statutes.

"**Anti-Money Laundering Laws**" means all applicable laws, rules, or regulations relating to money laundering, including limiting the use of proceeds from unlawful activity, or are designed to disrupt the flow of funds to terrorist organizations, including without limitation the United States Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended; the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956, 1957), as amended; the Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as restored and amended; and the Anti-Money Laundering Act of 2020, as may be amended, and any rules and regulations thereunder these statutes.

2

"**Anticipated Refinance Assets**" means those certain properties and improvements set forth on Schedule 8.

"**Appraisal**" is defined in Exhibit C.

"**Appraisal Trigger Event**" has the meaning set forth in Section 3.7(z)(ii) of this Agreement.

"**Approved Annual Budget**" means each Annual Budget approved by Preferred Investor in accordance with the provisions of Article 5 hereof.

"**Approved Project Costs**" means all reasonable and documented third-party costs and expenses relating to the acquisition, ownership, development, construction, management, operation, leasing, improvement, sale, entitlement, Approved Recapitalization and re-zoning of, any Property, including, without limitation, costs and expenses relating to the funding of balancing calls with respect to any Loan, the funding of interest and/or carry reserves with respect to any Loan, the funding of expense relating to interest rate cap agreements or the Preferred Return Rate Return Agreement and the funding of any Preferred Return required to be distributed in accordance with the terms hereof.

"**Approved Recapitalization**" means, with respect to one or more Properties that are Properties as of the date hereof, a recapitalization or similar capital transaction pursuant to which (i) the Common Member or an Affiliate recapitalizes third-party investors, and/or (ii) no previously invested capital of the Common Member or any Affiliate is returned to the Common Member or any Affiliate.

"**Attachment Cure Deficiency**" means, as of any date of determination, the sum of (a) the actual Attachment Point determined by the Preferred Investor, less (b) the Attachment Point Hurdle.

"**Attachment Point**" means the following fraction expressed as a percentage:  (a) the Outstanding Loan Balance divided by (b) the Fair Market Value of the Property.

"**Attachment Point Hurdle**" shall mean, initially, 65%, provided, however, that if Common Member exercises its right pursuant to Section 3.7(z)(iii) hereof, then the Attachment Point Hurdle shall be equal to the actual Attachment Point calculated by Preferred Investor immediately following Common Member's exercise of such right.

"**Attachment Point Property Sale Hurdle**" the lesser of (i) 55% and (ii) the then applicable Attachment Point Hurdle.

"**Award**" means any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy**" means, with respect to a Person, the occurrence of:  (a) an assignment by such Person for the benefit of creditors; (b) the filing by such Person of a voluntary petition in bankruptcy; (c) the entry of a judgment by any court that such Person is bankrupt or insolvent, or the entry against such Person of an order for relief in any bankruptcy or insolvency proceeding;

3

(d) the filing of a petition or answer by such Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other similar Legal Requirement; (e) the filing by such Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (f) the application for or the consent or acquiescence of such Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; (g) the admission by such Person in writing in a legal proceeding of its inability to pay its debts as they mature; (h) the filing of a petition against such Person seeking to have an order for relief entered against such Person as debtor or seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any Legal Requirement, which petition is not dismissed within sixty (60) days after being filed; or (i) any other event (other than a dissolution or a Transfer by such Person of its entire Membership Interest) which would cause such Person to cease to be a member of a limited liability company under Section 18-304 of the Act.

"**Bankruptcy Code**" means the U.S. Bankruptcy Code of 1978, as amended.

"**Benchmark**" shall mean, initially, Term SOFR, provided, that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced the then-current Benchmark pursuant to Section 8.7.

"**Benchmark Replacement**" means the sum of (i) the alternate benchmark rate that has been selected by Preferred Investor as the replacement for the then-current Benchmark, giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body, or (B) any evolving or then-prevailing market convention for determining a rate of interest as a replacement for the then-current Benchmark at such time, and (ii) the related Benchmark Replacement Adjustment.

"**Benchmark Replacement Adjustment**" means with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by Preferred Investor giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement at such time.

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark:

> (a)      shall mean the date specified by Preferred Investor in a notice sent to Common Member following a Benchmark Transition Event.  For the avoidance of doubt, if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but

<div align="center">4</div>

earlier than, the time determined by Preferred Investor (in its reasonable discretion) in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the time determined by Preferred Investor (in its reasonable discretion) for such determination; and

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component thereof), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component thereof) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component thereof), which states that the administrator of such Benchmark (or such component thereof) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(c)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or

5

such component thereof) is not, or as of a specified future date will not be, representative; or

(d)   a change in laws that Lender determines (which determination shall be conclusive and binding for all purposes absent manifest error) prohibits, restricts or limits the use of such Benchmark.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark solely to the extent that a public statement or publication of information set forth above has occurred with respect to such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 8.7 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 8.7.

"**Breakage Costs**" has the meaning specified in Section 8.7(d).

"**Business Day**" means any day other than a Saturday, a Sunday, or a legal holiday on which banks in New York City are not open for business.

"**Capital Account**" has the meaning set forth in Section 12.8(c).

"**Capital Contribution**" means the amount of cash contributed to the Company by Common Member pursuant to, and in accordance with, the terms of this Agreement and the other Transaction Documents which, as of the Closing Date, is set forth on Exhibit F.

"**Capital Transaction**" means (a) any direct or indirect sale, exchange, transfer, assignment or other disposition (including by ground lease, but excluding leases for space in a Property) by the Company, any Property Owner or a Subsidiary of any Property or any assets of the Company or any Subsidiary or direct or indirect interest therein, including disposition of interests in a Subsidiary (other than to the Company or another Subsidiary) (a "**Property Sale**"), including, without limitation, any Approved Recapitalization, (b) any secured or unsecured financing by the Company or a Subsidiary, or any refinancing of any indebtedness of the Company or a Subsidiary or any other indebtedness secured by any asset of the Company or any Subsidiary or any direct or indirect interest therein (other than trade debt and equipment financing in the ordinary course of business) (together with any other similar transaction, which is, in accordance with GAAP, treated as a financing transaction, a "**Financing**"), (c) any transfer of all or any portion of any assets of the Company pursuant to a Condemnation or a deed in lieu of Condemnation of, or any casualty with respect to, the Property or any portion thereof, and (d) any other similar transaction which is, in accordance with GAAP, treated as a capital or financing transaction.

"**Carry Guaranty**" means that certain Carry Guaranty of even date herewith given by Guarantor to Preferred Investor, together with any modification thereto approved by Preferred Investor.

6

"**Casualty**" means the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Certificate**" has the meaning set forth in Section 2.1.

"**Closing Date**" means the date of execution and delivery of this Agreement, which is the date Preferred Investor has contributed, or is deemed to have contributed, its Initial Preferred Investment in the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral Package**" means, with respect to any Financing entered into from and after the date hereof, (i) a recognition agreement from the applicable Lender in form and substance reasonably satisfactory to Preferred Investor, (ii) express approval to permit an equity pledge, and the implementation and effectuation of such equity pledge, and related documentation in favor of Preferred Investor as security for the Preferred Investment, in form and substance reasonably satisfactory to Preferred Investor, and (iii) all other instruments, documents, certificates, assignments and other writings, and do such other acts necessary or desirable to evidence, presence and/or protect the collateral as the Preferred Investor may reasonably request in connection with clauses (i) and (ii) above.

"**Common Member**" has the meaning set forth in the Preamble.

"**Common Member Contribution Request**" is defined in Section 6.1(b)(vi).

"**Common Member Estoppel**" is defined in Section 14.15.

"**Common Member Event of Default**" means the occurrence of one or more events described in Section 11.1 of this Agreement and the expiration of any grace or cure period expressly afforded with respect to any such event as set forth in such Section 11.1.

"**Common Related Party**" means any one or more of the following, (i) Common Member, the Company, its Subsidiaries, any Guarantor and any Key Principal and (ii) an Affiliate of any Person in clause (i) of this definition.

"**Company**" means Nied Member, LLC, a Delaware limited liability company.

"**Company Minimum Gain**" has the meaning set forth in Section 12.8(d) of this Agreement.

"**Completion Guaranty**" means that certain Completion Guaranty of even date herewith given by Guarantor to Preferred Investor, together with any modification thereto approved by Preferred Investor.

"**Compliance Certificate**" has the meaning set forth in the Recourse Guaranty.

"**Condemnation**" means a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent

domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Confidential Information**" is defined in Section 14.23.

"**Conforming Changes**" means, with respect to the use, administration, adoption or implementation of Term SOFR or any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day", the definition of "Accrual Period", the definition of "Monthly Payment Date" or any similar or analogous definition, timing and frequency of determining rates and making payments of any distributions, timing of advance requests or redemptions, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that Preferred Investor decides, from time to time, may be appropriate to reflect the adoption and implementation of any such rate and to permit the administration thereof by Preferred Investor.

"**Control**" or "**control**" means the power to direct or cause the direction of the management or policies of a Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. "**Controlled**" and "**Controlling**" shall have correlative meanings thereto.

"**Covenant of Cooperation**" is defined in Section 11.7.

"**Covenant of Non-Interference**" is defined in Section 11.6.

"**Debt**" means the Mortgage Loan Debt and/or the Mezzanine Loan Debt, as the context may require.

"**Default**" means a Mortgage Event of Default and/or a Mezzanine Event of Default, or an event of default under any other financing or preferred equity issuance that is senior in priority to the Preferred Investment, as the context may require.

"**Default Return**" means, with respect to (a) any Protective Advance Investment and (b) any other amounts that, pursuant to an express provision of this Agreement, bear a return equal to the Default Return Rate, a return on such amounts at the Default Return Rate.

"**Default Return Rate**" means the lesser of (a) five percent (5%) in excess of the Preferred Return Rate, compounded monthly and calculated on an actual/360 basis and (b) the highest rate of return permitted by Legal Requirements.

"**Depreciation**" has the meaning set forth in Section 12.8(e) of this Agreement.

"**Designee**" is defined in Exhibit H.

"**Detachment Point**" means the following fraction expressed as a percentage: (a) the sum of (1) (i) the Outstanding Loan Balance plus (ii) the Preferred Investment, less (2) the amount of Excess Cash then being held in the Preferred Investment Account divided by (b) the Fair Market Value of the Property.

8

"**Detachment Point Hurdle**" shall mean, initially, 70%, provided, however, that if Common Member exercises its right pursuant to Section 3.7(z)(iv) hereof, then the Detachment Point Hurdle shall be equal to the sum of i) the then-current Detachment Point Hurdle, less (b) the Attachment Cure Deficiency.

"**Detachment Point Property Sale Hurdle**" means the lesser of (i) 65% and (ii) the then applicable Detachment Point Hurdle.

"**Determination Date**" means, (a) with respect to the initial Accrual Period, the date that is two (2) Business Days before the date hereof and (b) with respect to any other Accrual Period, (i) during which the Benchmark is Term SOFR, the date which is two (2) Business Days prior to commencement of the applicable Accrual Period, and (ii) during which the Benchmark is not Term SOFR, the date and time determined by Preferred Investor in accordance with the Conforming Changes; provided, however, that with respect to both of the foregoing clauses (i) and (ii), Preferred Investor shall have the right to change the Determination Date to any other day upon written notice to Common Member (in which event such change shall then be deemed effective) and, if requested by Preferred Investor, Common Member shall promptly execute an amendment to this Agreement to evidence such change.

"**Distributable Net Cash Flow**" means, for each Accrual Period, (I) all monies permitted to be distributed by or on behalf of Property Owner to the Company (directly or indirectly through one or more Subsidiaries) any after: (i) payment of all amounts then due under the Loan Documents (including any escrows and/or reserves) and (ii) payment of all real estate taxes, insurance premiums and other operating expenses of the Property then due in accordance with the Loan Documents and in accordance with the Approved Annual Budget, and (II) all Property Specific Affiliate Revenue. "**Distributable Net Cash Flow**" shall not include Net Capital Transaction Proceeds.

"**Election Date**" has the meaning set forth in clause (a) of Exhibit G attached hereto.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may from time to time be amended, and the rules and regulations promulgated thereunder by any governmental agency or authority, as from time to time in effect.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is a member of a group of which the Company or any of its Subsidiaries is a member and which is under common control within the meaning of Section 414 of the Code, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Exit Fee**" means a fee in the amount of $500,000.

"**Extension Fee**" is defined in Section 9.3(b).

"**Extension Option**" means, as applicable, the First Extension Option or the Second Extension Option.

"**Extension Period**" means, as applicable, the period following the proper exercise of First Extension Option or the period following the proper exercise of the Second Extension Option.

"**Fair Market Value**" is defined in <u>Exhibit C</u> attached hereto.

"**First Extension Option**" is defined in <u>Section 9.3</u>.

"**Fiscal Year**" is defined in <u>Section 12.8(f)</u>.

"**Floor**" means two hundred (200) basis points.

"**Forced Sale Right**" has the meaning set forth in <u>Section 11.5</u>.

"**GAAP**" means generally accepted accounting principles consistently applied and maintained throughout the period indicated.  Whenever any accounting term is used herein and is not otherwise defined, it shall be interpreted in accordance with GAAP.

"**Governmental Authority**" means any court, tribunal, board, agency, commission, office, body, authority, department, commission, board, bureau, agency or instrumentality, of any nature whatsoever or any governmental or quasi-governmental unit (federal, state, commonwealth, county, district, municipal, city or otherwise) whether domestic or foreign and whether now or hereafter in existence.

"**Gross Asset Value**" has the meaning set forth in <u>Section 12.8(g)</u> of this Agreement.

"**Guarantor**" or "**Guarantors**" means collectively, and jointly and severally, Key Principals.

"**Guaranty**" means, individually or collectively, as the context may require, the Carry Guaranty, the Completion Guaranty and the Recourse Guaranty.

"**Immediate Family Member**" shall mean, with respect to any individual, the spouse, parent, sibling, child (including any adopted child), stepchild or grandchild of such individual, or the spouse of any of the foregoing.

"**In-Place Net Cash Flow**" shall mean, as of the date of calculation, the in-place annual net cash flow of each Property (<u>provided</u>, <u>however</u>, that with respect to a Shared Control Subsidiary, solely to the extent of Common Member's beneficial interest therein), as determined by Preferred Investor in its sole and absolute discretion, calculated based on:  (a) income from tenants in place (ignoring any free rent periods) and in occupancy at the Property with, in respect of commercial leases only, leases not expiring within 12 months from the date of determination; (b) income from tenants in place (ignoring any free rent periods) but not in occupancy under leases executed by the Company (or its Subsidiaries) in good faith, but solely to the extent that the Company (or its relevant Subsidiary) is complying with all obligations of landlord under such leases, including, without limitation, any obligations necessary or desirable to the commencement of such leases or the relevant tenant's occupancy thereunder; (c) normalized operating expenses adjusted for expected taxes and insurance for the immediately preceding trailing twelve (12) month period; and (d) normalized reserves for capital expenditures and tenant improvements and leasing commissions, which, as of the date of this Agreement are estimated to be

(a)    traditional multifamily: $250 per unit per year;

10

    (b)     independent living: $250 per unit per year;

    (c)     student: $150 pre bed per year; and

    (d)     senior assisted living: $300 unit year.

"**Indemnified Parties**" has the meaning set forth in Section 14.12.

"**Initial Preferred Investment**" means the initial investment made by the Preferred Investor to the Company as of the Closing Date for Approved Project Costs pursuant to the provisions of Section 6.1(a) of this Agreement, which amount is set forth on Exhibit F.

"**Insurance Proceeds**" means the proceeds of any insurance policies maintained by the Company or any Subsidiary.

"**Investment Opportunity**" means any proposed investment in real property (directly or indirectly) primarily used for (i) multi-family and/or (ii) assisted, senior, and/or active adult and located in the state of Florida; provided, however, that Investment Opportunity shall not include: (1) any of the investments set forth on Schedule 7, or (2) any Investment Opportunity in which the Key Principals, directly or indirectly, individually or in the aggregate, own less than 50.1% of the legal, economic or beneficial interests therein.

"**Investment Yield**" means, as of any date of determination, a ratio calculated by Preferred Investor and expressed as a percentage, in which (a) the numerator is the Underwritten Net Cash Flow as of such date of determination, and (b) the denominator is the sum of (1) (i) the Outstanding Loan Balance plus (ii) the Preferred Investment, less (2) the amount of Excess Cash then being held in the Preferred Investment Account.  Each determination by Preferred Investor of the Investment Yield shall be conclusive and binding for all purposes, absent manifest error.

"**Investment Yield (Trigger)**" means, as of any date of determination, a ratio calculated by Preferred Investor and expressed as a percentage, in which (a) the numerator is the In-Place Net Cash Flow as of such date of determination, and (b) the denominator is the sum of (i) the Outstanding Loan Balance plus (ii) the sum of Preferred Investor's (A) Unreturned Protective Advance Investments under this Agreement plus (B) Unreturned Total Preferred Investment under this Agreement.  Each determination by Preferred Investor of the Investment Yield shall be conclusive and binding for all purposes, absent manifest error.

"**Investment Yield (Trigger) Event**" means, as of any calculation date, the Investment Yield (Trigger) is less than 6.0%.

"**Key Principal**" means both Michael Niederst and David Niederst.

"**Key Principal Family Trusts**" means, with respect to a Key Principal, any of the trusts established by such Key Principal for the benefit of such Key Principal's Immediate Family Members that own a direct or indirect beneficial ownership interest in Common Member as of the Closing Date and listed in the ownership chart attached as Exhibit A.

11

"**Key Principal Group**" shall mean, with respect to any Key Principal, (a) any of such Key Principal's Immediate Family Members, (b) any Key Principal Family Trusts and (c) any beneficiaries of a Key Principal Family Trust pursuant to a distribution required by the terms of the trust as in effect on the date hereof following the death or legal incapacity of such Key Principal.

"**Legal Requirements**" means all federal, state and local laws, statutes, codes, ordinances, rules and regulations, including judicial opinions and presidential authority in the applicable jurisdiction of a Governmental Authority applicable to any Related Party or the Property and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to any Related Party, at any time in force affecting the Property or any part thereof, including any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" means a Mortgage Lender and/or a Mezzanine Lender, as the context may require.

"**Lien**" means any mortgage, deed of trust, deed to secure debt, lien (statutory or otherwise, but excluding liens for ad valorem taxes that are not delinquent), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any portion of the Property or the Company or any Subsidiary, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialman's, construction and other similar Liens and encumbrances.

"**Liquidation Event**" means (a) a Transfer of all of the Property (including a Transfer of the direct or indirect interests in the Property Owner but excluding any Transfer that is the subject of the following clause (b) below) or (b) any refinancing of all of the Property or any direct or indirect interest therein.

"**Loan**" means a Mortgage Loan and/or a Mezzanine Loan and/or any preferred equity issuance that is senior in priority to the Preferred Investment as the context may require.

"**Loan Agreement**" means a Mortgage Loan Agreement and/or a Mezzanine Loan Agreement, and/or a financing or preferred equity issuance that is senior in priority to the Preferred Investment as the context may require.

"**Loan Documents**" means Mortgage Loan Documents and/or Mezzanine Loan Documents, and/or any other documents evidencing a financing or preferred equity issuance that is senior in priority to the Preferred Investment, as the context may require.

"**Losses**" has the meaning set forth in Section 14.12.

"**Major Decisions**" has the meaning given to such term in Section 4.1(b).

"**Managing Member**" means, initially, Common Member, or any replacement "Managing Member" appointed pursuant to the terms of this Agreement.

"**Mandatory Redemption Date**" means (a) the Scheduled Redemption Date or (b) such earlier date on which the Required Redemption Amount becomes due and payable as provided in this Agreement, whether at such Scheduled Redemption Date, by acceleration, or otherwise, including, without limitation, upon the maturity or acceleration of any Loan or upon the occurrence of any Liquidation Event.

"**Material Action**" means any Bankruptcy or the taking of any action in furtherance of any of the actions described in the definition of Bankruptcy, or, to the fullest extent permitted by law, the taking of any action to dissolve or liquidate the Company or any of its Subsidiaries.

"**Material Adverse Effect**" means the occurrence of any event (including, without limitation, any adverse determination in any litigation, arbitration or governmental investigation or proceeding) which would materially adversely (a) affect the then-present or prospective financial condition or operations of a Property Owner, a Property or any Guarantor or (b) impair the ability of any Common Related Party to perform its respective obligations as and when required under any of the Loan Documents or any of the Transaction Documents.

"**Maximum Total Preferred Investment**" means, the sum of (a) the Initial Preferred Investment, plus (b) the Total Additional Preferred Investment.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 12.8(h) of this Agreement.

"**Member Nonrecourse Debt Minimum Gain**" has the meaning set forth in Section 12.8(i) of this Agreement.

"**Member Nonrecourse Deductions**" has the meaning set forth in Section 12.8(j) of this Agreement.

"**Members**" means Preferred Investor and Common Member, and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

"**Membership Interests**" means all of the rights and interests of whatsoever nature of the Members in the Company, including without limitation, the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit.

"**Mezzanine Event of Default**" means an "Event of Default" as defined in any Mezzanine Loan Documents.

"**Mezzanine Lender**" means the holder or holders from time to time of any Mezzanine Loan.

"**Mezzanine Loan**" means any loan secured by the equity interests in any Property Owner, together with any refinancing thereof in accordance with this Agreement.

13

"**Mezzanine Loan Agreement**" means each Mezzanine Loan Agreement pursuant to which a Mezzanine Loan was made by a Mezzanine Lender to the applicable Subsidiary of the Company.

"**Mezzanine Loan Debt**" means the indebtedness evidenced and secured by the Mezzanine Loan Documents.

"**Mezzanine Loan Documents**" means all documents now or hereafter entered into in accordance with this Agreement which evidence, secure and/or govern a Mezzanine Loan.

"**Minimum Hold and Control Requirement**" means that the Common Member is (i) Controlled by both Key Principals (and, in the case of the death or legal incapacitation of any Key Principal, subject to Section 10.4, Controlled by one or more Key Principal Family Trusts with respect to such dead or legally incapacitated Key Principal), and (ii) at least fifty and one-tenth percent (50.1%) legally and beneficially owned, directly or indirectly, by the Key Principals or any member(s) of the applicable Key Principal Group.

"**Minimum Return Amount**" means $13,500,000.

"**Monthly Payment Date**" means the 7th day of each calendar month during the term of this Agreement, beginning with March 7, 2023; provided, however, that Preferred Investor shall be entitled to elect, in its sole discretion, to change such day from time to time upon at least five (5) Business Days' advance written notice to the Company and Common Member.

"**Mortgage Event of Default**" means an "Event of Default" as defined in any Mortgage Loan Documents.

"**Mortgage Lender**" means the holder or holders from time to time of a Mortgage Loan.

"**Mortgage Loan**" means any loan secured by a mortgage on the Property as of the date hereof, together with any refinancing thereof in accordance with this Agreement.

"**Mortgage Loan Agreement**" means a Loan Agreement pursuant to which a Mortgage Loan was made by Mortgage Lender to Property Owner.

"**Mortgage Loan Debt**" means the indebtedness evidenced and secured by a Mortgage Loan Documents.

"**Mortgage Loan Documents**" means all documents now or hereafter entered into in accordance with this Agreement which evidence, secure and/or govern a Mortgage Loan.

"**Net Capital Transaction Proceeds**" means, with respect to any Capital Transaction, (I) the proceeds of such Capital Transaction less payment of all costs and other expenses related thereto, but, in each case, only to the extent available for distribution under the Act, and (II) Property Specific Affiliate Revenue.

"**Nonrecourse Liability**" has the meaning set forth in Section 12.8(l) of this Agreement.

14

"**Obligations**" shall mean the liabilities and obligations of the Company under this Agreement and the other Transaction Documents, collectively, to pay to Preferred Investor the Required Redemption Amount and all other amounts payable to Preferred Investor under this Agreement and the other Transaction Documents.

"**Obligatory Expenditure**" means any expenditure with respect to (a) property taxes, utilities or insurance premiums with respect to the Property, and (b) other non-discretionary operating expenses (not including capital expenditures) relating to the operation of the Property or resulting from the application of Legal Requirements.

"**Occupancy Threshold**" means, an amount equal to the lesser of (a) 90%, and (b) the then applicable weighted average market occupancy rate.

"**Officers**" has the meaning given to such term in Section 4.3.

"**Operating Covenant**" has the meaning set forth in Section 3.7(y).

"**Orderly Sale**" has the meaning set forth in clause (b) of Exhibit G.

"**Orderly Sale Milestone Failure**" has the meaning set forth in clause (b) of Exhibit G.

"**Orderly Sale Notice**" has the meaning set forth in clause (a) of Exhibit G.

"**Orderly Sale Right**" has the meaning set forth in Section 11.2(a).

"**Origination Fee**" means the Origination Fee payable by the Company to the Preferred Investor on the Closing Date in the amount of $1,000,000.

"**Outstanding Loan Balance**" means, as of the relevant determination date, the outstanding principal balance of any outstanding Loans, all accrued and unpaid interest thereon, and all other amounts due thereunder; provided that, with respect to any Property that is under construction or development, the outstanding principal balance with respect to such Loans shall be deemed to be outstanding principal balance of such Loan assuming that such Loan has been fully funded (together with all cost overruns reasonably determined by Lender) if such Loan has not otherwise been fully funded.

"**Partially Adjusted Capital Account**" has the meaning set forth in Section 12.8(m) of this Agreement.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015 and as the same may be further amended, extended, replaced or otherwise modified from time to time, and any corresponding provisions of future laws.

"**Performance Covenants**" shall mean, individually or collectively as the context shall require, the covenants set forth in Section 3.7(z)(i)(1), Section 3.7(z)(i)(2) and Section 3.7(z)(i)(3).

15

"**Permitted External Management and Development Projects**" means, Investment Opportunities in which Common Member, Guarantor or any Common Related Party or Affiliate thereof (i) both (A) owns less than 25% of the legal, economic or beneficial interests therein, and (B) retains no material affirmative or negative Control rights and (ii) and acts in the capacity of development manager or property manager.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"**Plan**" means each employee benefit plan covered by Title IV of ERISA whether now in existence or hereafter instituted, of Property Owner or any ERISA Affiliate.

"**Pledge Agreement**" means those certain Pledge and Security Agreements entered into as of the Closing Date or any date after the Closing Date in accordance with the terms of this Agreement and the other Transaction Documents.

"**Pledged Collateral**" has the meaning ascribed thereto in the Pledge Agreement.

"**Pre-Approved Affiliate Contracts**" means each of the contracts set forth on Schedule 5.

"**Pre-Approved Broker**" any broker that is set forth on Schedule 2.

"**Preferred Investment**" means the outstanding principal amount of the Total Preferred Investment, the Preferred Return, Origination Fees, Exit Fee, Unused Fee, the Return Differential (if any) any Default Return and any and all other amounts (including expense reimbursements) to which Preferred Investor is entitled to receive under this Agreement or any other Transaction Documents.

"**Preferred Investment Account**" has the meaning set forth in Section 8.6(a).

"**Preferred Investment Bank**" has the meaning set forth in Section 8.6(a).

"**Preferred Investor**" has the meaning set forth in the Preamble.

"**Preferred Return**" means the return to be paid to Preferred Investor on its Total Preferred Investment to the Company pursuant to Section 7.2 of this Agreement at the Preferred Return Rate. Unless otherwise set forth herein (i.e., with respect to a Default Return), the Preferred Return shall accrue on the Total Preferred Investment from the date each applicable Preferred Investment that forms a part of Total Preferred Investment is made until such Total Preferred Investment (or any part thereof) is repaid.

"**Preferred Return Coverage Ratio**" means, as of any date, the ratio of (a) In-Place Net Cash Flow to (b) the sum of (i) annualized Preferred Return, plus (ii) annualized amounts of debt service due under each Loan.  Each determination by Preferred Investor of the Preferred Return Coverage Ratio shall be conclusive and binding for all purposes, absent manifest error.

"**Preferred Return Coverage Ratio Event**" means, as of any calculation date, the Preferred Return Coverage Ratio is less than 1.20:1.00; provided, that if a Preferred Return Coverage Ratio Event has occurred, then the Common Member shall have the right, only on a Business Day, to redeem the Preferred Investment in part, in an amount sufficient such that, after application thereof, no Preferred Return Coverage Ratio Event will be in effect, and which redemption in part shall be accompanied by all other amounts due and payable in connection with such redemption in accordance with Section 9.5.

"**Preferred Return Rate**" means a rate per annum equal to the sum (i) of the Benchmark (determined as of the Determination Date immediately preceding the commencement of the applicable Accrual Period), plus (ii) nine percent (9%) (the "**Spread**"), compounded monthly and calculated on an actual/360 basis.  Notwithstanding anything to the contrary contained herein, in no event shall the Preferred Return Rate be less than the sum of the Floor plus nine percent (9%).

"**Preferred Return Rate Agreement**" means one or more interest rate caps (together with the confirmation and schedules relating thereto) in a form reasonably acceptable to Lender, between the Company and, subject to Section 8.7(g), an Acceptable Counterparty, and all amendments, restatements, replacements, supplements and modifications thereto, and after delivery of a Substitute Cap Agreement or a Replacement Cap Agreement, as applicable, to Preferred Investor, the term "Preferred Return Rate Agreement" shall be deemed to mean such Substitute Cap Agreement or Replacement Cap Agreement.

"**Presumed Tax Liability**" of Common Member for any Fiscal Year, means an amount equal to the product of (a) the amount of taxable income (as computed for U.S. federal income tax purposes) allocated by the Company to Common Member (determined by taking into account any allocations pursuant to Code Section 704(c)) for such Fiscal Year (and calculated by subtracting any net taxable loss of the Company (determined for U.S. federal income tax purposes and in the same manner as taxable income as described above but after taking into account any limitation on such net taxable loss pursuant to Code Section 172(a)(2)) or excess business interest of the Company (within the meaning of Code Section 163(j) but determined after taking into account any limitation on such excess business interest pursuant to Code Section 163(j)(4)(B)(ii)(I)) previously allocated to such Member for any prior Fiscal Year ending after the date hereof not previously taken into account for this purpose) and (b) the Presumed Tax Rate.

"**Presumed Tax Rate**" for any Fiscal Year means an effective rate equal to the highest combined marginal U.S. federal, state and local income tax rate (including taxes imposed pursuant to Code Section 1411) applicable during such Fiscal Year to a natural person residing in, or a corporation doing business in Florida whichever is higher (after giving effect to the U.S. federal income tax deduction for such state and local income taxes to the extent such amounts are deductible for individuals without an annual limitation amount and taking into account the effects of Code Sections 67 and 68, any deduction pursuant to Code Section 199A (assuming that Common Member's only income from any qualified trade or business as determined under Code Section 199A is income received in connection with this Agreement and that Common Member's total taxable income exceeds the threshold amount (as defined in Code Section 199A(e)(2)) plus $100,000) and any difference in rates applicable to ordinary income, capital gains and "qualified dividends" as such term is defined in Code Section 1(h)).

17

"**Profits**" and "**Losses**" has the meaning set forth in Section 12.8(o).

"**Property**" means all real property that qualifies as an Investment Opportunity (including all improvements, buildings, fixtures, building equipment and personal property thereon and all additions, alterations and replacements made at any time with respect to the foregoing) now owned, or any time hereafter, owned, directly or indirectly by the Company.

"**Property Owner**" means any Subsidiary that owns, leases, licenses or otherwise has any legal or beneficial interest in a Property.

"**Property Sale**" has the meaning set forth in the definition of "Capital Transaction".

"**Property Specific Affiliate Revenue**" means all monies and amounts permitted or required to be distributed (directly or indirectly) to Affiliated Revenue Recipients (directly or indirectly through one or more Subsidiaries) on account of, in connection with, or related to any one or more Properties.

"**Protective Advance Investment**" has the meaning set forth in Section 6.2(b).

"**Qualified Appraiser**" is defined in clause (b)(i) of Exhibit C.

"**Rate Cap Collateral**" has the meaning set forth in Section 8.7(h).

"**Recourse Guaranty**" means that certain Guaranty of Recourse Obligations of even date herewith given by Guarantor to Preferred Investor, together with any modification thereto approved by Preferred Investor.

"**Reference Rate**" means an adjustable rate equal to the rate quoted in *The Wall Street Journal* as the "prime rate".

"**Reference Rate Investment**" is defined in Section 8.7(e).

"**Reference Rate Spread**"  means, in connection with any conversion of the Preferred Investment in accordance with the terms hereof, the sum (expressed as the number of basis points and determined at the time of such conversion) of the Spread and the Reference Rate Spread Adjustment; provided that the Reference Rate Spread shall not be less than a spread resulting in the Preferred Return Rate immediately after giving effect to the conversion being at least equal to the Preferred Return Rate immediately prior to conversion, and in no event will the Reference Rate Spread be less than zero.

"**Reference Rate Spread Adjustment**" means, in connection with any conversion of the Preferred Investment in accordance with the terms hereof, a spread adjustment, expressed as the number of basis points and determined at the time of such conversion (which may be positive, negative or zero) equal to the daily average of Term SOFR (with a floor of zero percent).

"**Regulations**" has the meaning set forth in Section 12.8(p).

"**Regulatory Allocations**" has the meaning set forth in Section 12.5.

18

"**Related Party**" means any one or more of the following:  (a) Common Member, the Company, its Subsidiaries, any Guarantor and any Key Principal, (b) an Affiliate of any Person in clause (a) of this definition or (c) any of the shareholders, partners, members or other equity holders of any Person in clause (a) or clause (b) of this definition, but in each case, excluding Preferred Investor and its Affiliates.

"**Relevant Governmental Body**" means the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or any successor thereto.

"**Replacement Cap Agreement**" means an interest rate cap agreement from an Acceptable Counterparty, with terms that are the same in all material respects as the terms of the Preferred Return Rate Agreement except (a) that the same shall be effective as of (i) in connection with a replacement pursuant to this Agreement following a downgrade, withdrawal or qualification of the long-term unsecured debt rating of the Acceptable Counterparty, the date required in Section 8.7 or (ii) in connection with a replacement (or extension of the then-existing Preferred Return Rate Agreement) in connection with an extension of the Scheduled Redemption Date pursuant to Section 9.3 and Section 8.7, the date the applicable Extension Period commences (or such earlier date selected by Common Member) and (b) in connection with a replacement (or extension of the then-existing Preferred Return Rate Agreement) in connection with an extension of the Scheduled Redemption Date pursuant to Section 9.3 and Section 8.7 the Strike Price shall be as set forth in clause (ii) of the definition of "Strike Price" below; provided, that to the extent any such interest rate cap agreement does not meet the foregoing requirements, a Replacement Cap Agreement shall be such interest rate cap agreement approved in writing by Preferred Investor in its sole discretion.

"**Required Funds**" has the meaning ascribed to such term in Section 6.2(a) of this Agreement.

"**Required Records**" means any of the financial statements, certificates, reports or information required to be delivered to Preferred Investor in accordance with Article 5 and/or Section 5.4 of each Guaranty.

"**Required Records Failure**" means, as of any date, the failure by Common Member to provide to Preferred Investor any of the Required Records within the applicable time periods set forth in Article 5 and/or Section 5.4 of each Guaranty and such failure continues for fifteen (15) days after written notice thereof.

"**Required Redemption Amount**" means the sum of (a) all amounts required to be distributed to Preferred Investor such that the Preferred Investment would be reduced to zero (including, without limitation, any Exit Fee, Return Differential and Breakage Costs (if any)) and (b) any and all other amounts owed, due or accruing for the benefit of the Preferred Investor pursuant to the terms of any Transaction Documents.

"**Restricted Transferee**" means any of the Persons (or any Affiliates thereof) set forth on Schedule 6.

19

"**Return Differential**" means (a) if the Actual Return Amount is less than Minimum Return Amount, then, an amount equal to (i) the Minimum Return Amount, <u>less</u> (ii) the Actual Return Amount, and (b) if the Actual Return Amount is more than the Minimum Return Amount, then zero.  Notwithstanding anything to the contrary contained in this Agreement, the Return Differential shall be due and payable upon the earlier of (A) the Mandatory Redemption Date or (B) the redemption in full of the Required Redemption Amount in whole and shall only be calculated as of such earlier date.

"**Sales Procedures**" is defined in <u>Section 11.2(a)</u>.

"**Sanctions and Export Control Laws**" means any applicable laws, rules, or regulations related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the European Union, any European Union Member State, the United Nations, and Her Majesty's Treasury of the United Kingdom; or (c) anti-boycott measures.

"**Scheduled Redemption Date**" means March 2, 2026, as such date may be extended pursuant to the First Extension Option and the Second Extension Option, in each case, strictly in accordance with <u>Section 9.3</u>.

"**Second Extension Option**" is defined in <u>Section 9.3</u>.

"**Senior Lender Estoppel**" is defined in <u>Section 14.15</u>.

"**Shared Control Subsidiaries**" means each of the Subsidiaries listed on <u>Schedule 4</u> attached hereto.

"**SMBC**" has the meaning set forth in the definition of "Acceptable Counterparty".

"**SOFR**" means, with respect to any day, the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator), on the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Spread**" has the meaning set forth in the definition of "Preferred Return Rate".

"**Strike Price**" means (1) (i) prior to the Scheduled Redemption Date, 5.00%, and (ii) if in connection with the First Extension Option or the Second Extension Option, 3.50% and (2) following a Benchmark Replacement Date, the amount obtained by subtracting the Benchmark Replacement Adjustment from the applicable Strike Price set forth in <u>clause (i)</u>.

"**Subsidiary**" means any limited liability company, corporation or other entity (a) of which more than fifty percent (50%) of the outstanding capital stock or interests having ordinary voting power to elect a majority of the board of directors or the board of governors or otherwise to Control the activities of such entity (irrespective of whether or not at the time other class or classes of the equity of such entity shall or might have voting power upon the occurrence of any contingency) is

at the time directly or indirectly owned by the Company, Common Member or Guarantor or (b) Controlled directly or indirectly by the Company or Managing Member.

"**Substitute Cap Agreement**" has the meaning given to such term in Section 8.7(i)(ix).

"**Surviving Rights**" has the meaning given to such term in Section 9.1.

"**Target Capital Account**" has the meaning set forth in Section 12.8(r).

"**Tax Distributions**" for each Fiscal Year, or within the first 90 days following such Fiscal Year or when such taxes become payable, distributions of Distributable Net Cash Flow an amount to Common Member in proportion to its respective Presumed Tax Liabilities at the time of distribution until Common Member shall have received Common Member's Presumed Tax Liability for such Fiscal Year.  Any Tax Distributions with respect to a Fiscal Year shall reduce the amount distributable to Common Member as a Tax Distribution for such Fiscal Year.  Any Tax Distributions shall be deemed to be an advance distribution of amounts otherwise distributable to Common Member pursuant to Section 8.1 and shall reduce the amounts that would subsequently otherwise be distributed to Common Member pursuant to Section 8.1.  The Company may, in Preferred Investor's reasonable discretion, distribute Tax Distributions on an estimated basis prior to the end of a Fiscal Year.

"**Term SOFR**" means, with respect to any Accrual Period, the forward-looking term rate based on SOFR for a tenor one month on the Determination Date that has been selected or recommended by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on the applicable Determination Date the Term SOFR rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then Term SOFR will be the Term SOFR rate for such tenor published by the Term SOFR Administrator on the Business Day first preceding such Determination Date so long as such Business Day is not more than three (3) Business Days prior to such Determination Date.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the "Term SOFR Reference Rate" selected by Preferred Investor in its reasonable discretion).

"**Terminated Managing Member**" is defined in clause (c)(i) of Exhibit H.

"**Termination Notice**" is defined in Section 11.2(i).

"**Total Additional Preferred Investment**" means all Additional Preferred Investment made available by Preferred Investor whether or not the same has been funded in accordance with the terms of this Agreement.

"**Total Preferred Investment**" means (a) the Initial Preferred Investment (b) any Additional Preferred Investment made by Preferred Investor pursuant to Section 6.1 and (c) any Protective Advance Investment made by Preferred Investor pursuant to Section 6.2(b).

21

"**Transaction Documents**" means all documents now or hereafter entered into which evidence and/or govern Preferred Investor's Preferred Investment and/or any of the obligations of any Related Party to Preferred Investor, including, but not limited to, this Agreement, the Recourse Guaranty, the Carry Guaranty, the Completion Guaranty, the Pledge Agreement(s) and any documents, agreements or instruments entered into by any Related Party with respect to Preferred Investor's interests herein, and any amendments, modifications, restatements and/or supplements thereto.

"**Transfer**" means a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, lien, hypothecation, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest, including, without limitation, entering into a purchase and sale agreement or other agreement to effectuate any of the foregoing.

"**Trigger Period**" means:

(i)      any period of time commencing upon the occurrence of any Common Member Event of Default, and ending upon such time as Preferred Investor has accepted in writing a cure of such Common Member Event of Default (it being understood that Preferred Investor shall have no obligation to accept a cure by Common Member or Guarantor of a Common Member Event of Default, and any such acceptance of a cure may be made by Preferred Investor in its sole and absolute discretion) and so long as no other Common Member Event of Default or other Trigger Period then exists;

(ii)      from and after the occurrence of Investment Yield (Trigger) Event, until such time as the Investment Yield (Trigger) shall be at least 6.0% for two consecutive calendar quarters (provided that no Trigger Period remains in effect pursuant to clause (i) above or clauses (iii)-(iv) below);

(iii)      from and after the occurrence of a Preferred Return Coverage Ratio Event, until such time as the Preferred Return Coverage Ratio shall be at least 1.20:1.0x for two consecutive calendar quarters (provided that no Trigger Period remains in effect pursuant to clauses (i)-(ii) above or clause (iv) below); and

(iv)      from and after the occurrence of a Required Records Failure, until such time as Common Member delivers the applicable Required Records to Preferred Investor (provided that no Trigger Period remains in effect pursuant to clauses (i)-(iii) above).

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Underwritten Net Cash Flow**" shall mean, as of the date of calculation, as determined by a Qualified Appraiser (a) with respect to a Property for which the Occupancy Threshold has not been satisfied, In-Place Net Cash Flow calculated on an "as stabilized" basis; and (b) with respect to a Property for which the Occupancy Threshold has been satisfied, In-Place Net Cash Flow calculated on an "as is" basis.

22

"**Unpaid Default Return**" means, at any time, the excess of (a) the aggregate Default Return calculated for Preferred Investor on its Protective Advance Investment pursuant to Section 7.3 of this Agreement for all prior periods over (b) the aggregate amount theretofore distributed to Preferred Investor pursuant to Section 8.1(b).

"**Unpaid Preferred Return**" means, at any time, the excess of (a) the aggregate Preferred Return calculated for Preferred Investor on its Total Preferred Investment pursuant to Section 7.2 of this Agreement for all prior periods less (b) the aggregate amount theretofore distributed to Preferred Investor pursuant to Section 8.1(d).

"**Unreturned Protective Advance Investment**" means, at any time, the excess of (a) Protective Advance Investment theretofore made to the Company by Preferred Investor, less (b) the aggregate amount theretofore distributed to Preferred Investor pursuant to Section 8.1(c).

"**Unreturned Total Preferred Investment**" means, at any time, the excess of (a) the Total Preferred Investment theretofore made to the Company by Preferred Investor, less (b) the aggregate amount theretofore distributed to Preferred Investor pursuant to Section 8.1.

"**Unused Fee**" is defined in Section 7.6.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

## ARTICLE 2
## ORGANIZATIONAL MATTERS; PURPOSE; TERM

Section 2.1    Formation of Company.  The Company has been organized as a Delaware limited liability company by filing a certificate of formation (the "**Certificate**") under the Act on February 1, 2023 and continues in full force and effect on the date hereof.

Section 2.2    Name.  The name of the Company shall be NIED MEMBER, LLC, and all Company business shall be conducted in that name or such other name as the Common Member and Preferred Investor approve.

Section 2.3    Registered Office; Registered Agent; Principal Office.   The registered office and the registered agent of the Company in the State of Delaware shall be as specified in the Certificate or as designated by the Common Member.  The principal office of the Company and the mailing address shall be 485 N. Keller Road, Suite 520, Maitland Florida 32751.  All books and records of the Company shall be maintained at the Company's principal office.

Section 2.4    Foreign Qualification.  Before the Company conducts business in any jurisdiction other than Delaware, the Managing Member shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Managing Member, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

23

Section 2.5    Purpose and Scope.  The purposes and scope of the Company's activities are strictly limited to acquiring, managing and owning its interests in the Subsidiaries that directly or indirectly own the Property; financing the foregoing activities; and performing all other activities reasonably necessary or incidental to the furtherance of such purposes.

Section 2.6    Term.  The Company shall commence on the effective date of the Certificate and shall continue until December 31, 2072, unless sooner dissolved as herein provided.

## ARTICLE 3
## MEMBERSHIP; REPRESENTATIONS,
## WARRANTIES AND COVENANTS

Section 3.1    Members.   The Members of the Company are Preferred Investor and Common Member.

Section 3.2    Membership Interest.  Each Member shall be entitled to exercise all rights and remedies allocated to its Membership Interests in the Company from time to time.

Section 3.3    Creation of Additional Membership Interests.   Additional Membership Interests may be created and issued to existing Members or to other Persons, and such other Persons may be admitted to the Company as Members, and any new class or group of Members may be created, with the written approval of all Members or as otherwise expressly permitted herein, on such terms and conditions, as all Members may determine in their sole discretion at the time of admission or as otherwise expressly permitted herein.

Section 3.4    Resignation.   Common Member may not resign or withdraw from the Company without the prior written consent of Preferred Investor.

Section 3.5    Information.   In addition to the other rights specifically set forth in this Agreement, the Preferred Investor is entitled to receive, and Common Member agrees upon request (except for the information described in clause (b) below and the financial reporting and other information expressly required by this Agreement, which shall be delivered without the need for a request) to deliver:  (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) other information regarding the affairs of the Company to which that Member or permitted assignee is entitled pursuant to Section 18-305 of the Act (including all Company books and records).  Under no circumstances shall any information regarding the Company or its business be kept confidential from the Preferred Investor.  The provisions of this Section 3.5 shall also apply with equal force to each Subsidiary of the Company.

Section 3.6    Representations and Warranties of Common Member and the Company.  As a material inducement for Preferred Investor to contribute its Initial Preferred Investment to the

24

Company, Common Member hereby represents and warrants to the Preferred Investor, as of the date hereof, that:

(a)    Formation and Powers.  Each Common Related Party is duly organized, validly existing and in good standing under all Legal Requirements of the State of its organization, and qualified and authorized to do business in all jurisdictions in which the conduct of its business and affairs requires it to be so qualified.  Each Common Related Party has all power, authority, permits, consents, authorizations and licenses necessary to carry on its business, to own and operate (directly or indirectly, as applicable) the Property, and to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party.  All consents necessary to authorize the execution, delivery and performance of this Agreement and the other Transaction Documents by each applicable Common Related Party have been duly adopted and are in full force and effect, and this Agreement and the other Transaction Documents have been duly executed and delivered by each Common Related Party thereto.

(b)    Due Execution; Authority.  The execution, delivery and performance by each Common Related Party of each Transaction Document to which it is a party have been duly authorized by all necessary action by such Common Related Party and do not and will not (i) violate any Legal Requirements presently in effect having applicability to such Common Related Party, (ii) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which each such Common Related Party is a party or by which it or its properties may be bound or affected, or (iii) result in or require the creation or imposition of any security interest in any of its properties pursuant to the provisions of any agreement or other document binding upon or applicable to such Common Related Party or any of its properties, except pursuant to the Transaction Documents.

(c)    No Approvals.  No authorization, consent, approval, license, exemption of or filing or registration with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, is or will be necessary to the valid execution, delivery or performance by any Related Party of any Transaction Documents to which such Related Party is a party.

(d)    Legal and Valid Obligations.  This Agreement, each Guaranty and the other Transaction Documents to which a Related Party is a party constitute the legal, valid and binding obligations of each such Related Party, enforceable against it in accordance with their respective terms, subject to bankruptcy and subject to limitations on the availability of equitable remedies.

(e)    Re-Making of Loan Document Representations and Warranties.  Common Member hereby (i) confirms for the direct benefit of Preferred Investor that each of the representations and warranties made by it and/or by its Subsidiaries in the Loan Documents is true and complete as of the date hereof, (ii) agrees that such representations and warranties are hereby incorporated by reference into this Agreement as if set forth in full, and (iii) re-makes and restates such representations and warranties directly to Preferred Investor in the same manner, and with the same legal effect, as if such representations and warranties were set forth in full in this Section 3.6(e).

25

(f)     Federal Reserve Regulations.   No portion of the Preferred Investment hereunder will be used to purchase or carry any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System of the United States or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might constitute this transaction as a "purpose credit" within the meaning of said Regulation U.   No portion of the proceeds of the Preferred Investment will be used for any purpose that violates, or which is inconsistent with, the provisions of Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of said Board of Governors.

(g)     Investment Company Act.   No Related Party is an "investment company", or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.   The making of Preferred Investor's Preferred Investment hereunder, the application of the proceeds and repayment thereof by the Company and the performance of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.   Furthermore, no Related Party is subject to regulation under the Interstate Commerce Act, or any federal or state statue or regulation limiting its ability to incur indebtedness for money borrowed.

(h)     Unregistered Securities.   No Related Party has:  (i) issued any unregistered securities in violation of the registration requirements of Section 5 of the Securities Act of 1933, as amended, or any other Legal Requirements; or (ii) violated any rule, regulation or requirement under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, in either case where the effect of such violation would constitute a Material Adverse Effect as to such Person.

(i)     ERISA Compliance.   No Related Party has adopted a Plan.   As of the date hereof and throughout the term of this Agreement (i) each such Person is not and will not be an "employee benefit plan", as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (ii) none of the assets of any Related Party constitutes or will constitute, by virtue of the application of 29 C.F.R. Section 2510.3-101(f) as modified by Section 3(42) of ERISA, "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (iii) no Related Party is and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with any Related Party are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.   The Related Parties each hereby covenant and agree that each direct or indirect owner of Preferred Investor shall have the following direct contractual management rights:   (A) the right to advise and consult periodically with the Company regarding management of the Company and the direct or indirect assets of the Company, (B) the right to inspect the books and records regarding the Company and the direct or indirect assets of the Company at all reasonable times; and (C) the right to receive copies of all reports and financial statements delivered by the Company to the Preferred Investor under this Agreement.   Each of such owners is hereby designated as an intended third-party beneficiary of this Section and shall be entitled to enforce the provisions of this Section.

(j)     Compliance.   Each Related Party (i) is in compliance and conformity with all Legal Requirements the violation of which, individually or in the aggregate, would constitute

26

a Material Adverse Effect as to each such Person; and (ii) has not received and do not anticipate the receipt of any order or notice of any violation or claim of violation of any Legal Requirement which would constitute a Material Adverse Effect as to each such Person.

(k)    Consents.  To the extent that any franchises, licenses, permits, certificates, authorizations, approvals or consents from any federal, state or local (domestic or foreign) government, commission, bureau or agency are material to the present conduct of the business and operations of any Common Related Party or are required for the acquisition, ownership, operation or maintenance by each Common Related Party of properties it now owns, operates or maintains or the present conduct of its businesses and operations, such franchises, licenses, permits, certificates, authorizations, approvals and consents have been validly granted, are in full force and effect and constitute valid and sufficient authorization therefor.

(l)    Pledge Agreements.  The Pledge Agreements, together with any Uniform Commercial Code financing statements required to be filed in connection therewith and the delivery of the original Certificate (as defined in the Pledge Agreement) to Preferred Investor, will create a valid, first priority, perfected Lien in the Pledged Collateral, all in accordance with the terms thereof.

(m)    Subsidiaries.  The Company has no Subsidiaries other than as set forth on Exhibit A.

(n)    Ownership and Control.  As of the Closing Date, the direct and indirect owners of Property Owner are set forth on Exhibit A.

(o)    Debt.  As of the Closing Date, (i) Property Owner has no indebtedness except as disclosed to Preferred Investor in writing, (ii) no Subsidiary of the Company has any indebtedness except as disclosed on Schedule 1 and (iii) the Company has no indebtedness other than the Preferred Investment.

(p)    Use of Proceeds.  The net proceeds of the Initial Preferred Investment made on the Closing Date shall be distributed by the Company on the Closing Date to the Common Member to be used for the purpose of (i) paying the costs of closing the transaction contemplated hereunder (including the funding of required reserves hereunder), and (ii) for such other purposes as the Common Member shall elect in its sole discretion and as approved by Preferred Investor.

(q)    Solvency.  (i) No Common Related Party has entered into the transaction or any Transaction Document with the intent to hinder, delay, or defraud any creditor and (ii) each Common Related Party has received reasonably equivalent value in exchange for its obligations under the Transaction Documents.  After giving effect to the transactions contemplated hereunder, to the best of the Common Member's and the Company's knowledge, the fair saleable value of the Company's assets exceeds and will, immediately following the making of Preferred Investor's Initial Preferred Investment, exceed the Company's total liabilities, including subordinated, un-liquidated, disputed and contingent liabilities.  To the best of the Common Member's and the Company's knowledge, the fair saleable value of the Company's assets is, and immediately following the making of Preferred Investor's Initial Preferred Investment, will be, greater than the Company's probable liabilities, including the maximum amount of its contingent liabilities on its

27

debts as such debts become absolute and matured. The Company's assets do not and, immediately following the making of Preferred Investor's Initial Preferred Investment, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. None of the Company or Common Member has and neither will intentionally incur indebtedness and/or liabilities (including contingent liabilities and other commitments) beyond its ability to pay such indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by the Company and the amounts to be payable on or in respect of the obligations of the Company and Common Member).

(r)     Bank Holding Company.  No Related Party is a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

(s)     FIRPTA.  No Related Party, Guarantor, or any holder of any legal or beneficial interest therein is held, directly or indirectly, by a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of the Code Section 897, 1445 or 7701, the Foreign Investments in Real Property Tax Act of 1980, the International Investment and Trade Services Survey Act, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

(t)     Loans.  The Property is not encumbered by any loans as of the date hereof other than the Mortgage Loan and no Subsidiary of the Company has any Debt other than the Loans.

(u)     Equity Contribution.  As of the Closing Date, Common Member has contributed $33,252,970.00 to the Company.

(v)     Anti-Corruption Obligations.  Common Member and Guarantor and, to Common Member's and Guarantor's knowledge, each Person that has an economic interest in Common Member or Guarantor, has complied with and will continue to comply with all Anti-Corruption Laws (the "**Anti-Corruption Obligation**").  Common Member and Guarantor shall, at all times throughout the term of the Preferred Investment, maintain and enforce appropriate policies, procedures and controls to ensure compliance with the Anti-Corruption Obligation.

(w)     Anti-Money Laundering Obligations.  Common Member and Guarantor and, to Common Member's and Guarantor's knowledge, each Person that has an economic interest in Common Member or Guarantor, have complied with and will continue to comply with all Anti-Money Laundering Laws (the "**Anti-Money Laundering Obligation**").  Specifically, none of the funds of Common Member or Guarantor have been derived from any unlawful activity with the result that the investment in Common Member or Guarantor (whether directly or indirectly), is prohibited by Legal Requirements or the Preferred Investment is in violation of Legal Requirements.  Common Member and Guarantor shall, at all times throughout the term of the Preferred Investment, maintain and enforce appropriate policies, procedures and controls to ensure compliance with the Anti-Money Laundering Obligation.

28

(x)  Sanctions and Export Control Obligations.  Common Member and Guarantor, and each Person that has an economic interest in Common Member and Guarantor, has complied with and will continue to comply with all Sanctions and Export Control Laws (the "**Sanctions and Export Control Obligation**").  Specifically, Common Member and Guarantor and each Person that has an economic interest in Common Member or Guarantor, has not been (a) a Person named on any Sanctions and Export Control Laws-related list of designated Persons maintained by a Governmental Authority, under authorities including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., and any Executive Orders or regulations promulgated thereunder ("**Embargoed Person**"); (b) located, organized or ordinarily resident in a country or territory that is itself the subject of or target of any comprehensive Sanctions and Export Control Laws (at the time of this Agreement, the so-called Donetsk People's Republic and Luhansk People's Republic and the Crimea region of Ukraine, Cuba, Iran, North Korea, and Syria (each, a "**Sanctioned Country**")); (c) an entity owned, directly or indirectly, by one or more Persons described in clause (a) or (b); or (d) engaged in any transactions with or for the benefit of any Person in clauses (a) through (c) or otherwise engaged in dealings with or for the benefit of any Person described in clauses (a) through (c) or with any Sanctioned Country.  Common Member and Guarantor shall, at all times throughout the term of the Preferred Investment, maintain and enforce appropriate policies, procedures and controls to ensure compliance with the Sanctions and Export Control Obligation.

(y)  Patriot Act.

(i)  All capitalized words and phrases and all defined terms used in the Patriot Act and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, are incorporated into this clause (y).  Common Member hereby represents and warrants that Common Member and each and every Person that has an economic interest in Common Member or that has or will have an interest in the Company or any Subsidiary, is:  (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (as may be amended from time to time, the "**Annex**"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the statutes, rules, and regulations administered by OFAC; (iii) operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Preferred Investor for their review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a "Specially Designated Terrorist" or as a "blocked" Person on any lists maintained by OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; and (vii) not owned or controlled by or now acting and or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be subject to the prohibitions contained in the Patriot Act.  Common Member covenants and agrees that in the event Common Member receives any notice that Common

29

Member (or any of its beneficial owners, affiliates or participants) or any Person that has an interest in the Property become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Common Member shall immediately notify Preferred Investor.  At Preferred Investor's option, it shall be a Common Member Event of Default hereunder if Common Member or Guarantor becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

(ii)    The Patriot Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, Preferred Investor may from time to time request, and Common Member shall provide to Preferred Investor, Common Member's name, address, tax identification number and/or such other identification information as shall be necessary for Preferred Investor to comply with federal law.  An "account" for this purpose may include, without limitation, a deposit account, cash management service, a transaction or asset account, a credit account, a loan or other extension of credit, and/or other financial services product.

Each of the Company and Common Member agrees that all of the representations and warranties set forth in this Section 3.6 and elsewhere in this Agreement and in the other Transaction Documents shall survive the Closing Date and the repayment in full of the Required Redemption Amount.  All representations, warranties, covenants and agreements made in this Agreement or in the other Transactions Documents shall be deemed to have been relied upon by Preferred Investor notwithstanding any investigation heretofore or hereafter made by Preferred Investor or on its behalf.

Section 3.7    Covenants of Common Member and the Company.  Managing Member shall cause the Company and its Subsidiaries (and, with respect to any Shared Control Subsidiaries, solely to the extent that Managing Member has either the affirmative ability to so cause, or with respect to any negative covenant, solely to the extent that the Managing Member has veto rights with respect thereto) to comply with, observe and keep the following covenants and agreements until the Obligations have been satisfied:

(a)    Repayment of Preferred Investment.  to pay, when due, the Preferred Return, the Required Redemption Amount and all other amounts due and payable in accordance with the terms of this Agreement as and when the same shall become due and payable.

(b)    Loan Document Covenants.  to cause each Subsidiary to pay when due the principal, interest and other amounts due under, and to perform each of the covenants and obligations and to comply with all of the conditions and prohibitions required of them set forth in, the Loan Documents to which the Company or any Subsidiary is subject.

(c)    Property Obligations.  to cause Property Owner to promptly and strictly perform and comply with all covenants, conditions, obligations and prohibitions required of it in connection with all leases and any other document or instrument affecting the Property or any part thereof (exclusive of the Loan Documents, which are the subject of the preceding subsection (b)).

30

(d)   <u>Keeping of Records</u>.  to set up and maintain accurate and complete books, accounts and records pertaining to the Property.  Such parties will permit representatives of Preferred Investor to have free access to and to inspect and copy such books, records and contracts of the Property and to discuss such parties' affairs, finances and accounts with any of its officers, directors and partners upon reasonable advance notice, during normal business hours.  Any such inspection by Preferred Investor shall be for the sole benefit and protection of Preferred Investor and Preferred Investor shall not have any obligation to disclose the results thereof to any Person.

(e)   <u>Maintaining Insurance Coverage; Casualty and Condemnation</u>.

(i)   to cause Property Owner to, at all times maintain, or cause to be maintained, in full force and effect (and shall furnish to Preferred Investor copies of), insurance coverages complying with the provisions of the Loan Documents (or at any time that there is no Mortgage Loan in effect, insurance coverages required by Preferred Investor in its commercially reasonable discretion) which at a minimum shall include, but not be limited to, (a) all-risk/special form property insurance coverage in an amount equal to 100% of the full replacement cost of the Property (exclusive of costs of excavations, foundations, underground utilities and footings), and including business income interruption, coverage for terrorism, with no co-insurance and maximum deductibles as approved by Preferred Investor. Property Owner shall carry property coverage for catastrophic perils as applicable to any of the individual properties and as required by Preferred Investor; (b) commercial general liability insurance insuring against personal injury, death and property damage in amounts not less than $1,000,000 per occurrence and $2,000,000 in the aggregate; (c) umbrella / excess insurance in an amount not less than $5,000,000.  Managing Member shall not permit any Common Related Party to take any action that would void or otherwise impair any coverages required hereby or that would result in any denial or limitation of such coverages.  Managing Member shall also cause, to the extent obtainable, all insurance policies required under this Section to provide for at least thirty (30) days prior notice to Preferred Investor in the event of policy cancellation or material reduction in coverage.  Not less than thirty (30) days prior to the expiration dates of the policies theretofore furnished to Preferred Investor pursuant to the terms hereof, certified copies of the insurance policies marked "premium paid" or accompanied by evidence satisfactory to Preferred Investor of payment of the premiums due thereunder shall be delivered by Managing Member to Preferred Investor; <u>provided</u>, <u>however</u>, that in the case of renewal insurance policies, Managing Member may furnish Preferred Investor with binders therefor to be followed promptly by the original insurance policies when issued.  If at any time Preferred Investor is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Preferred Investor shall have the right, without notice to Managing Member, to take such action as Preferred Investor deems necessary to protect its interests in the Company, including, without limitation, obtaining such insurance coverage as Preferred Investor in its sole discretion deems appropriate and all expenses incurred by Preferred Investor in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by the Company to Preferred Investor upon demand with a return thereon at the Default Return Rate until paid by the Company.

(ii)   If a Property shall sustain a Casualty, Managing Member shall give prompt notice of such Casualty to Preferred Investor and shall cause Company to cause Property Owner to promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such

31

Casualty and otherwise in accordance with, and subject to, the provisions of the Loan Documents; provided, however, that to the extent any Insurance Proceeds or Awards are applied to the Mortgage Loan and, after repayment in full of the Mortgage Loan and, if applicable, any Mezzanine Loan, any excess funds remain, Preferred Investor shall not be obligated to disburse such funds to the Company or Common Member and Preferred Investor may apply such amounts in accordance with Section 8.1.

(iii)    Managing Member shall give Preferred Investor prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Preferred Investor a copy of any and all papers served in connection with such proceedings.  Subject to the rights of Mortgage Lender with respect to the Property, Preferred Investor may participate in any such proceedings, and Managing Member from time to time shall cause the Company to cause Property Owner to deliver to Preferred Investor all instruments requested by Preferred Investor to permit such participation.  Managing Member shall, at its expense, cause the Company to cause Property Owner to diligently prosecute any such proceedings, and shall consult with Preferred Investor, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.

(iv)    Managing Member shall deliver to Preferred Investor all reports, plans, specifications, documents and other materials that are delivered to Mortgage Lender under the Mortgage Loan Documents in connection with a restoration of the Property after a Casualty or Condemnation.  If any Insurance Proceeds or Awards are to be disbursed by Mortgage Lender for restoration, Managing Member shall deliver or cause to be delivered to Preferred Investor copies of all written correspondence delivered to and received from Mortgage Lender that relates to the restoration and release of the Insurance Proceeds or Awards.  Notwithstanding any provision in this Agreement to the contrary, all Insurance Proceeds and Awards will be made available to Property Owner in accordance with the Loan Documents.

(f)    Maintain Existence.  to preserve and maintain itself, its existence, rights and privileges in the jurisdiction of its organization and to qualify and remain qualified in each jurisdiction in which such qualification is necessary in view of its business and operations.

(g)    Compliance with Applicable Legal Requirements.  To promptly and faithfully comply with, conform to and obey all present and future Legal Requirements; provided, however, that Managing Member shall, upon advance written notice to Preferred Investor, have the ability to contest any alleged failure to conform to or comply with such Legal Requirements so long as such obligations shall be contested by appropriate proceedings pursued in good faith in accordance with the provisions of the Loan Documents.

(h)    Notice of Certain Events.

(i)    Managing Member shall give prompt written notice to Preferred Investor of:  (1) any action or proceeding instituted by or against the against any Related Party in any federal or state court or before or by any commission or other regulatory body, federal, state or local, or any such proceedings threatened against any Related Party which, if adversely determined, would be a Material Adverse Effect; (2) any Default; (3) any event actually known to Managing Member or Common Member which constitutes (or following the passage of time

would constitute) a Common Member Event of Default, or both, notice of such occurrence, together with a detailed statement of the steps being taken to cure such event; and (4) all proceedings before any Governmental Authority affecting any Related Party which, if adversely determined, would constitute a Material Adverse Effect; and

(ii)     Managing Member shall give no less than sixty (60) days prior written notice to Preferred Investor of:  (1) the closing date or consummation date of any anticipated or pending Capital Transaction, and (2) a Common Member Contribution Request that is equal to or greater than ten million dollars ($10,000,000).

(i)     Merger and Consolidation.  Neither the Company nor its Subsidiaries shall merge or consolidate into any Person or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other Person.

(j)     Restricted Distributions.  Neither the Company nor any Subsidiary shall (i) make any distribution of money or property to any Common Related Party (other than distributions by a Subsidiary (directly or indirectly) to the Company), (ii) make any loan or advance to any Common Related Party, (iii) pay any principal or interest on any indebtedness due any Common Related Party, or (iv) pay any fees or other compensation to itself or to any Common Related Party, in each of (i) through (iv) above, either (I) obtaining Preferred Investor's prior written consent thereto, or (II) entering into the Subordination Agreement substantially in the form attached as Exhibit I (a "**Subordination Agreement**").

(k)     Organizational Documents.  The Company shall not, without the prior written consent of Preferred Investor, permit or suffer: (i) any amendment or modification of its organizational documents, (ii) any dissolution or termination of its existence, (iii) change its state of formation or incorporation or its name, or (iv) permit or suffer the admission of any new member, partner or shareholder.

(l)     Intentionally Omitted.

(m)     Site Visits, Inspections, Observation and Testing.  Preferred Investor and its agents, employees, representatives, consultants and independent contractors shall have the right at any reasonable time to enter and visit the Property for the purpose of performing inspections, appraisals, and observing the Property, subject to the rights of tenants under leases and so long as no Common Member Event of Default exists, upon reasonable advance notice.  Preferred Investor hereby reserves the right, and the Company hereby expressly authorizes Preferred Investor, to make available to any Person in connection with a sale of the Property any and all environmental reports, whether prepared for Preferred Investor or prepared for the Company and provided to Preferred Investor, which Preferred Investor may have with respect to the Property.  The Company, Common Member and Preferred Investor agree that Preferred Investor has no duty to visit, examine, inspect or observe the Property or to conduct tests thereon, and no site visit, examination, inspection, observation or tests conducted by Preferred Investor, its agents, employees, representatives, or independent contractors shall impose any liability on any of Preferred Investor, its agents, employees, representatives, or independent contractors.  None of Preferred Investor, its agents, employees, representatives, consultants or contractors owe any duty of care to protect the

33

Company or any other Person against, or to inform the Company or any other Person of, any condition affecting the Property.

     (n)    <u>Legal Requirements</u>.  to comply with all Legal Requirements which are applicable to it and to the Property.

     (o)    <u>Notice of Change</u>.  The Company shall give Preferred Investor prior written notice of any change in the location of its or any Subsidiary's place of business or its or any Subsidiary's chief executive office if it has more than one place of business.

     (p)    <u>Further Assurances</u>.  The Company, Managing Member and Common Member shall, at the Company's sole cost and expense:

     (i)    execute and deliver to Preferred Investor such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect Preferred Investor's interests in the Company and the Property granted pursuant to this Agreement or any other Transaction Document, as Preferred Investor may reasonably require; and

     (ii)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Transaction Documents, as any member of Preferred Investor shall reasonably require from time to time.

     (q)    <u>Debt Cancellation</u>.  Neither the Company nor any Subsidiary shall cancel or otherwise forgive or release any claim or debt (other than the termination of leases in accordance with their terms) owed to such Person by any other Person, except for reasonably equivalent value and in the ordinary course of such Person's business.

     (r)    <u>Employees</u>.  Neither the Company nor any Subsidiary shall have or hire any employees.

     (s)    <u>Distributions</u>.  On each date on which amounts are required to be paid to Preferred Investor under any of the Transaction Documents, the Company shall cause its Subsidiaries to make distributions to the Company to pay such amounts, subject to any restrictions on amounts permitted to be distributed under any Loan Documents.

     (t)    <u>Payments In Kind</u>.  Neither the Company nor any of its Affiliates shall give its consent or approval to, nor permit any Subsidiary to make any distribution by such Subsidiary to the Company of property other than cash.

     (u)    <u>Governmental Proceedings</u>.  Each of Managing Member and Common Member shall cooperate, and shall cause Company to cause its Subsidiaries to cooperate, fully with Preferred Investor with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Preferred Investor hereunder or any rights obtained by Preferred Investor under any of the other Transaction Documents and, in connection therewith, permit Preferred Investor, at its election, to participate in any such proceedings.

(v)     Awards and Insurance Benefits.  Subject to the rights of any Lender under its Loan Documents, each of Managing Member and Common Member shall cooperate with Preferred Investor in obtaining for Preferred Investor the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property to the extent not previously disbursed by a Lender in accordance with the terms of its Loan Documents and applied to the costs of repair and restoration of the Property or the reduction of the Loan in accordance with the terms of the Loan Documents.

(w)     No Acquisition of Loan.  No Common Related Party or any Person acting at any such Common Related Party's request or direction, shall acquire or agree to acquire all or any portion of any Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of any Loan, via purchase, transfer, exchange or otherwise, unless the prior written consent of Preferred Investor is obtained prior thereto.

(x)     Minimum Hold and Control Covenant.  The Minimum Hold and Control Requirement is, and shall at all times, be satisfied.

(y)     Operating Covenant.

(i)     Until the Required Redemption Amount is paid in full, Common Member shall not, and shall not permit any Common Related Party to, directly or indirectly, (a) present or cause to be offered any Investment Opportunities to any Person other than the Company or any Subsidiary; (b) seek, source, originate, identify, evaluate, conduct due diligence with respect to, or develop any Investment Opportunity other than for the benefit of the Company or (c) invest or otherwise participate in, or provide any service to, any investment, project or business opportunity related to or affiliated any Investment Opportunity other than for the benefit of the Company (the foregoing obligation, the "**Operating Covenant**"); provided, however, that the Operating Covenant shall not apply with respect to Permitted External Management and Development Projects.  Common Member and each Common Related Party acknowledges and agrees that a breach by Common Member of this clause (y) shall be deemed a breach by Common Member for all purposes and that money damages would not be sufficient remedy and that in addition to all other rights and remedies available at law or in equity, Preferred Investor may obtain injunctive relief without proof of actual damages; and, for the avoidance of doubt, the Anticipated Refinance Assets are subject to the Operating Covenant immediately upon repayment of the mortgage debt currently encumbering the Anticipated Refinance Assets.

(ii)     Any Investment Opportunity that is effectuated in accordance with the Operating Covenant, shall require that (a) the Forced Sale right be exercisable pursuant to, and in accordance with, the terms hereof, without the consent, authorization, approval or interference of any Person, (b) the Orderly Sale Right be exercisable pursuant to, and in accordance with, the terms hereof, without the consent, authorization, approval or interference of any Person; and (c) that Common Member or any applicable Common Related Party be entitled and permitted to exercise any capital transaction with respect to such Investment Opportunity in its sole and complete discretion.

(z)     Performance Covenants.

35

(i)       Until all the Obligations have been satisfied in full, and at all times prior thereto:

(1)       The Attachment Point shall not exceed the Attachment Point Hurdle.

(2)       The Detachment Point shall not exceed the Detachment Point Hurdle.

(3)       The Investment Yield shall not be less 6.75%.

(ii)       Each of the Performance Covenants shall be determined and calculated by Preferred Investor (1) on the 15th day of March, June, September and December of each calendar year, (2) if Common Member shall make a Common Member Contribution Request (which shall be made in accordance with Section 3.7(h)(ii)) that is equal to or greater than ten million dollars ($10,000,000), (3) in advance of the consummation of any Capital Transaction and/or (4) as expressly otherwise set forth in the Transaction Documents ((1) – (4) above, an "**Appraisal Trigger Event**").  Each determination and calculation by Preferred Investor of the applicable Performance Covenants shall be conclusive and binding for all purposes absent manifest error.

(iii)       If, following any determination made by Preferred Investor, the Attachment Point exceeds the Attachment Point Hurdle, then, Common Member shall have the right (subject to Section 11.2(a)), only a Business Day, to redeem the Preferred Investment in part, in an amount sufficient to reduce the Detachment Point by the Attachment Cure Deficiency and which shall be accompanied by all other amounts due and payable in connection with such redemption in accordance with Section 9.5.

(iv)       If, following any determination made by Preferred Investor, the Detachment Point exceeds the Detachment Point Hurdle, then Common Member shall have the right (subject to Section 11.2(a)), within five (5) Business Days and only a Business Day, to redeem the Preferred Investment in part, in an amount sufficient to reduce the Detachment Point to the Detachment Point Hurdle and which shall be accompanied by all other amounts due and payable in connection with such redemption in accordance with Section 9.5.

(v)       If, following any determination made by Preferred Investor, the Investment Yield is less than 6.75%, then, Common Member shall have the right (subject to Section 11.2(a)), only a Business Day, to redeem the Preferred Investment in part, in an amount sufficient to satisfy the Investment Yield (upon the application of such redemption) and which shall be accompanied by all other amounts due and payable in connection with such redemption. in accordance with Section 9.5.

## ARTICLE 4
## MANAGEMENT OF COMPANY

Section 4.1    Management.  (a) Subject in all events to the provisions of Section 4.5 and Section 11.2, the Managing Member shall manage the affairs of the Company and make all decisions with regard thereto, except (i) where Preferred Investor's approval is required pursuant

36

to Section 4.1(b) or any other provision of this Agreement or any other Transaction Document, (ii) where the approval of all of the Members is expressly required by a non-waivable provision of the Act or other Legal Requirements and (iii) that the Preferred Investor exclusively shall manage the affairs of the Company with respect to matters the subject of Section 4.5.

(b)      Notwithstanding anything to the contrary set forth in this Agreement or any other Transaction Document, none of the following actions shall be taken, sum expended, or obligation incurred by the Managing Member, Common Member, the Company or any Subsidiary regarding the matters described below (the "**Major Decisions**") without the prior written approval of Preferred Investor, following submission by the Managing Member of a notice captioned "MAJOR DECISION APPROVAL REQUEST" together with supporting documentation required by Preferred Investor to make an informed decision (with Preferred Investor having the right to request such additional information that it shall require to make an informed decision), such approval to be exercised in Preferred Investor's sole and absolute discretion:

(1)      any amendment of the constituent documents of the Company;

(2)      any direct or indirect issuance of additional ownership interests in the Company;

(3)      any Transfer of any interest in the Company or any Subsidiary not expressly permitted by the provisions of this Agreement;

(4)      any merger, consolidation, reorganization or other business combination of the Company;

(5)      the filing of any petition that would subject the Company or any Subsidiary to a Bankruptcy or the taking of any Material Action;

(6)      the closing of any Property Sale other than in accordance with the express terms of Section 10.5;

(7)      using any assets of the Company or any Subsidiary (including any portion of the Property) for anything other than Company purposes;

(8)      causing the Company or any Subsidiary to enter into or to amend any Affiliate Agreement except as set forth in Section 4.5;

(9)      performing or causing or permitting any Subsidiary to perform any act in contravention of this Agreement which would make it impossible to carry on the purposes of the Company;

(10)      taking any action that would have a disproportionately and materially adverse effect on Preferred Investor;

(11)      performing any act, or causing any Subsidiary to perform any act, which would reasonably be expected, at the time such act occurred, to

37

subject Preferred Investor to personal liability or cause Preferred Investor to guarantee or be deemed to become a guarantor or surety of any indebtedness of the Company or any Subsidiary;

(12)    taking any other action (or causing any Subsidiary to) which requires the consent or approval of Preferred Investor pursuant to the express terms of this Agreement or any other Transaction Document;

(13)    the execution by the Company or any Subsidiary of any guaranty and or indemnity, including, without limitation, a completion guaranty, a payment guaranty, a guaranty of non-recourse carveouts and/or an environmental indemnity agreement that, in each instance, are (i) in form and substance substantially similar to those previously delivered to Preferred Investor, and (ii) are non-recourse carveout guaranties, environmental indemnity agreements, interest and carry guaranties, and completion guaranties; and

(14)    the closing of a Financing that (i) does not include the delivery of a Collateral Package, or (ii) that cross-collateralizes one or more Property with any one or more other Properties.

(c)    Except as otherwise expressly provided in this Section 4.1, the Managing Member shall have the authority to execute a contract on behalf of the Company provided that such contract is a normal and customary contract and entered into in the ordinary course of business.

(d)    The Managing Member shall discharge its duties in a good and proper manner as provided for in this Agreement.  The Managing Member, on behalf of the Company, shall in good faith use all commercially reasonable efforts to (i) implement all Major Decisions approved by the Common Member and Preferred Investor, and (ii) conduct the ordinary business and affairs of the Company and Property Owner in accordance with good industry practice and this Agreement.

Section 4.2    Meetings of Members.

(a)    Regular or Special Meetings.  The Members may hold annual meetings or special meetings regarding Company business as the Members may unanimously determine from time to time.

(b)    Procedure.  Each Company meeting shall be held at the principal place of business of the Company, unless the Members otherwise agree.  Any meeting may take place by means of telephone conference, video conference, or similar communication equipment by means of which all Persons participating therein can hear each other.  This Section 4.2 shall not be interpreted to negate the requirement for any approval or consent by any Member expressly required by this Agreement.

Section 4.3    Officers.  The Managing Member, with prior written notice to Preferred Investor, may designate one or more Persons to be officers of the Company ("**Officers**"), and any Officer so designated shall have such title, authorities, duties, and salaries as the Managing

38

Member may delegate to them.  Any Officer may be removed as such, either with or without cause, by the Managing Member, with the prior written notice to Preferred Investor.

Section 4.4    Compensation of Members.  Except as herein otherwise specifically provided, no compensatory payment shall be made by the Company to Managing Member or any Member for the services to the Company of Managing Member, such Member or any member or employee of such Member.

Section 4.5    Transactions with Related Parties.

(a)    General.  Neither the Company nor any Subsidiary shall enter into, or be a party to, any Affiliate Agreement without the prior written consent of Preferred Investor other than with respect to Pre-Approved Affiliate Contracts that are subject to a Subordination Agreement. Notwithstanding the foregoing, Preferred Investor shall have the sole authority to enforce (or to agree to waive or modify) any agreement between the Company or the Property Owner, on the one hand, and Common Member or its Affiliates, on the other hand, and to otherwise make all decisions thereunder on behalf of Company and/or Property Owner.

(b)    Termination of Affiliate Agreements.  Upon the occurrence and during the continuance of a Common Member Event of Default, the Preferred Investor shall have the unilateral right to cause the Company to (and to cause its Subsidiaries to) terminate all Affiliate Agreements, and all Affiliate Agreements (or a separate document executed and delivered by the applicable Common Related Party) shall contain a provision that allows for the exercise of the right of termination under this Section 4.5(b).  Upon such termination, Managing Member and Common Member shall cause such Common Related Party to such terminated Affiliate Agreement(s) to cooperate with the transition thereof to the new party appointed or engaged Preferred Investor with respect to the services provided thereunder.

(c)    Enforcement of Affiliate Agreements.  Preferred Investor shall have the sole and exclusive authority to enforce (or to agree to waive or modify) the terms of any Affiliate Agreement, and to otherwise make all decisions thereunder on behalf of Company and/or its Subsidiaries with respect to Affiliate Agreements.

Section 4.6    Conflicts of Interest.  Preferred Investor or any Affiliate thereof (other than the Company and its Subsidiaries) may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member or Officer the right to participate therein or to account, therefore.

**ARTICLE 5**
**FINANCIAL REPORTING; BUDGET**

Section 5.1    Annual Budget.  For each Fiscal Year during the term of this Agreement, Managing Member shall submit to Preferred Investor an annual budget, business plan, leasing plan (including leasing parameters) and capital plan (collectively, the "**Annual Budget**") not later than sixty (60) days prior to the commencement of such Fiscal Year (provided, however, that the Annual Budget for the Fiscal Year in which the Closing Date occurs shall be submitted to Preferred Investor for its approval prior to the date hereof), setting forth in reasonable detail budgeted

39

monthly operating income and monthly operating capital and other expenses for the Property, including, without limitation, line items for management fees, operating expenses, capital expenditures, third party service fees, and other expenses as Managing Member may reasonably determine.  The initial Approved Annual Budget is attached hereto as Exhibit D.

Section 5.2     Reports.  Managing Member shall furnish and, with respect to the reports referred to in clause (b) of this Section 5.2, cause each Guarantor to furnish to Preferred Investor the following:

(a)     Financial Statements, Draw Requests.  Simultaneously with the delivery to any Lender, copies of all (i) of the financial statements, certifications and other financial reporting delivered pursuant to all Loan Documents, and (ii) all of the draw and advance requests delivered pursuant to all Loan Documents.

(b)     Guarantor Financial Statements.  As soon as available and in any event within ninety (90) days after the close of each Fiscal Year of Guarantor, a balance sheet (net worth statement) of each Guarantor, certified by each such Guarantor and an independent certified public accountant reasonably approved by Preferred Investor that the same fairly present the financial condition of such Guarantor as of the date thereof and, with respect to any interests in real property owned directly or indirectly by any such Guarantor that were included in such balance sheet or statement, (i) a separate listing of the dollar amount attributable to each such interest (which shall be reduced by the ratable amount of mortgage, mezzanine or other indebtedness allocable to such interest) and (ii) a certification by such accountant that no unaccrued carried interest was included in such calculation.

(c)     Compliance Certificate.  Within thirty (30) days after the end of each calendar quarter, Common Member shall deliver, or cause Guarantor to deliver, a Compliance Certificate for Guarantor.

(d)     Tax Returns.  Within the earlier of (i) thirty (30) days after the filing thereof, or (ii) thirty (30) days after the filing extension deadline, copies of the federal income tax returns of the Company (or if the Company does not itself file a tax return because its items of income and expense are included in the tax return of another Person, the tax return of such other Person).

(e)     Certification; Supporting Documentation.  Each financial statement shall in scope and detail satisfactory to Preferred Investor and certified by the chief financial representative of the Company and Common Member.

(f)     Accounting Principles.  All financial statements shall be prepared in accordance with GAAP.  If the financial statements are prepared on an accrual basis, such statements shall be accompanied by a reconciliation to cash basis accounting principles.

(g)     Other Information.  Common Member shall deliver to Preferred Investor such additional information regarding the Company, any Subsidiary, Guarantor and the Properties within thirty (30) days after Preferred Investor's request therefor.

40

**ARTICLE 6**
**CONTRIBUTIONS**

Section 6.1    Initial Preferred Investment and Additional Preferred Investments.

(a)    The Preferred Investor shall contribute the Initial Preferred Investment to the capital of the Company on the Closing Date and simultaneously therewith, the Company shall pay to Preferred Investor the Origination Fee and all amounts incurred by Preferred Investor to third parties in connection with the transactions contemplated by the Transaction Documents (which amounts may be netted out of such Initial Preferred Investment) and the balance thereof shall be distributed to Common Member.  Except as set forth in clause (b) below, the Preferred Investor shall not be obligated, under any circumstances to fund more than the Initial Preferred Investment, which may not be re-called from the Preferred Investor if redeemed by the Company.

(b)    Following the contribution of the Initial Preferred Investment, the Preferred Investor will make Additional Preferred Investments in the Company only for Approved Project Costs.  Preferred Investor's obligation to make Additional Preferred Investments will be subject to the conditions set forth below, all of which must be satisfied at the time of the funding of each such Additional Preferred Investment:

(i)    the Transaction Documents shall be and remain outstanding and enforceable in accordance with their terms, all as required hereunder;

(ii)    no Additional Preferred Investment shall (A) be made after March 1, 2027, or (B) exceed the Additional Preferred Investment Cap, or (C) be funded more than one time per month;

(iii)    the representations and warranties made by Common Member, as contained in this Agreement and in all other Transaction Documents shall be true and correct in as of the date of each Additional Preferred Investment subject to disclosed circumstances and conditions occurring since the most recent prior update of such representation and warranties which circumstances or conditions that are not, in and of themselves, a Common Member Event of Default or constitute a Material Adverse Effect; and if requested by Preferred Investor, Common Member shall give to Preferred Investor a certificate to that effect;

(iv)    the covenants made by Common Member to Preferred Investor, as contained in this Agreement and in all other Transaction Documents shall have been fully complied with;

(v)    each of the Performance Covenants shall remain satisfied as of the date of the applicable Common Member Contribution Request and as of the date of the funding of any applicable Additional Preferred Investment.

(vi)    Preferred Investor shall have received from Common Member a properly executed and completed written request for an Additional Preferred Investment on the form reasonably approved by Preferred Investor and containing (I) copies of the most recent appraisals with respect to the Properties (including, any pro-forma appraisals delivered in connection with any Financing, (II) evidence reasonably satisfactory to Preferred Investor that the

41

Additional Preferred Investment is for Approved Project Costs, and (III) such other information as Preferred Investor reasonably requests for such Additional Preferred Investment, completed, executed and sworn to by Common Member no later than thirty (30) days prior to the date that any such Additional Preferred Investment is required to be funded (or, with respect to any request that is equal to or greater than $10,000,000, within the time period set forth in Section 3.7(h)(ii) above) (a "**Common Member Contribution Request**");

(vii)   Common Member shall not request an Additional Preferred Investment in an amount less than $250,000 other than the final Additional Preferred Investment, which may be for an amount less than $250,000;

(viii)   no Common Member Event of Default or any event, circumstance or action which, with the giving of notice, passage of time or failure to cure would give rise to a Common Member Event of Default has occurred and is then existing;

(ix)   with respect to the first Additional Preferred Investment following the Initial Preferred Investment only, the Preferred Investor shall be reasonably satisfied that the uses of the Initial Preferred Investment have been utilized only for Approved Project Costs. Common Member shall provide such documentation and evidence reasonably requested by the Preferred Investor with respect to the foregoing (including, without limitation, receipts and invoices marked "paid"); and

(x)   no Material Adverse Effect has occurred.

(c)   The funding of any Additional Preferred Investment shall not constitute a waiver of any of the conditions of Preferred Investor's obligations to make further Additional Preferred Investments, nor, in the event the Company is unable to satisfy any such condition, shall any such Additional Preferred Investment have the effect of precluding Preferred Investor from thereafter declaring such inability to be a Common Member Event of Default, if applicable.

Section 6.2   Additional Common Member Capital Contributions; Protective Advance Investment.

(a)   If not otherwise funded by Preferred Investor as an Additional Preferred Investment in accordance with Section 6.1(b) above, Common Member shall have the obligation to make additional contributions of capital to the Company ("**Additional Common Member Capital Contributions**") from time to time with respect to Required Funds. For purposes hereof, "**Required Funds**" shall mean funds required by the Property Owner if:

(i)   funds are needed for the completion of required repairs to the improvements required by the Loan Documents any material leases or applicable Legal Requirements;

(ii)   to (A) pay actual operating expenses of the Property, (B) pay debt service on each Loan or to make any other payments then required under any Loan Documents, including any balancing calls or requests to fund reserves, (C) satisfy any Liens against the Property or (D) pay any other Obligatory Expenditure; or

42

(iii)    it is necessary in order for the Company to conduct its business, maintain its assets or discharge its liabilities.

(b)    If Common Member does not make any Additional Common Member Capital Contribution necessary to provide Required Funds at least five (5) Business Days before such amounts are needed to avoid a default by the Company or any Subsidiary under the Loan Documents, any lease or any other applicable agreement or to avoid a delinquency in payment of such Required Funds, then Preferred Investor may, but shall not be obligated to, make an additional preferred equity investment in the Company ("**Protective Advance Investment**") in an amount sufficient to pay the Required Funds not timely paid by the Common Member.

(c)    All Protective Advance Investments made by Preferred Investor shall earn a return equal to the Default Return from the date paid until such Protective Advance Investment are repaid to Preferred Investor pursuant to Article 8 of this Agreement.

Section 6.3    Balances.    The Company's books and records shall contain entries indicating the type and amount of the Total Preferred Investment including and the type of return (Preferred Return or Default Return) applicable to each component of the Total Preferred Investment.

## ARTICLE 7
## PREFERRED RETURN; ADDITIONAL CONTRIBUTION RETURN; ORIGINATION FEE; EXIT FEE; UNUSED FEE

Section 7.1    Funding and Distribution of Preferred Return.    Preferred Investor's Unreturned Total Preferred Investment shall earn, and the Company shall be obligated to distribute to Preferred Investor, a Preferred Return calculated as provided in Section 7.2 below.

Section 7.2    Calculation of Preferred Return.    The Preferred Return shall be calculated on Preferred Investor's Unreturned Total Preferred Investment for each Accrual Period at the Preferred Return Rate; provided, however, that (a) during the continuance of a Common Member Event of Default (other than as expressly set forth herein), the return on Preferred Investor's Unreturned Total Preferred Investment shall be calculated and paid at the Default Return Rate, and (b) any portion of the Preferred Investor's Unreturned Total Preferred Investment that constitutes a Protective Advance Investment or is otherwise to be calculated and paid at the Default Return in accordance with the terms of the Transaction Documents.

Section 7.3    Calculation of Default Return.    The Default Return shall be calculated on Preferred Investor's Unreturned Total Preferred Investment for each applicable Accrual Period at a rate per annum equal to the Default Return Rate.

Section 7.4    Origination Fee.    Immediately upon receipt of the Initial Preferred Investment, the Company shall pay to Preferred Investor the Origination Fee, which shall be earned upon receipt and shall be non-refundable.

Section 7.5    Exit Fee.    On the date on which the Preferred Investment is fully redeemed, the Company shall make payment of the Exit Fee to the Preferred Investor.

Section 7.6    Unused Fee.  In consideration of any portion of the Additional Preferred Investment which has been committed but not yet disbursed by Preferred Investor, the Company agrees to pay to Preferred Investor a fee on such uncontributed portion of the Additional Preferred Investment (the "**Unused Fee**") in an amount per annum, equal to one-quarter of one percent (0.25%) of the undisbursed amount of the Additional Preferred Investment, which fee shall accrue beginning on March 3, 2025 and shall be payable monthly in arrears on each Monthly Payment Date on the basis of a 360-day year and the actual number of days in an Accrual Period.

## ARTICLE 8
## REQUIRED PAYMENTS; NON-LIQUIDATION DISTRIBUTIONS; ALLOCATIONS

Section 8.1    Distributions.  Distributions from any of the Preferred Investment Account, Additional Preferred Investments and/or from Additional Common Member Capital Contributions shall be made on each Monthly Payment Date (or if such day is not a Business Day, the next Business Day), and with respect to Net Capital Transaction Proceeds, promptly following the receipt thereof, in each case, in each instance, in the following order of priority:

(a)    First, to Preferred Investor to pay unpaid costs and expenses of Preferred Investor required to be paid to Preferred Investor in accordance with Section 14.20 and to pay any late charges incurred pursuant to Section 11.2(b);

(b)    Next, to Preferred Investor to pay any Unpaid Default Return;

(c)    Next, to Preferred Investor to pay (i) any Unreturned Protective Advance Investments plus Default Return thereon and (ii) any other amounts that, pursuant to an express provision of this Agreement, bears a return equal to the Default Return;

(d)    Next, to Preferred Investor to pay any Unpaid Preferred Return;

(e)    Next, if the Second Extension Option has been properly exercised, to Preferred Investor to reduce the Unreturned Total Preferred Investment until such time as the Unreturned Total Preferred Investment is equal to zero;

(f)    Next, if (and for so long as) a Trigger Period then exists:

(i)    After payment of all amounts set forth in clauses (a)-(e) above and only if each of the Performance Covenants are satisfied (and will be satisfied on a *pro forma* basis), to Common Member in an amount not to exceed the sum of:

(1)    ten percent (10%) multiplied by an amount equal to (A) Distributable Net Cash Flow less (B) amounts distributed pursuant to clauses (a)-(e) above; provided, however that no amount distributed pursuant this clause (f)(i)(1) shall exceed five million dollars ($5,000,000) in any calendar year, plus:

(2)    the excess of the amount of cash on reserve in the Preferred Investment Account less the Unreturned Total Preferred Investment; and

44

(ii)     To Common Member for Tax Distributions to the extent then due; and

(iii)    The remainder shall remain in the Preferred Investment Account ("**Excess Cash**")

(g)     Next, with respect to Net Capital Transaction Proceeds only, if the conditions set forth in clauses (g)(i) and (ii) below are satisfied, to Common Member:

(i)     the Performance Covenants remain satisfied on a pro-forma basis following the closing of such Capital Transaction, and

(ii)    if the amount of Excess Cash is equal to or greater than Unreturned Total Preferred Investment on a pro-forma basis following the closing of such Capital Transaction.

(h)     Thereafter, with respect to Distributable Net Cash Flow, absent the existence of a Common Member Event of Default or the occurrence of a Trigger Period, the remaining balance to Common Member.

Section 8.2     Excess Cash.   At Preferred Investor's sole and exclusive election, any Excess Cash (including, without limitation, Excess Cash generated from Net Capital Transaction Proceeds) shall be held either in an account owned and controlled by Preferred Investor or as otherwise expressly required by Preferred Investor.

Section 8.3     Time and Method of Payments.   All payments made hereunder or under the other Transaction Documents shall be made, without deduction, set off, or counterclaim, in immediately available funds not later than 3:00 p.m., Eastern time on the dates due, to the applicable Member at the office specified by it from time to time.   Funds received on any day after 3:00 p.m., Eastern time shall be deemed to have been received on the next Business Day. Whenever any payment to be made hereunder or under the other Transaction Documents shall be stated to be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of any interest or fees.

Section 8.4     Applications During Common Member Event of Default.   Notwithstanding anything to the contrary in this Agreement (including, without limitation, Section 8.1), upon the occurrence and continuation of a Common Member Event of Default, all Distributable Net Cash Flow and Net Capital Transaction Proceeds shall be paid to Preferred Investor and Preferred Investor may apply such amounts to the redemption of the Required Redemption Amount in such order, proportion and priority as Preferred Investor may determine in its sole discretion until the Required Redemption Amount has been paid in full, which right shall be in addition to all other rights and remedies provided to Preferred Investor under the Transaction Documents.

Section 8.5     Distributions.   Notwithstanding any provision to the contrary in this Agreement, the Company shall not be required to make a distribution to any Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act, the Mortgage Loan Documents or other applicable law; provided, however, that if any such distribution would violate any of the foregoing, the otherwise distributable amounts shall be

45

retained by the Company and not distributed to Common Member or its direct or indirect owners without Preferred Investor's written consent.

Section 8.6   Preferred Investment Account.

(a)   An account (the "**Preferred Investment Account**") shall be established on the date hereof, and until such time as the Required Redemption Amount is paid in full and Preferred Investor's Membership Interest in the Company is fully redeemed in accordance with this Agreement, all Distributable Net Cash Flow and Net Capital Transaction Proceeds payable to the Company or any of its Subsidiaries shall be deposited (and, with respect to Property Specific Affiliate Revenue, shall cause to be deposited) in the Preferred Investment Account.  Managing Member and Common Member each hereby agrees to cause each the Company to execute a direction letter addressed to every Lender and any applicable cash management bank directing the deposit of all such Distributable Net Cash Flow (and, with respect to Net Capital Transaction Proceeds, any applicable escrow agent, as applicable) into the Preferred Investment Account. During the continuance of a Common Member Event of Default, Preferred Investor may without further notice to the Company deliver any such direction letter to any Lender.  The Preferred Investment Account shall be a non-interest bearing demand deposit account established by the Company and under the sole dominion and control of Preferred Investor with a bank reasonably approved by Preferred Investor in writing (the "**Preferred Investment Bank**").  Managing Member and Common Member shall, to the extent Managing Member, Common Member, the Company, any Subsidiary received Distributable Net Cash Flow or Net Capital Transaction Proceeds directly, cause all such Distributable Net Cash Flow or Net Capital Transaction Proceeds to be deposited into the Preferred Investment Account within two (2) Business Days following receipt thereof.  As additional security for the Company's performance under the Transaction Documents, the Company hereby irrevocably pledges and assigns to Preferred Investor, and grants to Preferred Investor a security interest in, all deposit accounts now or hereafter existing in the name of or on behalf of the Company or any Subsidiary and all monies at any time on deposit in any such deposit accounts including, without limitation, the Preferred Investment Account and for all accounts held by any Subsidiary agrees to cause the applicable Subsidiary to pledge and assign, and grant a security interest in, all such accounts to Preferred Investor.  Anything herein to the contrary notwithstanding, during the continuance of a Common Member Event of Default, Preferred Investor shall have the right to apply all sums on deposit in the Preferred Investment Account and any reserve account established hereunder in its sole and absolute discretion.

(b)   Managing Member and Preferred Investor shall each be authorized signatories on the Preferred Investment Account, with the signatures of any duly authorized officer of Managing Member being necessary and sufficient to effect withdrawals therefrom, provided that (i) such withdrawals shall only be permitted if made in express terms of this Agreement, (ii) from and after a Trigger Period, all withdrawals by the Managing Member shall be approved by Preferred Investor, and (iii) from an after a Common Member Event of Default, only the Preferred Investor shall have the right of withdrawal with respect to the Preferred Investment Account.

(c)   Common Member is responsible for implementing, maintain and monitoring a proper control environment, including a proper segmentation of duties between individuals who received funds, those that record the cash receipts in the general ledger and those that perform bank reconciliation.

Section 8.7     Preferred Return Rate.

(a)     Notwithstanding anything to the contrary herein or in any other Transaction Document (and any Preferred Return Rate Agreement shall be deemed not to be a "Transaction Document" for purposes of this Section 8.7(a)), if a Benchmark Transition Event and its related Benchmark Replacement Date have both occurred prior to the Determination Date in respect of any determination of any then-current Benchmark, then such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Transaction Document in respect of any Benchmark setting, effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided, without any amendment to, or further action or consent of any other party to, this Agreement or any other Transaction Document.  In connection with the implementation and administration of a Benchmark Replacement, Preferred Investor will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Transaction Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of Common Member.  Preferred Investor will promptly notify Common Member in writing of (i) any occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Conforming Changes and (iv) the commencement and related conclusion of any Benchmark Unavailability Period.  Notwithstanding the foregoing, at Common Member's election, if the Preferred Investor elects, in accordance with this Section 8.7(a) to have the Benchmark Replacement replace the Benchmark as aforesaid, then, in such instance, Common Member shall have a one-time right, exercisable within two (2) Business Days following such election by the Preferred Investor, to convert to a Reference Rate Investment.

(b)     In connection with the use or administration of Term SOFR or a Benchmark Replacement, Preferred Investor will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Transaction Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of Common Member (provided that Preferred Investor shall be generally consistent with its approach on similarly situated investments).  Preferred Investor will promptly notify Common Member of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

(c)     Any determination, decision or election that may be made by Preferred Investor pursuant to this Section 8.7, including any determination with respect to a rate (including the applicable Benchmark) or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from Common Member.

(d)     Common Member agrees to indemnify Preferred Investor upon demand, and to hold Preferred Investor harmless from any Losses which such Preferred Investor sustains or incurs as a consequence of (i) any prepayment (whether voluntary or mandatory) of the Preferred Investment when the Benchmark is Term SOFR on a day that is not a Monthly Payment Date, (ii) any redemption (whether voluntary or mandatory) of the Preferred Investment when the Benchmark is Term SOFR on a day that is a Monthly Payment Date if Common Member did not

47

give the prior written notice of such redemption required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by such Preferred Investor to lenders of funds obtained by it in order to maintain the Preferred Investment when the Benchmark is Term SOFR hereunder or (iii) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Preferred Return Rate to a Benchmark other than Term SOFR with respect to any portion of the Preferred Investment then bearing interest at a rate based on a Benchmark other than Term SOFR on a date other than the first day of an Accrual Period, including, without limitation, such Losses arising from interest or fees payable by Preferred Investor to lenders of funds obtained by it in order to maintain the Preferred Investment when the Benchmark is Term SOFR hereunder (the amounts referred to in clauses (i), (ii) and (iii) are herein referred to collectively as the "**Breakage Costs**").  Whenever in this Section 8.7 the term "interest or fees payable by Preferred Investor to lenders of funds obtained by it" is used and no such funds were actually obtained from such lenders, it shall include interest or fees which would have been payable by the Preferred Investor if it had obtained funds from lenders in order to maintain the Benchmark of Term SOFR hereunder; provided, however, that Common Member shall not indemnify Preferred Investor from any Losses arising solely from Preferred Investor's willful misconduct or gross negligence.  Preferred Investor will provide to Common Member a statement detailing such Breakage Costs and the calculation thereof.

(e)     During any Benchmark Unavailability Period, the Preferred Investment shall accrue at the Reference Rate plus the Reference Rate Spread (a "**Reference Rate Investment**").

(f)     The provisions of this Section 8.7 shall survive repayment of the Required Redemption Amount.

(g)     Preferred Return Rate Agreement.  Prior to or contemporaneously with the Closing Date, the Company shall have obtained, and shall thereafter maintain in full force and effect, the Preferred Return Rate Agreement, which shall have a term expiring no earlier than the last day of the Accrual Period in which the Scheduled Redemption Date occurs, have a strike rate equal to the Strike Price and have a notional amount equal to the Maximum Total Preferred Investment.

(i)     Prior to the expiration of the term of the initial Preferred Return Rate Agreement or any Preferred Return Rate Agreement thereafter in effect, Common Member shall either (x) extend the term of the Preferred Return Rate Agreement then in effect or (y) purchase a Replacement Cap Agreement, in each case, such that the term of the Preferred Return Rate Agreement is extended for a period of no less than one (1) year (or if the Scheduled Redemption Date is less than one (1) year from the date of expiration, until the Scheduled Redemption Date), which Preferred Return Rate Agreement shall have a strike rate equal to the Strike Price and have a notional amount equal to the Maximum Total Preferred Investment.

(ii)     As a condition to the Company's exercising its right to extend the term of the Preferred Return Rate Agreement for the First Extension Option or the Second Extension Option, on or prior to the applicable Scheduled Redemption Date, Common Member shall extend the term of the then-current Preferred Return Rate Agreement or purchase a Replacement Cap Agreement as required under this Section 8.7(g).

(h)      Pledge and Collateral Assignment.  As security for the full and punctual payment and performance of the Obligations when due (whether upon scheduled mandatory redemption, by acceleration, early termination or otherwise), the Company, as pledgor, hereby pledges, assigns, hypothecates, transfers and delivers to Preferred Investor as collateral and hereby grants to Preferred Investor a continuing first priority lien on and security interest in, to and under all of the following whether now owned or hereafter acquired and whether now existing or hereafter arising (the "**Rate Cap Collateral**"):  all of the right, title and interest of the Company in and to (i) the Preferred Return Rate Agreement; (ii) all payments, distributions, disbursements or proceeds due, owing, payable or required to be delivered to the Company in respect of the Preferred Return Rate Agreement or arising out of the Preferred Return Agreement, whether as contractual obligations, damages or otherwise; and (iii) all of the Company's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the Preferred Return Rate Agreement, in each case including all accessions and additions to, substitutions for and replacements, products and proceeds of any or all of the foregoing.

(i)      Covenants.

(i)      The Company shall comply with all of its obligations under the terms and provisions of the Preferred Return Rate Agreement.  All amounts paid by the Acceptable Counterparty under the Preferred Return Agreement to the Company or Preferred Investor shall be deposited immediately into the Preferred Investment Account pursuant to Section 8.6.  Subject to the terms hereof, provided that no Common Member Event of Default has occurred and is continuing, the Company shall be entitled to exercise all rights, powers and privileges of the Company under, and to control the prosecution of all claims with respect to, the Preferred Return Rate Agreement and the other Rate Cap Collateral.  The Company shall take all actions reasonably requested by Preferred Investor to enforce the Company's rights under the Preferred Return Rate Agreement in the event of a default by the Acceptable Counterparty thereunder and shall not waive, amend or otherwise modify any of its rights thereunder.

(ii)      The Company shall defend Preferred Investor's right, title and interest in and to the Rate Cap Collateral pledged by the Company pursuant hereto or in which it has granted a security interest pursuant hereto against the claims and demands of all other Persons.

(iii)      In the event of any downgrade, withdrawal or qualification of the rating of the Acceptable Counterparty such that it ceases to qualify as an Acceptable Counterparty, the Common Member shall replace the Preferred Return Agreement with a Replacement Cap Agreement not later than ten (10) Business Days following receipt of notice from Preferred Investor, or any other Person of such downgrade, withdrawal or qualification.

(iv)      In the event that the Company fails to purchase and deliver the Preferred Return Rate Agreement as and when required hereunder, Preferred Investor may purchase the Preferred Return Rate Agreement and the cost incurred by Preferred Investor in purchasing the Cap Agreement shall be a Protective Advance Investment.

(v)      The Company shall not sell, assign, or otherwise dispose of, or mortgage, pledge or grant a security interest in, any of the Rate Cap Collateral or any interest therein, and any sale, assignment, mortgage, pledge or security interest whatsoever made in

49

violation of this covenant shall be a nullity and of no force and effect, and upon demand of Preferred Investor, shall forthwith be cancelled or satisfied by an appropriate instrument in writing.

(vi)    The Company shall not (1) without the prior written consent of Preferred Investor, modify, amend or supplement the terms of the Preferred Return Rate Agreement, (2) without the prior written consent of Preferred Investor, except in accordance with the terms of the Preferred Return Rate Agreement, cause the termination of the Preferred Return Rate Agreement prior to its stated maturity date, (3)  without the prior written consent of Preferred Investor, except as aforesaid, waive or release any obligation of the Acceptable Counterparty (or any successor or substitute party to the Preferred Return Rate Agreement) under the Preferred Return Rate Agreement, (4) without the prior written consent of Preferred Investor, consent or agree to any act or omission to act on the part of the Acceptable Counterparty (or any successor or substitute party to the Preferred Return Rate Agreement) which, without such consent or agreement, would constitute a default under the Preferred Return Rate Agreement, (5) fail to exercise promptly and diligently each and every material right which it may have under the Preferred Return Rate Agreement, (6) take or intentionally omit to take any action or intentionally suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Preferred Return Rate Agreement or any defense by the Acceptable Counterparty (or any successor or substitute party to the Preferred Return Rate Agreement) to payment or (7) fail to give prompt notice to Preferred Investor of any notice of default given by or to the Company under or with respect to the Preferred Return Rate Agreement, together with a complete copy of such notice.

(vii)    In connection with a Preferred Return Rate Agreement, the Company shall obtain and deliver to Preferred Investor an opinion of counsel from counsel (which counsel may be in-house counsel for the Acceptable Counterparty) for the Acceptable Counterparty upon which Preferred Investor and its successors and assigns may rely, under New York law and, if the Acceptable Counterparty is a non-U.S. entity, the applicable foreign law, which shall provide in relevant part, that:  (1) the issuer is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Preferred Return Rate Agreement; (2) the execution and delivery of the Preferred Return Rate Agreement by the issuer, and any other agreement which the issuer has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property; (3) all consents, authorizations and approvals required for the execution and delivery by the issuer of the Preferred Return Rate Agreement, and any other agreement which the issuer has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any Governmental Authority or regulatory body is required for such execution, delivery or performance; and (4) the Preferred Return Rate Agreement, and any other agreement which the issuer has executed and delivered pursuant thereto, has been duly executed and delivered by the issuer and constitutes the legal, valid and binding obligation of the issuer, enforceable against the issuer in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws

50

affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(viii)    The Company shall at all times comply with all Legal Requirements related to the Preferred Return Rate Agreement, including, without limitation, the requirement to maintain a "Legal Entity Identifier" number with respect to the Preferred Return Rate Agreement, and the Company shall, upon request by Preferred Investor, provide Preferred Investor with evidence reasonably satisfactory to Preferred Investor that the Company has complied with such requirements.

(ix)    Notwithstanding anything to the contrary contained in this Section 8.7 or elsewhere in this Agreement, if at any time the Preferred Investment is a Reference Rate Investment or within thirty (30) days following the occurrence of a Benchmark Replacement Date:

(1)    the Company shall either (i) enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Preferred Return Rate Agreement (and in connection therewith, but not prior to the Company taking all the actions described in this clause (1), the Company shall have the right to terminate any then-existing Preferred Return Rate Agreement) or (ii) cause the then-existing Preferred Return Rate Agreement to be modified such that such then-existing Preferred Return Rate Agreement satisfies the requirements of a Substitute Preferred Return Rate Agreement as set forth below in the definition thereof; and

(2)    in lieu of satisfying the condition described in this Section 8.7 with respect to any outstanding Extension Option, the Company shall instead enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of a Substitute Preferred Return Rate Agreement on or prior to the first day of such Extension Period.

As used herein, "**Substitute Cap Agreement**" means an interest rate cap agreement between an Acceptable Counterparty and the Company, obtained by the Company and collaterally assigned to Preferred Investor pursuant to this Agreement and shall contain each of the following:

(1)    a term expiring no earlier than the end of the Accrual Period in which the then-applicable Scheduled Redemption Date occurs;

(2)    the notional amount of the Substitute Cap Agreement shall be equal to the Maximum Total Preferred Investment;

(3)    a strike rate equal to the amount required pursuant to the proviso in the definition of Strike Price;

(4)    it provides that the only obligation of the Company thereunder is the making of a single payment to the Acceptable Counterparty thereunder upon the execution and delivery thereof; and

51

(5)      it provides to Preferred Investor and the Company (as determined by Preferred Investor in its sole but good faith discretion), for the term of the Substitute Cap Agreement, a hedge against rising interest rates that is no less beneficial to the Company and Preferred Investor than (i) that which was provided by the Preferred Return Rate Agreement being replaced by the Substitute Cap Agreement and (ii) that which was intended to be provided by the Preferred Return Rate Agreement that, but for the operation of this Section 8.7(i), would have been required to have been delivered by the Company pursuant to Section 8.7(g) above as a condition to the requested Extension Option.

From and after the Benchmark Replacement Date, all references to "Preferred Return Rate Agreement" and "Replacement Cap Agreement" herein (other than in the definition of "Preferred Return Rate Agreement" and the definition of "Replacement Cap Agreement") shall be deemed to refer or relate, as applicable, to a Substitute Cap Agreement.

(j)      Representations and Warranties.  The Company hereby covenants with, and represents and warrants to, Preferred Investor as follows:

(i)      The Rate Cap Collateral is free and clear of all claims or security interests of every nature whatsoever, except such as are created pursuant to this Agreement and the other Transaction Documents, and the Company has the right to pledge and grant a security interest in the same as herein provided without the consent of any other Person other than any such consent that has been obtained and is in full force and effect.

(ii)      The Rate Cap Collateral has been duly and validly pledged hereunder.  All consents and approvals required to be obtained by the Company for the consummation of the transactions contemplated by this Agreement have been obtained.

(iii)      Giving effect to the aforesaid grant and assignment to Preferred Investor, Preferred Investor has, as of the date of this Agreement, and as to Rate Cap Collateral acquired from time to time after such date, shall have, a valid, and upon proper filing, perfected and continuing first priority lien upon and security interest in the Rate Cap Collateral; provided that no representation or warranty is made with respect to the perfected status of the security interest of Preferred Investor in the proceeds of Rate Cap Collateral consisting of "cash proceeds" or "non-cash proceeds" as defined in the UCC except if, and to the extent, the provisions of Section 9-306 of the UCC shall be complied with.

(iv)      Except for financing statements filed or to be filed in favor of Preferred Investor as secured party, there are no financing statements under the UCC covering any or all of the Rate Cap Collateral and the Company shall not, without the prior written consent of Preferred Investor, until payment in full of all of the Obligations, execute and file in any public office, any enforceable financing statement or statements covering any or all of the Rate Cap Collateral, except financing statements filed or to be filed in favor of Preferred Investor as secured party.

(k)      Remedies.   Subject to the provisions of the Preferred Return Rate Agreement, if a Common Member Event of Default shall occur and then be continuing:

52

(i)  Preferred Investor, without obligation to resort to any other security, right or remedy granted under any other agreement or instrument, shall have the right to, in addition to all rights, powers and remedies of a secured party pursuant to the UCC, at any time and from time to time, sell, resell, assign and deliver, in its sole discretion, any or all of the Rate Cap Collateral (in one or more portions and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash, upon credit or for future delivery, and in connection therewith Preferred Investor may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Rate Cap Collateral are being purchased for investment only, the Company hereby waiving and releasing any and all equity or right of redemption to the fullest extent permitted by the UCC or applicable Legal Requirements.  If all or any of the Rate Cap Collateral is sold by Preferred Investor upon credit or for future delivery, Preferred Investor shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Preferred Investor may resell such Rate Cap Collateral.

(ii)  Preferred Investor may exercise, either by itself or by its nominee or designee, in the name of the Company, all of Preferred Investor's rights, powers and remedies in respect of the Rate Cap Collateral, hereunder and under law.

(iii)  The Company hereby irrevocably, in the name of the Company or otherwise, authorizes and empowers Preferred Investor and assigns and transfers unto Preferred Investor, and constitutes and appoints Preferred Investor its true and lawful attorney-in-fact, and as its agent, irrevocably, with full power of substitution for the Company and in the name of the Company, (1) if a Common Member Event of Default exists, to exercise and enforce every right, power, remedy, authority, option and privilege of the Company under the Preferred Return Rate Agreement, including any power to subordinate, modify, terminate or cancel the Preferred Return Rate Agreement, or to give any notices, or to take any action resulting in such subordination, termination, cancellation or modification and (2) in order to more fully vest in Preferred Investor the rights and remedies provided for herein, to exercise all of the rights, remedies and powers granted to Preferred Investor in this Agreement, and the Company further authorizes and empowers Preferred Investor, as the Company's attorney-in-fact, and as its agent, irrevocably, with full power of substitution for the Company and in the name of the Company, to give any authorization, to furnish any information, to make any demands, to execute any instruments and to take any and all other action on behalf of and in the name of the Company which in the opinion of Preferred Investor may be necessary or appropriate to be given, furnished, made, exercised or taken under the Preferred Return Rate Agreement, in order to comply therewith, to perform the conditions thereof or to prevent or remedy any default by the Company thereunder or to enforce any of the rights of the Company thereunder.  These powers-of-attorney are irrevocable and coupled with an interest, and any similar or dissimilar powers heretofore given by the Company in respect of the Rate Cap Collateral to any other Person are hereby revoked.

(iv)  Preferred Investor may, without notice to, or assent by, the Company or any other Person (to the extent permitted by law), but without affecting any of the Obligations, in the name of the Company or in the name of Preferred Investor, notify the Acceptable Counterparty, or if applicable, any other counterparty to the Preferred Return Rate Agreement, to make payment and performance directly to Preferred Investor; extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any

53

terms and conditions, any obligations owing to the Company, or claims of the Company, under the Preferred Return Rate Agreement; file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Preferred Investor necessary or advisable for the purpose of collecting upon or enforcing the Preferred Return Rate Agreement; and execute any instrument and do all other things deemed necessary and proper by Preferred Investor to protect and preserve and realize upon the Rate Cap Collateral and the other rights contemplated hereby.

(v)     Pursuant to the powers of attorney provided for above, Preferred Investor may take any action and exercise and execute any instrument which it may deem necessary or advisable to accomplish the purposes hereof; provided, however, that Preferred Investor shall not be permitted to take any action pursuant to said power of attorney that would conflict with any limitation on Preferred Investor's rights with respect to the Rate Cap Collateral. Without limiting the generality of the foregoing, Preferred Investor, after the occurrence of an Common Member Event of Default, shall have the right and power to receive, endorse and collect all checks and other orders for the payment of money made payable to the Company representing: (1) any payment of obligations owed pursuant to the Preferred Return Rate Agreement, (2) return accruing on any of the Rate Cap Collateral or (3) any other payment or distribution payable in respect of the Rate Cap Collateral or any part thereof, and for and in the name, place and stead of the Company, to execute endorsements, assignments or other instruments of conveyance or transfer in respect of any property which is or may become a part of the Rate Cap Collateral hereunder.

(vi)     Preferred Investor may exercise all of the rights and remedies of a secured party under the UCC.

(vii)     Without limiting any other provision of this Agreement or any of the Company's rights hereunder, and without waiving or releasing the Company from any obligation or default hereunder, Preferred Investor shall have the right, but not the obligation, to perform any act or take any appropriate action, as it, in its reasonable judgment, may deem necessary to protect the security of this Agreement, to cure such Common Member Event of Default or to cause any term, covenant, condition or obligation required under this Agreement or the Preferred Return Rate Agreement to be performed or observed by the Company to be promptly performed or observed on behalf of the Company.  All amounts advanced by, or on behalf of, Preferred Investor in exercising its rights under this Section 8.7(k) (including, but not limited to, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Return Rate from the date of each such advance, shall be payable by the Company to Preferred Investor upon demand and shall be secured by this Agreement.

(l)     Sales of Rate Cap Collateral.  If a Common Member Event of Default has occurred and is continuing, no demand, advertisement or notice, all of which are, to the fullest extent permitted by law, hereby expressly waived by the Company and the Common Member, shall be required in connection with any sale or other disposition of all or any part of the Rate Cap Collateral, except that Preferred Investor shall give the Company at least thirty (30) Business Days' prior written notice of the time and place of any public sale or of the time when and the place where any private sale or other disposition is to be made, which notice the Company hereby agrees is reasonable, all other demands, advertisements and notices being hereby waived.  To the extent permitted by law, Preferred Investor shall not be obligated to make any sale of the Rate Cap

54

Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given, and Preferred Investor may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Upon each private sale of the Rate Cap Collateral of a type customarily sold in a recognized market and upon each public sale, unless prohibited by any applicable statute which cannot be waived, Preferred Investor (or its nominee or designee) may purchase any or all of the Rate Cap Collateral being sold, free and discharged from any trusts, claims, equity or right of redemption of the Company, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Obligations in lieu of cash or any other obligations.  In the case of all sales of the Rate Cap Collateral, public or private, the Company shall pay all reasonable costs and expenses of every kind for sale or delivery, including brokers' and fees and disbursements, legal costs and any tax imposed thereon.  However, the proceeds of sale of Rate Cap Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of sale, Preferred Investor shall apply any residue to the payment of the Obligations in the order of priority as set forth in this Agreement.

(m)     Public Sales Not Possible.  The Company acknowledges that the terms of the Preferred Return Rate Agreement may prohibit public sales, that the Rate Cap Collateral may not be of the type appropriately sold at public sales, and that such sales may be prohibited by law. In light of these considerations, the Company and the Common Member agree that private sales of the Rate Cap Collateral shall not be deemed to have been made in a commercially unreasonably manner by mere virtue of having been made privately.

(n)     Receipt of Sale Proceeds.  Upon any sale of the Rate Cap Collateral by Preferred Investor hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt by Preferred Investor or the officer making the sale or the proceeds of such sale shall be a sufficient discharge to the purchaser or purchasers of the Rate Cap Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Preferred Investor or such officer or be answerable in any way for the misapplication or non-application thereof.

## ARTICLE 9
## MANDATORY REDEMPTION DATE

Section 9.1     Mandatory Redemption Date.  Notwithstanding any provision contained herein to the contrary, on the Mandatory Redemption Date, the Common Member shall cause the Company to distribute the Required Redemption Amount to Preferred Investor; provided, however, that each of Preferred Investor and its respective Affiliates shall continue to (i) receive the benefit of the indemnities under Sections 14.12 and 12.9, (ii) receive the benefit of the Recourse Guaranty which shall not terminate, and (iii) receive the benefit of any other Transaction Document that expressly survives distribution of the Required Redemption Amount (collectively, the rights under this proviso are referred to as the "**Surviving Rights**").  Once the Required Redemption Amount has been paid in full to Preferred Investor, as applicable:  (A) Preferred Investor shall have no further rights or remedies under this Agreement or the other Transaction Documents other than the Surviving Rights; (B) the Company shall redeem the Preferred Investor's Membership Interest in the Company for the sum of $10.00; and (C) Preferred Investor

55

shall execute such documents, at the Company's expense, as may be reasonably requested by the Managing Member to evidence such redemption.

Section 9.2    Early Redemption.  Except as expressly set forth in Section 9.4 below, Common Member shall be permitted to redeem all of Preferred Investor's Membership Interest in whole (but not in part) at any time prior to the Mandatory Redemption Date, whether or not a Common Member Event of Default exists, upon thirty (30) days' prior written notice; provided, however, that (a) Common Member or the Company pays to Preferred Investor an amount equal to the Required Redemption Amount and (b) the Preferred Investor shall continue to have the benefit of the Surviving Rights.

Section 9.3    Extension Options.  The Common Member shall have two (2) options to extend the Scheduled Redemption Date:  (i) first, for a single twelve (12) month period (the "**First Extension Option**") and (ii) second, for a single twelve (12) month period (the "**Second Extension Option**").  In order to exercise each extension option, Common Member shall deliver to Preferred Investor written notice of such extension not less than thirty (30) days and not more than ninety (90) days prior to the then-Scheduled Redemption Date and shall satisfy each of the conditions set forth below in this Section 9.3 on or before the date listed below for each such condition.   The then-Scheduled Redemption Date shall be extended pursuant to Common Member's notices as aforesaid, provided that Preferred Investor has determined that the following conditions precedent have been satisfied to Preferred Investor's reasonable satisfaction:

(a)    No Common Member Event of Default shall have occurred and be continuing as of the then-Scheduled Redemption Date;

(b)    Common Member shall have paid to Preferred Investor on or prior to the then-Scheduled Redemption Date an extension fee equal to the product of (1) one-quarter of one percent (0.25%) multiplied by (2) (i) the Unreturned Total Preferred Investment plus (ii) the undisbursed and uncancelled portion of the Additional Preferred Investment (such fee, the "**Extension Fee**"); provided that the failure to pay the Extension Fee shall not be a Common Member Event of Default, but shall instead make Common Member's election to extend the Scheduled Redemption Date null and void;

(c)    Common Member shall have paid all of Preferred Investor's attorneys' fees and other reasonable out-of-pocket costs and expenses in connection with such extension;

(d)    All of the representations and warranties contained in Section 3.6 shall be true and correct on and as of the then-Scheduled Redemption Date with the same force and effect as if such representations and warranties had been made on and as of such date, except (A) for changes in facts or circumstances covered by such representations that do not constitute a breach under this Agreement and (B) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date;

(e)    Common Member shall provide a certificate in form and substance reasonably acceptable to the Preferred Investor that the Performance Covenants are satisfied as of the then-Scheduled Redemption Date;

56

(f)     The Company shall have amended the Preferred Return Rate Agreement or purchased a Replacement Cap Agreement with a term through the end of the applicable Extension Period, a notional amount equal to the then applicable Maximum Total Preferred Investment and a strike rate equal to the applicable Strike Price (and that otherwise complies with the requirements of Section 8.7, including the rating of the Acceptable Counterparty).  Within ten (10) days of the purchase of a Replacement Cap Agreement, Common Member shall deliver a copy of the Replacement Cap Agreement and Preferred Return Rate security agreement covering such Replacement Cap Agreement, duly executed by the Company, together with the consent of the Acceptable Counterparty to the Preferred Return rate security agreement.

Section 9.4     Permitted Partial Redemptions.

(a)     Common Member shall have the right, in connection with the exercise of the First Extension Option or the Second Extension Option, to redeem any portion of the Preferred Investment in an amount sufficient to satisfy, as applicable with respect to any Extension Option, any applicable Performance Covenant, which redemption shall be made in accordance with this Section 9.4, Section 9.5, and in accordance with Section 3.7(z)(iii), (iv) and (v) and accompanied by all amounts required herein (including, without limitation, the payment of the Exit Fee with respect to the amounts so redeemed).

(b)     Common Member shall have the right as set forth in Section 3.7(z)(iii), (iv) and (v), to redeem a portion of the Preferred Investment, which redemption shall be made in accordance with this Section 9.4, Section 9.5, and accompanied by all amounts required herein (including, without limitation, the payment of the Exit Fee with respect to the amounts so redeemed).

Section 9.5     Redemption Conditions.

(a)     On the date on which a redemption, voluntary or mandatory, is made, which date must be a Business Day, Common Member shall pay to Preferred Investor, together with the amount being prepaid:

(i)     all accrued and unpaid Preferred Return calculated at the Preferred Return Rate on the amount of Preferred Investment (or, if applicable Default Return at the Default Return Rate on the Preferred Investment)  being redeemed through and including the date on which such redemption is made, together with an amount equal to the Preferred Return (or Default Return, if applicable) that would have accrued at the Preferred Return Rate (or the Default Return Rate, if applicable) on the amount of the Preferred Investment being redeemed through the end of the Accrual Period in which such redemption occurs, notwithstanding that such Accrual Period extends beyond the date of redemption;

(ii)     if the redemption is made on a day other than a Monthly Payment Date, Breakage Costs (if any), without duplication of any sums paid pursuant to the preceding clause (i);

(iii)     the Exit Fee; and

(iv)     all other sums then due under this Agreement and the other Transaction Documents.

(b)     Common Member shall pay all reasonable costs and expenses of Preferred Investor incurred in connection with the redemption (including the reasonable out-of-pocket attorney's fees and expenses) incurred by Preferred Investor.

(c)     Any amounts redeemed by the Company may not be re-called by Common Member.

## ARTICLE 10
## DISPOSITIONS OF MEMBERSHIP INTERESTS

Section 10.1     General Restriction.  A Member may not make or permit any direct or indirect Transfer of all or any portion of its Membership Interest, the equity of the Company in the Subsidiary or the Property, nor make or permit any change of Control of such Member other than in accordance with and to the extent permitted by this Article 10.  In no event shall any such Transfers constitute or result in the occurrence of one or more non-exempt prohibited transactions under ERISA or the Code or result in any violation of Article 15 hereof.  Any such attempted Transfer other than in strict accordance with this Article 10, shall be null and void.

Section 10.2     Preferred Investor Transfers.  Preferred Investor may directly and indirectly Transfer all or any portion of its respective Membership Interest without the consent of, or notice to, Common Member, the Company or any other Person; provided, however, that so long as no Common Member Event of Default or any event, circumstance or action which, with the giving of notice, passage of time or failure to cure would give rise to a Common Member Event of Default has occurred and is then continuing, Preferred Investor may not directly Transfer all or any portion of its respective Membership Interests to a Restricted Transferee without the prior written consent of the Common Member, not to be unreasonably conditioned, withheld or delayed.

Section 10.3     Permitted Common Member Transfers.  A direct or indirect interest in Common Member may be the subject of a Transfer provided that each of the following clauses (a) through (d) are complied with in connection with such Transfer:

(a)     upon consummation of such Transfer, the Minimum Hold and Control Requirement shall continue to be satisfied; provided, however, that any failure of the Common Member to satisfy the Minimum Hold and Control Requirement which solely and directly results from the death or legal incapacity of any Person shall not be deemed a violation of this Section 10.3 or for recourse purposes under the Recourse Guaranty;

(b)     no such Transfer shall result (directly or indirectly, voluntarily or involuntarily, by operation of Legal Requirements or otherwise, and whether or not for consideration or of record) in any pledge, hypothecation, encumbrance, mortgage or grant of any option on any interest in or other financing (whether in the form of debt or disguised as equity) of any legal or beneficial interest in Common Member, if the potential effect of such Transfer, including, without limitation, any foreclosure, transfer of title as a result thereof or transfer of title by deed-in-lieu or assignment-in-lieu thereof, would violate any restriction set forth in Section 10.3(a);

(c)     such Transfer shall not be in violation with, and shall comply in all respects with the requirements of, all Loan Documents; and

(d)     as a condition to each such Transfer:

(i)     no Common Member Event of Default shall exist at the time of such Transfer; provided, however, that this Section 10.3(d)(i) shall not apply with respect to a Transfer resulting from the death or legal incapacitation of an individual or with respect to a Transfer by any Person that is not in the Key Principal Group;

(ii)     Preferred Investor shall receive written notice of such proposed Transfer at least 30 days prior to the date such Transfer becomes effective, except in the event of either a Transfer by reason of the death or legal incapacitation of an individual, in which event such written notice shall be delivered within a reasonable time after such death or legal incapacitation or in the event of a Transfer by any Person that is not in the Key Principal Group, in which event such written notice shall be delivered promptly following Common Member obtaining knowledge thereof;

(iii)     Each member of Preferred Investor shall receive information regarding the proposed transferee then required by each such member of Preferred Investor to comply with Section 10.1, Section 3.6(g), Section 3.6(i), Section 3.6(j), Section 3.6(l), Section 3.6(n), Section 3.6(q), Section 3.6(r), Section 3.6(s), Section 3.6(v), Section 3.6(w), Section 3.6(x), and Section 3.6(y) of this Agreement and any other "know your customer" requirements then required by Legal Requirements or otherwise then being required by such member of Preferred Investor for the Company on debt or preferred equity transactions comparable in nature to this transaction and such transferee shall comply with and satisfy all such requirements;

(iv)     the Company shall deliver an officer's certificate certifying to Preferred Investor that such Transfer complies with the applicable provisions of this Section 10.3 together with an updated Exhibit A;

(v)     in connection with any Transfer in which a Person that did not previously own ten percent (10%) or more of the aggregate direct and/or indirect ownership interests (at any tier of ownership) in Common Member shall acquire such a ten percent (10%) direct and/or indirect ownership interest (at any tier of ownership) in Common Member, Common Member shall, at least twenty (20) days before such Transfer, notify Preferred Investor of the proposed transfer and provide copies of all instruments effectuating such transfer, and any organizational documents that Preferred Investor shall require, and such other information as Preferred Investor shall reasonably request regarding the proposed transferee so as to conduct such background checks, investigations, Patriot Act, the U.S. Bank Secrecy Act, OFAC and other record searches as Preferred Investor shall reasonably require (and any regulatory requirements and/or internal compliance, "know your customer" and/or committee requirements of Preferred Investor, to the extent such internal requirements are applied on a non-discriminatory basis, shall be deemed reasonable), in each case, at Common Member's sole cost and expense, and if Preferred Investor, within twenty (20) days of receiving such notice from Common Member, sends a notice to Common Member that it has in good faith determined that such Transfer will result in a violation

59

of its legal, regulatory or internal organizational requirements, such Transfer shall not constitute a Transfer permitted hereunder; and

(vi)    Common Member shall pay, or shall cause the transferor to pay, to Preferred Investor all actual out-of-pocket costs and/or expenses of Preferred Investor incurred in connection with confirming that the related Transfer complies with all of the requirements of this Article 10 (whether or not such Transfer is approved or consummated).

Section 10.4    Death or Incompetency of a Guarantor.  In the event of a Transfer by reason of the death or incompetency of a Guarantor, the executor of the estate of such Guarantor (or the representative of such Guarantor, if alive) shall confirm the continuing obligation of such estate (or such Guarantor, if alive) under the Transaction Documents to which such Guarantor was a party.  Such confirmation shall be in writing, shall be satisfactory in form and substance to Preferred Investor in its reasonable discretion and shall be executed and delivered within forty-five (45) days of the written request therefor by Preferred Investor.  If either (a) Preferred Investor does not timely receive such writing or (b) all Guarantors shall either die or become incompetent, then within forty-five (45) days following notice thereof from Preferred Investor, a creditworthy replacement guarantor who or which would comply with Section 10.3(d)(iii) (as if it were a transferee) and would, together with any other Guarantor that is then alive, meet in the aggregate the net worth and liquidity test set forth in the Recourse Guaranty and otherwise be reasonably acceptable to Preferred Investor shall execute a joinder to each Transaction Document to which Guarantor was a party and shall become jointly and severally liable thereunder, such joinder being in form and substance satisfactory to Preferred Investor in its sole discretion.  If the requirements of the foregoing sentence are not timely complied with, time being of the essence, no Common Member Event of Default shall exist and be continuing, but Preferred Investor shall have the right to replace Common Member as Managing Member pursuant to Section 11.2.

Section 10.5    Property Sales.  Notwithstanding Section 4.1(b)(6), Property Sales to an unaffiliated third-party shall be permitted provided that each of the following conditions are satisfied with release thereto:

(a)    Common Member shall have provided notice thereof in accordance with Section 3.7(h)(ii);

(b)    Both immediately before the closing of the Property Sale and immediately thereafter, no Common Member Event of Default shall have occurred and be continuing;

(c)    The Property Sale shall be on arm's length, market terms;

(d)    Common Member shall have delivered to Preferred Investor (i) a copy of the executed purchase and sale agreement for the Property subject to the Property Sale at least ten (10) Business Days prior to the anticipated closing of the Property Sale, and (ii) a copy of the final closing settlement statement for the Property Sale no later than two (2) Business Days prior to the date of the closing of the Property Sale;

(e)    Common Member shall pay all reasonable and actual out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Preferred Investor in connection with the Property Sale; and

60

(f)  Immediately following the closing of the Property, (i) the Attachment Point shall not exceed the Attachment Point Property Sale Hurdle, and (ii) the Detachment Point shall not exceed the Detachment Point Property Sale Hurdle.

## ARTICLE 11
## COMMON MEMBER EVENTS OF DEFAULT; REMEDIES

Section 11.1  Common Member Events of Default.  A "**Common Member Event of Default**" shall mean the following:

(a)  The Company shall default in any payment of any Preferred Return, Default Return or Required Funds when due according to the terms hereof, and such failure shall remain uncured for a period of five (5) days after the payment became due (other than with respect to payments due on the Mandatory Redemption Date for which there shall be no cure period);

(b)  There shall be a failure by any party hereto in any payment when due according to the terms of the other Transaction Documents, and such failure shall remain uncured for a period of five (5) Business Days following written notice from the Preferred Investor of such default after the payment became due; provided, however, that if a different notice and/or cure period is expressly specified in any such Transaction Document for such failure, such express provisions shall apply;

(c)  Preferred Investor shall fail to receive all of the Required Redemption Amount on the Mandatory Redemption Date;

(d)  An event shall occur that triggers liability under the Recourse Guaranty;

(e)  The occurrence of a Default;

(f)  Any Common Related Party shall fail to comply with the Operating Covenant, the Covenant of Cooperation or the Covenant of Non-Interference;

(g)  The Company shall be in default of any of the Performance Covenants that continues unremedied for a period of twenty (20) Business Days after the earlier of (i) notice of such default from the Preferred Investor to the Common Member, and (ii) Common Member having actual knowledge thereof; provided, however, that any such remedy must be effectuated by Common Member in accordance with Section 3.7(z)(iii), (iv) or (v) (as applicable) and Section 9.5 on or prior to the expiration of such twenty (20) Business Day period.

(h)  Any Related Party shall default in the performance or observance of any agreement, covenant, condition or obligation required to be performed or observed by such Related Party under the terms of this Agreement or any other Transaction Document, other than a default described elsewhere in this Section 11.1, and such default continues unremedied for a period of thirty (30) days after notice from the Preferred Investor to Common Member thereof; provided, however, that if cure cannot reasonably be effected within such thirty (30) day period, such failure shall not be an event of default hereunder so long as Common Member promptly (in any event, within ten (10) days after such notice of default from any member of the Preferred Investor) commences cure, and thereafter diligently prosecutes such cure to completion (in any event, within

ninety (90) days after such notice of default from any member of the Preferred Investor); and provided further, however, that notwithstanding the 30-day cure period or extended cure period described above in this subparagraph (h), if a notice and cure period is specified under any Transaction Document or under any provision of the Transaction Documents as to any such failure or breach that is different than the aforesaid notice and cure period, the specific Transaction Document or provision shall control, and Common Member shall have no more time to cure the failure or breach than is allowed under the specific Transaction Document or provision as to such failure or breach;

(i)      Any representation or warranty made by any Related Party in this Agreement, in any of the other Transaction Documents, or in any certificate or document furnished under the terms of this Agreement or in connection with the transactions contemplated hereunder, shall be untrue in any material respect when made or deemed made or restated hereunder;

(j)      If any Common Related Party shall be subject to a Bankruptcy, dissolved, liquidated, terminated or merged with another Person;

(k)      The occurrence of a default by any Guarantor or pledgor under any of the Transaction Documents to which it is a party, which (i) if a payment default, remains uncured for a period of five (5) days following written notice thereof from Preferred Investor and (ii) if any other default, remains uncured for thirty (30) days following written notice thereof from Preferred Investor; provided however, that with respect to any party's failure to comply with the provisions of Schedule 1 paragraphs 5, 9, 11 and Schedule 2 of the Recourse Guaranty, there shall be no cure period;

(l)      an "Event of Default" shall occur under any Transaction Document;

(m)      the taking of any action constituting a Major Decision without the express prior written consent of each member of the Preferred Investor;

(n)      if, at any time, the Minimum Hold and Control Requirement is not satisfied;

(o)      any Transfer is made in violation of Section 10.3;

(p)      if any insurance policy required under this Agreement or any Mortgage Loan Document shall expire or lapse and such default remains uncured during the applicable cure period;

(q)      any breach by Guarantor of Guarantor's financial covenants in any Transaction Document or any failure by Guarantor to provide adequate financial information as may be required by the Transaction Documents in order for the Preferred Investor to verify Guarantor's then current compliance with Guarantor's financial covenants, and such breach remains uncured during the applicable cure period;

(r)      Common Member's failure to perform, observe or comply with any of the agreements, covenants or provisions contained in Article 15;

(s)      if any Related Party or any Person owning a direct or indirect ownership interest in any Related Party shall be indicted for, or convicted of, or shall plead guilty or no contest to, a Patriot Act Offense or a violation of the Anti-Corruption Laws, Anti-Money Laundering Laws, and/or Sanction and Export Control Laws;

(t)      a final judgment or decree (not subject to appeal or as to which the time for appeal has expired) is entered against Managing Member, Common Member, Company, Guarantor or any Subsidiary or Affiliate of the foregoing, for the dissolution of the Managing Member, Common Member, Company or Guarantor, or any Subsidiary or Affiliate of the foregoing; and/or

(u)      if any of the following shall occur:  (i) any failure of Common Member to provide to Preferred Investor any of the Required Records within the applicable time periods set forth in Article 5 and/or Section 5.4 of each Guaranty, if such failure continues for fifteen (15) days after written notice thereof, or (ii) any Required Records shall be materially inaccurate or false, or (iii) the failure of Common Member to permit Preferred Investor or its representatives to inspect said books, records and accounts upon request of Lender as required by Section 3.6, Section 3.7 or Article 5.

Section 11.2   Remedies.   Upon the occurrence and during the continuance of any Common Member Event of Default, in addition to any other rights or remedies available to each member of Preferred Investor at law or in equity, Preferred Investor shall be entitled to exercise any one or more of the following remedies:

(a)      If (i) the applicable Common Member Event of Default is solely the result of a breach of any Performance Covenant, and (ii) no other Common Member Event of Default then exists, and (iii) for so long as no Orderly Sale Milestone Failure has occurred (in which event this clause (a) shall be the only remedy available to Preferred Investor), then to unilaterally cause the Company to sell, and cause its Subsidiaries to sell all or any portion of the Company's assets (the "**Orderly Sale Right**") in on or more transactions in accordance with the procedures set forth on Exhibit G (the "**Sales Procedures**");

(b)      to the extent any amount due hereunder (other than the full Required Redemption Amount on the Mandatory Redemption Date) is not paid within five (5) Business Days of the date when due, to assess a late charge equal to five percent (5%) of such amount;

(c)      to the extent any amount due hereunder (including the full Required Redemption Amount on the Mandatory Redemption Date) is not paid when due, the Total Preferred Investment shall accrue at the Default Return Rate (without duplication); provided, however, that if (i) the applicable Common Member Event of Default is solely the result of a breach of any Performance Covenant and (ii) the-then applicable Scheduled Redemption Date has not occurred, then, no Default Return shall accrue thereon if:

(i)      within twenty (20) Business Days following written notice thereof to Common Member from the Preferred Investor, Common Member cures such breach in accordance with Section 3.7(z)(iii), (iv) or (v) (as applicable) and Section 9.5; or

(ii)    Common Member has elected to conduct an Orderly Sale in accordance with Exhibit G, then, until 120 days following receipt by Preferred Investor of such election; or

(iii)    Common Member has elected to conduct an Orderly Sale in accordance with Exhibit G, then, except as provided in clause (ii) above, unless and until an Orderly Sale Milestone Failure occurs.

(d)    terminate, or cause the Company and/or its Subsidiaries to terminate any or all Affiliate Agreements upon notice from Preferred Investor, without payment of any termination fees or penalties;

(e)    exercise any and all rights and remedies available to Preferred Investor under this Agreement and/or any of the other Transaction Documents;

(f)    apply the proceeds of any reserves to the Required Redemption Amount;

(g)    control all revenues and all bank accounts maintained by the Company, Property Owner or any other Subsidiary not already controlled by Preferred Investor and, at Preferred Investor's option, Preferred Investor or its designee shall become the sole signatory on all such accounts and Common Member shall be removed therefrom as an authorized signatory. In furtherance of the foregoing, Preferred Investor shall have the right to open one or more accounts, in the name of the Company, over which accounts Preferred Investor shall have sole dominion and control;

(h)    exercise the Forced Sale Right;

(i)    deliver a termination notice (a "**Termination Notice**") providing for the immediate removal and replacement of Common Member as Managing Member of the Company in which event the provisions set forth on Exhibit H shall apply; provided, however, that Preferred Investor shall not be entitled to exercise its remedy under this clause (i) if, in the reasonable determination of Preferred Investor, the consummation of the removal and replacement of Common Member would result in a violation of any non-recourse guaranty delivered by any Guarantor to any Lender; and

(j)    to foreclose or partially foreclose the Pledge Agreements.

Section 11.3    Attorney-In-Fact.    The Company, Managing Member and Common Member each hereby irrevocably appoints each member of the Preferred Investor as its attorney-in-fact, coupled with an interest, with full authority in the place and stead of the Company, Managing Member and Common Member, as applicable, and in the name of the Company, Managing Member and Common Member, as applicable, or otherwise in the discretion of Preferred Investor, to from time to time after the occurrence and during the continuance of a Common Member Event of Default to take any action and execute any instrument which Preferred Investor may deem necessary or advisable to accomplish the purposes of Section 11.2. Without limiting the generality of the foregoing, in connection with any sale of the Company's assets pursuant to Section 11.2 (including, without limitation, in connection with an Orderly Sale or the Forced Sale Right) each of Managing Member and Common Member hereby (i) authorizes the

64

Preferred Investor (and any of its authorized signatories) to sign any document, make any payment and take any other action (including, without limitation, retention of a broker) on behalf of the Company and/or its Subsidiaries that the Preferred Investor determines is necessary or advisable for the Company to sell all or any portion of its assets pursuant to, and in accordance with, such Section, (ii) agrees that each member of the Preferred Investor may act alone on behalf of the Company pursuant to Section 11.2 without any requirement for any signature, consent, approval or other action by Common Member or the Managing Member or any other Person, and (iii) at the request of Preferred Investor and at the expense of the Company, agrees to sign any document and take any other action that Preferred Investor may request so that the sale of such assets of the Company on behalf of the Company pursuant to such Section of this Agreement can be completed successfully.

Section 11.4    Specific Performance.  Common Member agrees that, in the event of a Common Member Event of Default, the award of damages may be an insufficient remedy for the Preferred Investor and, as a result, each Member of the Preferred Investor shall have the right to seek specific performance to enforce its rights and remedies under and/or to ensure compliance with this Article 11.

Section 11.5    Forced Sale Right.  Preferred Investor shall have the unilateral right and full Company power and authority to cause the Company to sell (and to market and/or retain a broker in connection therewith), or to cause any Property Owner or Subsidiary to sell, as applicable, all or any portion of the Property or any Company Property subject to any restrictions contained in the Loan Documents to on such terms and conditions as the Preferred Investor shall approve in the exercise of its sole and absolute discretion (the "**Forced Sale Right**").   To the extent the aforementioned sale process fails to produce an adequate offer meeting the requirements above, Preferred Investor may require the Company to (or to cause any Property Owner or any Subsidiary to, as applicable) remarket any Property or any Company property from time to time.  Preferred Investor shall have the right to cause the Company, Subsidiary and/or Property Owner (as applicable) to accept any offer in its sole and absolute discretion.

Section 11.6    Covenant of Non-Interference.  The Related Parties, and each of them, jointly and severally, on behalf of themselves and all of their respective heirs, successors and assigns, hereby covenant and agree that none of the Related Parties shall take any action on any kind or nature whatsoever, either directly, or indirectly, to oppose, impede, obstruct, hinder, enjoin, or otherwise interfere with the exercise by Preferred Investor, of any of Preferred Investor's rights or remedies against or with respect the Preferred Investor's remedies with respect to the Transaction Documents (including, without limitation the Forced Sale Right or with respect to a Termination Notice) in each instance, other than defenses filed by Common Member in good faith and on which Common Member prevails.  Specifically, but without limitation to the foregoing, the Related Parties, jointly and severally, covenant and agree not to oppose, impede, obstruct, hinder, enjoin, other otherwise interfere with the exercise by Preferred Investor of Preferred Investor's execution and consummation of any sale of any Property in accordance with the terms hereof (the covenants contained in this Section 11.6, the "**Covenant of Non-Interference**").

Section 11.7    Covenant of Cooperation.  The Related Parties, and each of them, jointly and severally, on behalf of themselves and all of their respective heirs, successors and assigns, hereby covenant to cooperate with Preferred Investor in effecting a smooth and efficient transition

65

of possession and operation of any Property to the prospective purchaser of any Property in accordance with the terms hereof or pursuant to the Forced Sale Right and/or in connection with Termination Notice or any other remedy of Preferred Investor set forth herein.  Specifically, but without limitation, the Related Parties shall (i) upon request of Preferred Investor, execute and deliver such documents and instruments as Preferred Investor may determine are beneficial to convey to the prospective purchaser or Preferred Investor of any Property, and (ii) take such other actions as Preferred Investor may determine is desirable in order to assist Preferred Investor in exercising the rights and remedies and benefits conferred upon Preferred Investor pursuant to this Agreement and the other Transaction Documents, including, without limitation, the Forced Sale Right and a Termination Notice (the covenant contained in this <u>Section 11.7</u>, the "**Covenant of Cooperation**").

Section 11.8   <u>Power of Attorney</u>.  The Company hereby irrevocably, in the name of the Company or otherwise, authorizes and empowers Preferred Investor and assigns and transfers unto Preferred Investor, and constitutes and appoints Preferred Investor its true and lawful attorney-in-fact, and as its agent, irrevocably, with full power of substitution for the Company and in the name of the Company, (1) if Preferred Investor is exercising the Forced Sale Right, to exercise and enforce every right, power, remedy, authority, option and privilege of the Company with respect thereto and (2) in order to more fully vest in Preferred Investor the rights and remedies provided for herein, to exercise all of the rights, remedies and powers granted to Preferred Investor in this Agreement, and the Company further authorizes and empowers Preferred Investor, as the Company's attorney-in-fact, and as its agent, irrevocably, with full power of substitution for the Company and in the name of the Company, to give any authorization, to furnish any information, to make any demands, to execute any instruments and to take any and all other action on behalf of and in the name of the Company which in the opinion of Preferred Investor may be necessary or appropriate to be given, furnished, made, exercised or taken with respect to the Forced Sale Right.  These powers-of-attorney are irrevocable and coupled with an interest, and any similar or dissimilar powers heretofore given by the Company in respect of the foregoing to any other Person are hereby revoked.

Section 11.9   <u>Preferred Investor's Right to Cure</u>.

(a)      Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Common Member from any of its obligations hereunder, upon the occurrence and during the continuance of a Default, Common Member hereby expressly agrees that Preferred Investor shall have the immediate right, without prior notice to Common Member, but shall be under no obligation, to pay all or any part of any Loan and any other sums that are then due and payable, and cause Property Owner and any other Company Subsidiary to perform any act or take any action as may be appropriate, to cure or, if the same is imminent, to prevent the occurrence of, any Default.  All sums so paid and the costs and expenses incurred by Preferred Investor in exercising its rights under this <u>Section 11.9</u> (including reasonable attorneys' fees) shall be deemed Protective Advance Investments.

(b)      Common Member hereby indemnifies Preferred Investor from and against all liabilities, obligations, losses, damages, penalties, assessments, actions or causes of action, judgments, suits, claims, demands, costs, expenses (including reasonable attorneys' and other professional fees, whether or not suit is brought, and settlement costs) and disbursements of any

66

kind or nature whatsoever which may be imposed on, incurred by or asserted against Preferred Investor as a result of the foregoing actions, other than as a result of Preferred Investor's gross negligence or willful misconduct. Preferred Investor shall have no obligation to Common Member, any other Member, Property Owner or any other Subsidiary to make any such payment or performance described in Section 11.9(a). Common Member shall not impede, interfere with, hinder or delay, and shall not permit Property Owner or any other Subsidiary or Related Party to impede, interfere with, hinder or delay, any effort or action on the part of Preferred Investor to cure any Default.

(c)	If Preferred Investor shall receive a copy of any notice of a Default or any "Event of Default" (or similar term) under and as defined in any Loan Document, such notice (or failure of notice) shall constitute full protection to Preferred Investor for any action taken or omitted to be taken by Preferred Investor in good faith in reliance thereon in accordance with the terms of this Agreement. As a material inducement to Preferred Investor's making the Preferred Investment, Common Member hereby absolutely and unconditionally releases and waives all claims against Preferred Investor arising out of Preferred Investor's exercise of its rights and remedies provided in this Section 11.9 except for Preferred Investor's gross negligence or willful misconduct.

# ARTICLE 12

## TAX MATTERS

Section 12.1	Tax Treatment of Preferred Investor. The Members agree that, for all U.S. federal income tax purposes (and any applicable state or local purposes) and for regulatory and accounting purposes, Preferred Investor's Preferred Investment shall be treated as indebtedness of the Company and not as equity.

Section 12.2	Profits and Losses.

(a)	Profits. After giving effect to the special allocations in Sections 12.3 and 12.4 hereof, Profits for any Allocation Year shall be allocated among the Members so as to reduce, proportionately, the differences between their respective Target Capital Accounts and Partially Adjusted Capital Accounts for such Allocation Year. No portion of the Profits for any Allocation Year shall be allocated to a Member whose Partially Adjusted Capital Account is greater than or equal to his Target Capital Account for such Allocation Year.

(b)	Losses. After giving effect to the special allocations in Sections 12.3 and 12.4 hereof, Losses for any Allocation Year shall be allocated among the Members so as to reduce, proportionately, the differences between their respective Partially Adjusted Capital Accounts and Target Capital Accounts for such Allocation Year. No portion of the Losses for any Allocation Year shall be allocated to a Member whose Target Capital Account is greater than or equal to its Partially Adjusted Capital Account for such Allocation Year.

Section 12.3	Special Allocations. The following special allocations shall be made in the following order:

67

(a)    Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article 12, if there is a net decrease in Company Minimum Gain during any Allocation Year, the Members shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Person's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 12.3(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article 12, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to a Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations.  This Section 12.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)    Qualified Income Offset.  In the event any Member who does not have an unlimited deficit restorative obligation unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 12.3(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 12 have been tentatively made as if this Section 12.3(c) were not in the Agreement.

(d)    Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Allocation Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of gross income in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 12.3(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations

68

provided for in this <u>Article 12</u> have been made as if <u>Section 12.3(c)</u> and this <u>Section 12.3(d)</u> were not in this Agreement.

Section 12.4 <u>Member Nonrecourse Deductions</u>. Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(a) <u>Nonrecourse Deductions</u>. Member Nonrecourse Deductions for any Allocation Year shall be specially allocated one hundred percent (100%) to the Common Member.

(b) <u>Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to other Members in accordance with their interests in the Company in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

Section 12.5 <u>Curative Allocations</u>. The allocations set forth in <u>Sections 12.3(a)</u>, <u>12.3(b)</u>, <u>12.3(c)</u>, <u>12.3(d)</u>, <u>12.4(a)</u> and <u>12.4(b)</u> (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this <u>Section 12.5</u>. Therefore, notwithstanding any other provision of this <u>Article 12</u> (other than the Regulatory Allocations), the Managing Member shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance of such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to <u>Section 12.2</u>. In exercising its discretion under this <u>Section 12.5</u>, the Managing Member shall take into account future Regulatory Allocations under <u>Sections 12.3(a)</u> and <u>12.3(b)</u> that, although not yet made, are likely to offset other Regulatory Allocations previously made under <u>Sections 12.4(a)</u> and <u>12.4(b)</u>.

Section 12.6 <u>Other Allocation Rules</u>.

(a) Profits, Losses and any other items of income, gain, loss or deduction shall be allocated to the Members pursuant to this <u>Article 12</u> as of the last day of each Fiscal Year.

(b) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Code Section 706 and the Regulations thereunder.

<div align="center">69</div>

(c)     The Members are aware of the income tax consequences of the allocations made by this <u>Article 12</u> and hereby agree to be bound by the provisions of this <u>Article 12</u> in reporting their shares of Company income and loss for income tax purposes, except to the extent otherwise required by law.

(d)     "Excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), shall be allocated one hundred percent (100%) to the Common Member.

Section 12.7     <u>Tax Allocations:  Code Section 704(c)</u>.  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with <u>subparagraph (i)</u> of the definition of "Gross Asset Value" in <u>Section 12.8</u>).   In the event the Gross Asset Value of any Company asset is adjusted pursuant to <u>subparagraph (ii)</u> of the definition of "Gross Asset Value" in <u>Section 12.8</u>, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.  Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement, provided that the Company shall elect to apply the traditional allocation method permitted by the Regulations under Code Section 704(c).  Allocations pursuant to this <u>Section 12.7</u> are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.  Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the Allocation Year.

Section 12.8     <u>Certain Definitions</u>.  As used in this <u>Article 12</u>, the following terms shall have the following meanings:

(a)     "**Adjusted Capital Account Deficit**" means, with respect to Members, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which the Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

70

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(b)    "**Allocation Year**" means (i) the period commencing on the date this agreement is entered into and ending on December 31, 2023, (ii) any subsequent period commencing on January 1 and ending on the following December 31, or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to this Article 12.

(c)    "**Capital Account**" means, with respect to any of the Members, the Capital Account maintained for such Person in accordance with the following provisions:

(i)    To such Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 12.3 or Section 12.4, and the amount of any Company liabilities assumed by such Person or which are secured by any property distributed to such Person.

(ii)    To such Person's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 12.3 or Section 12.4, and the amount of any liabilities of such Person assumed by the Company or which are secured by any property contributed by such Person to the Company.

(iii)    In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)    In determining the amount of any liability for purposes of subparagraphs (i) and (ii), there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributions or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Managing Member may make such modification, provided that it is not likely to have a material adverse effect on the amounts distributed to any Person pursuant to Article 13 upon the dissolution of the Company.  The Managing Member also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate

71

modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b), provided that, to the extent that any such adjustment is inconsistent with other provisions of this Agreement and would have a material adverse effect on any Member, such adjustment shall require the consent of such Member.

(d)      "**Company Minimum Gain**" has the same meaning as the term "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(e)      "**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, then Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Members.

(f)      "**Fiscal Year**" means (i) the period commencing on the date this Agreement is entered into and ending on December 31, 2023, and (ii) any subsequent period commencing on January 1 and ending on the earlier to occur of (A) the following December 31, or (B) the date on which all Company Property is distributed pursuant to Section 13.2 and the Certificate has been canceled pursuant to the Act.

(g)      "**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)      The initial Gross Asset Value of the Property previously contributed by the Common Member to the Company shall be the gross fair market value of such asset, as determined by the Common Member and the Preferred Investor;

(ii)      The Gross Asset Values of the Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), provided, however, that adjustments pursuant to clauses (A) and (B) above shall be made only if the Managing Member reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Managing Member; and

72

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and subparagraph (iii) of the definition of "Profits" and "Losses" in this Section 12.8 or Section 12.3; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Managing Member determines that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(h)    "**Member Nonrecourse Debt**" has the same meaning as the term "partner nonrecourse debt" set forth in Section 1.704-2(b)(4) of the Regulations.

(i)    "**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

(j)    "**Member Nonrecourse Deductions**" has the same meaning as the term "partner nonrecourse deductions" set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(k)    "**Members**" means, with respect to this Article 12 only, collectively, Common Member and Preferred Investor.  "**Member**" means any one of the Members.

(l)    "**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

(m)    "**Partially Adjusted Capital Account**" means, with respect to any Member and any Allocation Year, the Capital Account of such Member at the beginning of such Allocation Year, adjusted as set forth in the definition of "Capital Account" for all contributions and distributions during such year and all special allocations pursuant to Sections 12.3 and 12.4 hereof with respect to such Allocation Year, but before giving effect to any allocations of Profits or Losses for such Allocation Year pursuant to Section 12.2 hereof.

(n)    "**Person**", with respect to this Article 12 only, means any of the Common Member and the Preferred Investor.

(o)    "**Profits**" and "**Losses**" means, for each Allocation Year, an amount equal to the Company's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

73

(i)      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)      Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation; and

(iv)      Notwithstanding any of the provisions of this definition of Profit and Losses, any items which are specially allocated pursuant to Section 12.3 or Section 12.4 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 12.3 and Section 12.4  shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (iii) above.

(p)      "**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended, modified or supplemented from time to time (including corresponding provisions of succeeding regulations).

(q)      "**Regulatory Allocations**" has the meaning set forth in Section 12.5.

(r)      "**Target Capital Account**" means, with respect to any Member and any Allocation Year, an amount (which may be either a positive or a deficit balance) equal to the hypothetical distribution such Member would receive, minus the Member's share of Company Minimum Gain determined pursuant to Regulations Section 1.704-2(g), and minus the Member's share of Member Nonrecourse Debt Minimum Gain determined in accordance with Regulations Section 1.704-2(i)(5), all computed immediately prior to the hypothetical sale described below:

The hypothetical distribution to a Member is equal to the amount that would be received by such Member if all Company assets were sold for cash equal to their Gross Asset Values, all Company liabilities were satisfied to the extent required by their terms (limited, with respect to each Nonrecourse Liability or Member Nonrecourse Debt, to the Gross Asset Value of the assets securing each such liability), and the net assets of the Company were distributed in full to the Members pursuant to the terms of this Agreement, all as of the last day of such year.

Section 12.9   Indemnity.  The Company shall indemnify and hold harmless the Preferred Investor from any and all taxes, penalties, interest and other Losses (including attorney's and accountant's fees) incurred by the Preferred Investor as a result of the Preferred Investor agreeing to treat the Preferred Investment as indebtedness of the Company and not as equity for all U.S. federal income tax purposes (and any applicable state or local purposes).

74

**ARTICLE 13**
**WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION**

Section 13.1   Dissolution, Liquidation, and Termination Generally.  The Company shall be dissolved upon the first to occur of any of the following:

(a)   The sale or disposition of all of the assets of the Company and the receipt, in cash, of all consideration therefor;

(b)   The determination of the Common Member, Preferred Investor to dissolve the Company;

(c)   The expiration of the term of the Company; and

(d)   The occurrence of any event which, as a matter of Legal Requirements, requires that the Company be dissolved.

Notwithstanding the foregoing, if the Company is dissolved pursuant to Section 13.1(c) because an event described in Section 18-801(4) of the Act occurs with respect to a Member, then the other Members may elect to continue the Company business within ninety (90) days after the Members have actual notice of such event, and, at the option of the electing Member, may admit a new Member to the Company.

Section 13.2   Liquidation and Termination.  Upon dissolution of the Company, unless it is continued as provided above, the Managing Member shall act as liquidator or may appoint one or more other Persons as liquidator; provided, however, that if the Company is dissolved because of an event occurring with respect to the Managing Member or if a Common Member Event of Default has occurred, the liquidator shall be one or more Persons selected in writing by Preferred Investor.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein.  The costs of liquidation shall be a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managing Member hereunder.  The steps to be accomplished by the liquidator are as follows:

(a)   as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a firm of certified public accountants acceptable to Preferred Investor of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable;

(b)   the liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c)   all remaining assets of the Company shall be distributed to the Members as follows:

75

(i)      the liquidator may sell any or all Company property and the sum of (A) any resulting gain or loss from each sale plus (B) the fair market value of such property that has not been sold shall be determined and (notwithstanding the provisions of this Article 13) income, gain, loss, and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) shall be allocated among the Members to the extent possible to cause the Capital Account balance of each Member to equal the amount distributable to such Member under Section 8.1; and

(ii)      Company property shall be distributed to the Members as provided in Section 8.1.

Section 13.3   Deficit Capital Accounts.  Except as otherwise provided in this Agreement, no Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

Section 13.4   Cancellation of Certificate.  On completion of the distribution of Company assets, the Managing Member (or such other person as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Article 2, and take such other actions as may be necessary to terminate the existence of the Company.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

Section 14.1   Notices.  All notices provided for or permitted to be given pursuant to this Agreement shall be to party's address set forth on Exhibit E attached hereto, must be in writing and shall be given or served (a) by depositing the same in the United States mail addressed to the party to be notified, postpaid and certified with return receipt requested, (b) by depositing the same with a nationally recognized overnight courier service which requires recipients to sign for all deliveries, (c) by delivering such notice in person to such party or (d) by email so long as a copy thereof is also sent on the same day pursuant clause (b) or (c).  All notices given in accordance with this Agreement shall be effective upon delivery at the address of the addressee.  By giving at least ten (10) days advance written notice thereof, each Member shall have the right from time to time to change its address pursuant hereto.

Section 14.2   Approvals.  All consents, approvals and other matters of similar import required pursuant to the terms of this Agreement shall be in effect only if in writing signed by the party sought to be bound.

Section 14.3   Governing Law.  This Agreement and the obligations of the Members hereunder shall be construed and enforced in accordance with the Legal Requirements of the State of Delaware, excluding any conflicts of law rule or principle which might refer such construction to the Legal Requirements of another state or country.

Section 14.4   Non-Exclusive Jurisdiction; Summary Proceeding.

(a)      **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST MANAGING MEMBER, ANY MEMBER OR THE COMPANY ARISING OUT OF OR**

RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS MAY, AT ANY MEMBER'S OPTION, BE INSTITUTED IN ANY DELAWARE CHANCERY COURT OR FEDERAL COURT IN THE COUNTY AND STATE OF NEW YORK OR STATE COURT IN THE BOROUGH OF MANHATTAN, STATE OF NEW YORK (SUBJECT TO THE EXCLUSIVE JURISDICTION PROVISIONS OF **SECTION 14.4(b)**) AND MANAGING MEMBER, EACH MEMBER AND THE COMPANY HEREBY WAIVE ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND COMMON MEMBER AND THE COMPANY HEREBY IRREVOCABLY SUBMITS, TO THE FULLEST EXTENT PERMITTED BY LAW, TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. THE COMPANY AND COMMON MEMBER EACH DOES HEREBY DESIGNATE AND APPOINT UNIVERSAL REGISTERED AGENTS, INC., IN EACH CASE, AS ITS AUTHORIZED AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY DELAWARE CHANCERY COURT AND THE COMPANY AND COMMON MEMBER EACH DOES HEREBY DESIGNATE AND APPOINT CT CORPORATION AS ITS AUTHORIZED AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL COURT IN THE COUNTY AND STATE OF NEW YORK OR STATE COURT IN THE BOROUGH OF MANHATTAN, STATE OF NEW YORK AND AGREE, TO THE FULLEST EXTENT PERMITTED BY LAW, THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON THE COMPANY AND COMMON MEMBER IN ANY SUCH SUIT, ACTION OR PROCEEDING. THE COMPANY (I) SHALL GIVE PROMPT NOTICE TO THE MEMBERS OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE STATE OF DELAWARE OR NEW YORK, AS APPLICABLE, WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN THE STATE OF NEW YORK OR STATE OF DELAWARE OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

(b) **IN FURTHERANCE OF THE FOREGOING, COMMON MEMBER REPRESENTS, WARRANTS AND AGREES THAT, WITH RESPECT TO ANY EXERCISE OF ANY RIGHT SET FORTH IN SECTION 11.2, (I) SUCH PROCEEDING SHALL BE BROUGHT EXCLUSIVELY IN DELAWARE CHANCERY COURT, (II) SUCH PROCEEDING SHALL BE DEEMED PROPERLY BROUGHT PURSUANT TO SECTION 18-110 OF THE ACT, AS AMENDED, AS A SUMMARY PROCEEDING FOR AN EXPEDITED REMEDY, (III) IT IS THE EXPRESS INTENTION OF THE PARTIES TO THIS AGREEMENT TO PRESERVE AN EXPEDITED REMEDY IN CASE OF ANY SUCH EXERCISE, AND (IV) THERE IS SUFFICIENT POSSIBILITY OF A THREATENED IRREPARABLE INJURY TO THE COMPANY AND THE MEMBERS**

77

**IF AN EXPEDITED REMEDY IS NOT AVAILABLE TO PREFERRED INVESTOR AND THE COMPANY SINCE, DURING THE PENDENCY OF ANY DISPUTE, THE COMPANY WILL BE FORCED TO OPERATE WITH AN EXISTING CONTROVERSY AS TO WHICH OF ITS MEMBERS HAVE THE POWER TO ACT FOR THE COMPANY AND ITS DIRECT OR INDIRECT SUBSIDIARIES (AND EACH OF THEIR RESPECTIVE SUCCESSORS) IN DEALINGS WITH ANY PERSON WHO IS NOT A PARTY TO THIS AGREEMENT.**

Section 14.5   Entireties; Amendments.   This Agreement, the other Transaction Documents and the schedules and exhibits hereto and thereto constitute the entire agreement of the parties hereto and thereto (inclusive of their Affiliates) in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties (inclusive of their Affiliates), whether oral or written (including, without limitation, any executed or unexecuted term sheets, emails, correspondence or other written or electronic communications), are superseded by the terms of this Agreement and the other Transaction Documents.  Neither this Agreement nor any provisions hereof or thereof may be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of any party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 14.6   Waiver.  No consent or waiver, express or implied, by Preferred Investor of any breach or default by Managing Member or Common Member in the performance by Managing Member or Common Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder.  Failure on the part of Preferred Investor to complain of any act or to declare Managing Member or Common Member in default, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

Section 14.7   Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, and such invalidity or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by Legal Requirements.

Section 14.8   Ownership of Property and Right of Partition.  A Member's interest in the Company shall be personal property for all purposes.  No Member shall have any right to partition the property owned by the Company.

Section 14.9   Captions, References and Construction.  Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate.  Article and section headings are for convenience of reference and shall not affect the construction or interpretation of this Agreement.  Whenever the terms "hereof", "hereby", "herein", or words of similar import are used in this Agreement, they shall be construed as referring to this Agreement in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary.  Whenever the word "including" is used herein, it shall be

78

construed to mean including without limitation.  Any reference to a particular "Article", "Section", "Schedules" or "Exhibit" herein shall be construed as referring to the indicated article, section or exhibit of this Agreement unless the context indicates to the contrary.  Each party hereto acknowledges participating in the drafting of this Agreement and agrees that this Agreement shall not be construed more stringently against one party than the other.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and the plural forms of the terms so defined.

Section 14.10  Sole Discretion.  Wherever pursuant to this Agreement (a) Preferred Investor exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Preferred Investor, or (c) any other decision or determination is to be made by Preferred Investor, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Preferred Investor, in each case, shall be in the sole discretion of Preferred Investor except, in each case in the absence of a continuing Common Member Event of Default, as may be otherwise expressly and specifically provided herein.

Section 14.11  Counterparts.  This Agreement may be executed in multiple counterparts, with signature pages signed by each party affixed to constitute a fully executed instrument.

Section 14.12  General Indemnification of Preferred Investor.  In consideration of Preferred Investor's Preferred Investment, the Company agrees to indemnify and defend Preferred Investor and each of their respective Affiliates and each of their respective directors, officers, agents and employees (the "**Indemnified Parties**") from, and hold each of them harmless against, any and all losses, liabilities, claims, damages, deficiencies, interest, judgments, costs or expenses (collectively, "**Losses**") incurred by them or any of them, including, but without limitation, amounts paid in settlement, court costs, and reasonable fees and disbursements of counsel incurred in connection with any investigation, litigation or other proceeding, arising out of or by reason of any investigation, litigation or other proceeding brought or threatened, arising out of or by reason of their execution of any Transaction Document, the transactions contemplated thereby and the direct or indirect ownership of the Property by the Company and its Subsidiaries, including, but not limited to, any use effected or proposed to be effected by the Company of the proceeds of Preferred Investor's Total Preferred Investment, but excluding any such Losses incurred by reason of the gross negligence or willful misconduct of the relevant Indemnified Party. Any Indemnified Party seeking indemnification under this Section 14.12 will notify the Company of any event requiring indemnification within thirty (30) Business Days following such Indemnified Party's receipt of notice of commencement of any action or proceeding, or such Indemnified Party's obtaining knowledge of the occurrence of any other event, giving rise to a claim for indemnification hereunder; provided, however, the failure of such Indemnified Party to timely notify the Company shall not excuse the Company from any indemnification obligations other than to the extent solely and directly caused by such delayed notification.  The Company will be entitled (but not obligated) to assume the defense or settlement of any such action or proceeding or to

79

participate in any negotiations to settle or otherwise resolve any claim using counsel of its choice; provided that:

(i)     the Company notifies such Indemnified Party in writing that the Company will indemnify such Indemnified Party from and against the relevant claim;

(ii)     such counsel is reasonably satisfactory to such Indemnified Party;

(iii)     the Company conducts the defense of such claim actively and diligently;

(iv)     no conflict of interest has arisen which would prevent counsel for the Company from also representing such Indemnified Party because the defendants in any action include both such Indemnified Party and the Company; and

(v)     the Company will not consent to the entry of any judgment or enter into any settlement with respect to such claim without the prior written consent of such Indemnified Party (not to be withheld unreasonably).

So long as the Company has assumed the defense of such claim and is conducting such defense in accordance with the foregoing, such Indemnified Party: (A) may retain separate co-counsel at its sole cost and expense and participate in the defense of such claim; and (B) will not consent to the entry of any judgment or enter into any settlement with respect to such claim without the prior written consent of the Company with respect to such claim (not to be withheld unreasonably).

If the Company fails to assume such defense or, after doing so, the Company fails to satisfy any of the above conditions to the Company's defense, such Indemnified Party (and its counsel) may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, such claim in any manner it may reasonably deem appropriate (and such Indemnified Party need not consult with, or obtain any consent from, the Company in connection therewith) and the Company will reimburse such Indemnified Party promptly and periodically for the costs of defending against such claim (including reasonable attorneys' fees and expenses) and the Company will remain responsible for any Loss which such Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by such claim to the fullest extent provided for and required by this Agreement.

The indemnity obligations of the Indemnified Parties in this Section 14.12 shall survive termination or expiration of this Agreement in perpetuity.  If any proceeding is filed for which indemnity is required under this Section 14.12, the Indemnifying Party agrees, upon request therefor, to defend the Indemnified Party in such proceeding at its sole cost utilizing counsel reasonably satisfactory to the Indemnified Party.

Section 14.13  Intentionally Omitted.

Section 14.14  Time of the Essence.  Time shall be of the essence as to all deadlines and time permits set forth in this Agreement.

Section 14.15  Estoppel Certificate.  Common Member agrees to give Preferred Investor or any proposed permitted transferee of such Member, on not less than ten (10) days' written request, a certificate, binding upon Common Member and its successors and assigns, stating (a) whether or not, there exists a Common Member Event of Default (and stating with particularity the nature of any claimed defaults or potential defaults), (b) the balance of all Unpaid Preferred Return, Unpaid Default Return, Total Preferred Investment, Unreturned Total Preferred Investment and Unreturned Protective Advance Investment, (c) any offsets or defenses to the payment and performance of the obligations of Common Member and the Company hereunder, if any, and (d) that this Agreement is in full force and effect and has not been amended, or if amended, the date of each amendment (a "**Common Member Estoppel**").  Unless (i) a Common Member Event of Default shall exist, or (ii) in connection with a proposed transfer by the Preferred Investor, the Common Member shall not be required to deliver a Common Member Estoppel more than two times in any calendar year.  Upon the written request of Preferred Investor, Common Member shall request an estoppel certificate from any Lender on a form that Preferred Investor may deliver to Common Member (a "**Senior Lender Estoppel**").  There shall not restrictions on the amount of Senior Lender Estoppels that may be requested.

Section 14.16  Certain Waivers.

(a)    THE PARTIES HERETO ACKNOWLEDGE THAT THEY WERE REPRESENTED BY COMPETENT COUNSEL IN CONNECTION WITH THE NEGOTIATION, DRAFTING AND EXECUTION OF THIS AGREEMENT.  PREFERRED INVESTOR SHALL NOT BE SUBJECT TO ANY LIMITATION WHATSOEVER IN THE EXERCISE OF ANY RIGHTS OR REMEDIES AVAILABLE TO IT UNDER THIS AGREEMENT OR UNDER ANY OTHER DOCUMENTS EVIDENCING OR RELATING TO THE INVESTMENT DESCRIBED HEREIN, OR ANY PARENT, SUBSIDIARY, OR AFFILIATE OF PREFERRED INVESTOR, AND COMMON MEMBER HEREBY IRREVOCABLY WAIVES THE RIGHT TO RAISE ANY DEFENSE OR TAKE ANY ACTION ON THE BASIS OF THE FOREGOING WITH RESPECT TO PREFERRED INVESTOR'S EXERCISE OF ANY SUCH RIGHTS OR REMEDIES.

(b)    PREFERRED INVESTOR SHALL NOT OWE ANY DUTY WHATSOEVER (FIDUCIARY, DUTY OF LOYALTY, DUTY OF CARE, OR OTHERWISE) TO THE COMPANY, MANAGING MEMBER, COMMON MEMBER, OR ANY AFFILIATE OF COMMON MEMBER. TO THE EXTENT THE PROVISIONS OF THIS PARAGRAPH ELIMINATE ANY DUTIES AND LIABILITIES TO ANY PERSON OTHERWISE EXISTING AT LAW OR IN EQUITY (INCLUDING FIDUCIARY DUTIES OR OBLIGATIONS TO THE COMPANY OR TO ITS MEMBERS), MANAGING MEMBER, COMMON MEMBER AND THE COMPANY HAVE EXPRESSLY AGREED TO, AND HEREBY KNOWINGLY AND IRREVOCABLY, ELIMINATE AND WAIVE THOSE DUTIES AND LIABILITIES PURSUANT TO THE MAXIMUM EXTENT PERMITTED UNDER DELAWARE LAW, INCLUDING UNDER SECTION 18-1101 OF THE DELAWARE ACT.

(c)    Company, Managing Member, Common Member and each of their respective Affiliates hereby agrees that, in the event of an alleged breach or dispute under this Agreement or any of the other Transaction Documents, that Company, Managing Member, Common Member and each of their respective Affiliates hereby waives the right (i) to institute

81

any action, suit or proceeding against any Indemnified Parties other than an action against Preferred Investor seeking specific performance of the express written obligations of Preferred Investor under the applicable Transaction Documents, (ii) to assert a defense or counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against any such Person by Preferred Investor or its agents and (iii) to seek damages from any Indemnified Parties.

Section 14.17 <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE PROPERTY OR ANY CONDUCT, ACT OR OMISSION OF ANY PARTY HERETO, OR ANY RESPECTIVE DIRECTOR, OFFICER, PARTNER, MEMBER, EMPLOYEE, AGENT OR ATTORNEY, OR ANY OTHER PERSONS AFFILIATED WITH SUCH PARTY, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Section 14.18 <u>Cooperation of the Common Member</u>.  In the event of a Transfer by Preferred Investor in accordance with the terms hereof, Managing Member and the Common Member shall, upon reasonable notice, (a) make available to the prospective transferee at all reasonable hours all books of account, correspondence, leases and all other information related to the Company, its Subsidiaries and the Property and to the management thereof, at the request and expense of the person requesting such documents and information, or copies thereof; and (b) cause the management personnel involved directly or indirectly in the affairs of the Company to cooperate fully with the parties to any such transfer or designees of any of them and furnish information requested by such persons as to the status of the affairs of the Company.

Section 14.19 <u>Limitation on Liability</u>.

(a)     Except as required by the Act, the aggregate liability of Preferred Investor hereunder shall be limited to the amount of the Preferred Investment and any other payments to Preferred Investor provided for expressly herein.  The Company and the Common Member agree that, notwithstanding anything contained in this Agreement to the contrary, to the fullest extent permitted by Legal Requirements, no recourse shall be had for the payment of any obligation or liability to the Company or the Common Member hereunder or for any claim based hereon or otherwise in respect hereof against (i) any partner, agent, contractor, director, officer, member, consultant, manager, stockholder, subscriber to capital stock, incorporator, beneficiary, participant, trustee or advisor of Preferred Investor, any member in either of the foregoing, or any partner or member therein; (ii) any legal representative, heir, estate, successor or assign of any thereof; (iii) any corporation (or any officer, director, employee or shareholder thereof), limited liability company (or member thereof), partnership (or any partner thereof), individual or entity to which any ownership interest in Preferred Investor shall have been directly or indirectly transferred; (iv) any purchaser of any asset of Preferred Investor; or (v) any other Person that is an Affiliate of Preferred Investor, in each case, for any deficiency or other sum owing with respect to any obligation or liability arising under this Agreement.

(b)      Preferred Investor agree that, notwithstanding anything contained in this Agreement to the contrary, to the fullest extent permitted by Legal Requirements, other than with respect to Guarantor in connection with each Guaranty, no recourse shall be had for the payment of any obligation or liability to the Company or Preferred Investor hereunder or for any claim based hereon or otherwise in respect hereof against (i) any partner, agent, contractor, director, officer, member, consultant, manager, stockholder, subscriber to capital stock, incorporator, beneficiary, participant, trustee or advisor of Common Member, any member in Common Member, or any partner or member therein; (ii) any legal representative, heir, estate, successor or assign of any thereof; (iii) any corporation (or any officer, director, employee or shareholder thereof), limited liability company (or member thereof), partnership (or any partner thereof), individual or entity to which any ownership interest in Common Member shall have been directly or indirectly transferred; (iv) any purchaser of any asset of Common Member; or (v) any other Person that is an Affiliate of Common Member, in each case, for any deficiency or other sum owing with respect to any obligation or liability arising under this Agreement.

Section 14.20  Expenses.  Common Member, but not Preferred Investor, shall bear and be wholly responsible for any and all reasonable (except with respect to costs and expenses under clause (b) below, which shall not be qualified by the adjective "reasonable") out-of-pocket costs, disbursements, taxes, expenses, fees (including title insurance fees and premiums, and attorneys', appraisers', consultants' and other professional and transactional fees) (a) actually incurred by Preferred Investor and Common Member in connection with the consummation of the transactions contemplated hereby and by the other Transaction Documents, (b) actually incurred by Preferred Investor in connection with the enforcement of Preferred Investor's rights or remedies under the Transaction Documents in connection with a default by Managing Member, Common Member or any Guarantor (including, without limitation, with respect to enforcement of the Pledge Agreements), (c) actually incurred by Preferred Investor in connection with the approval of any Loan or Loan Documents (including legal fees incurred in connection with the negotiation thereof) or any lease, contract or any other matter requiring the consent or approval of Preferred Investor (including fees and expenses of professionals reasonably required by Preferred Investor to make an informed decision with respect thereto), (d) actually incurred by Preferred Investor in connection with the servicing of the transaction contemplated hereunder and/or the other Transaction Documents and/or (e) otherwise reimbursable or payable to Preferred Investor as may be provided in the Transaction Documents.

Section 14.21  Fairness of Remedies.  Managing Member acknowledges and agrees that, as an essential part of the consideration from Preferred Investor to enter into this Agreement and fund the Preferred Investment, Managing Member has agreed to the rights and remedies set forth in this Agreement and Preferred Investor and its related parties will suffer substantial harm if the events giving rise to a Common Member Event of Default occur, the damages for which are incapable or very difficult to estimate accurately, the estimation of which would entail substantial cost and inconvenience and a substantial drain on the resources of the judiciary, and would be difficult for the parties to prove and calculate, and the elements of such harm are expected to include, but may not be limited to:  (A) lost or substantially diminished revenues and business opportunities that cannot be realized or exploited fully (or at all); (B) substantial harm and damage to the reputation of Preferred Investor and its related parties; (C) substantial harm to the relationships of Preferred Investor and its related parties with any lender, tenants, investors, vendors, brokers, agents and other persons and entities; and (D) diversion of management time.

83

In light of the acknowledgements set forth in the previous sentence, and including, without limitation, the difficulty in calculating precisely the damages that Preferred Investor would incur arising from a Common Member Event of Default, the parties have agreed that if a Common Member Event of Default occurs (and Preferred Investor has not notified Managing Member in writing that such Common Member Event of Default has been cured or waived, which written notice the parties acknowledge and agree Preferred Investor has no obligation whatsoever to provide and that the determination to accept such cure or waive such Common Member Event of Default shall be made in Preferred Investor's sole and absolute discretion), Preferred Investor shall have the rights and remedies set forth above as a reasonable forecast and compensation of Preferred Investor's damages as of the Closing Date, and not as penalty.

Section 14.22 No Attorney Conflicts. It acknowledges and agrees that Milbank LLP serves as counsel to Preferred Investor, and that Milbank LLP does not serve as counsel to any other Member. Managing Member and Common Member acknowledge and agree that it does not have an attorney-client relationship with Milbank LLP in relation to this Agreement or any Transaction Document the transaction contemplated hereby, and that no such relationship will arise in the course of the Company's existence or dissolution by any means. It also acknowledges that Milbank LLP may continue to represent Preferred Investor and/or the Company following the date of this Agreement. Each Member has been given an opportunity to evaluate Milbank LLP's role as described in this Section 14.22, and to consider any conflict of interest which may develop therefrom. Each Member has been advised to seek independent counsel to advise it as to this waiver of conflict. After consultation with such independent counsel, each Member hereby consents to Milbank LLP's representation of Preferred Investor, the Company and Subsidiaries and Common Member and each Related Party agrees that in the event any conflicts of interest, disputes or adverse proceedings or claims (including litigation, bankruptcy, arbitration or other adverse proceedings or claims) may arise in the future between the Company and/or Common Member and/or any Related Party, on the one hand, and Preferred Investor and their Affiliates, on the other hand (collectively, "**Conflicts/Disputes**"), Milbank LLP shall be entitled to continue its representation of Preferred Investor and its Affiliates in connection with such Conflicts/Disputes. Notwithstanding anything set forth in this Agreement to the contrary, Milbank LLP shall be deemed to be a third party beneficiary of the provisions of this Section 14.22.

Section 14.23 Confidentiality. Managing Member agrees not to disclose or permit the disclosure of any of the terms of this Agreement or any Transaction Document or the Preferred Investment (collectively, "**Confidential Information**"), provided that such disclosure may be made (a) to any Person who is a partner, officer, director or employee of Managing Member or an Affiliate of Managing Member or counsel to or accountants of Managing Member or an Affiliate of Managing Member solely for their use and on a need-to-know basis, (b) with the prior written consent of Preferred Investor, (c) subject to the following sentence, pursuant to a subpoena or order issued by a court, arbitrator or governmental body, agency or official, (d) to any lender providing financing to any Subsidiary or (e) if required under applicable law. In the event that Managing Member shall receive a request to disclose any Confidential Information under a subpoena or order, Managing Member shall (i) promptly notify Preferred Investor thereof, (ii) consult with Preferred Investor on the advisability of taking steps to resist or narrow such request and (iii) if disclosure is required or deemed advisable, cooperate with Preferred Investor in any attempt it may make to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed. Notwithstanding any terms or conditions in this

84

Agreement to the contrary but subject to confidentiality restrictions reasonably necessary to comply with federal or state securities laws, Managing Member (and each employee, representative or other agent of Managing Member) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure.  For the avoidance of doubt, this authorization is not intended to permit disclosure of the names of, or other identifying information regarding, the participants in the transaction, or of any information or the portion of any materials not relevant to the tax treatment or tax structure of the transaction.

## ARTICLE 15
## ANTI-CORRUPTION, ANTI-MONEY LAUNDERING, AND INTERNATIONAL TRADE CONTROLS

Common Member represents, warrants and covenants to Preferred Investor and the Company that:

(a)    Common Member will at all times comply with the Anti-Corruption Laws, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the U.K. Bribery Act 2010, as amended, and all applicable requirements of Governmental Authorities having jurisdiction over Common Member and/or any Subsidiary, including those relating to corruption and kleptocracy and shall put into place all policies, practices and procedures as required by Legal Requirements.  Preferred Investor shall have the right to audit Common Member's compliance with the Anti-Corruption Laws and all applicable requirements of Governmental Authorities having jurisdiction over Common Member and/or any Subsidiary, including those relating to corruption and kleptocracy.  In the event that Common Member fails to comply with the Anti-Corruption Laws or any such requirements of Governmental Authorities, then Preferred Investor may, at its option, inform such other Governmental Authority as it deems appropriate notwithstanding any confidentiality obligation contained herein.

(b)    Common Member will at all times comply with the Anti-Money Laundering Laws and all applicable requirements of Governmental Authorities having jurisdiction over Common Member and/or any Subsidiary, including those relating to money laundering and terrorism and shall put into place all policies, practices and procedures as required by Legal Requirements.  Preferred Investor shall have the right to audit Common Member's compliance with the Anti-Money Laundering Laws and all applicable requirements of Governmental Authorities having jurisdiction over Common Member and/or any Subsidiary, including those relating to money laundering and terrorism.  In the event that Common Member fails to comply with the Anti-Money Laundering Laws or any such requirements of Governmental Authorities, then Preferred Investor may, at its option, inform the U.S. Department of Treasury's Financial Crimes Enforcement Network or such other Governmental Authority as it deems appropriate notwithstanding any confidentiality obligation contained herein.

(c)    Common Member will at all times comply with the Sanctions and Export Control Laws and all applicable requirements of Governmental Authorities having jurisdiction over Common Member and/or any Subsidiary, including those relating to international trade controls and shall put into place all policies, practices and procedures as required by Legal Requirements.  Preferred Investor shall have the right to audit Common Member's compliance

85

with the Sanctions and Export Control Laws and all applicable requirements of Governmental Authorities having jurisdiction over Common Member and/or any Subsidiary, including those relating to international trade controls. In the event that Common Member fails to comply with the Sanctions and Export Control Laws or any such requirements of Governmental Authorities, then Preferred Investor may, at its option, inform the U.S. Department of Treasury's Office of Foreign Assets Control or such other Governmental Authority as it deems appropriate notwithstanding any confidentiality obligation contained herein.

(d)      None of Common Member, any Related Party nor any direct or indirect owner of any Related Party (i) is or will be listed on any Government Lists (as defined below), (ii) is or will be a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, or (iii) has been or will be convicted of any Patriot Act Offense. For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states relating to terrorism or the laundering of monetary instruments, or that would be a criminal violation of such laws if committed within the jurisdiction of the United States of America or any of the several states, including any offense under any Anti-Money Laundering Laws. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "Government Lists" means (1) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (2) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Common Member in writing is now included in "Government Lists", or (3) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority with jurisdiction over Common Member, any Related Party or any direct or indirect owner of any Related Party or pursuant to any Executive Order of the President of the United States of America relating to terrorism or money laundering that Lender notified Common Member in writing is now included in "Government Lists".

(e)      At all times throughout the term of the Preferred Investment, including after giving effect to any Transfers permitted pursuant to Transaction Documents, (a) neither the Company, any Property nor any of the proceeds derived therefrom shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Embargoed Person or the Preferred Investment made by Preferred Investor would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in any Related Party with the result that the Preferred Investment would be in violation of law, and (c) none of the funds of any Related Party shall be derived from any unlawful activity with the result that the investment in any Related Party (whether directly or indirectly), would be prohibited by law or the Preferred Investment would be in violation of law.

(f)      It has taken, and shall continue to take until after the Preferred Investment is fully repaid, such measures as are required by law to verify that the funds invested in Common Member, and funds used to make payments on the Preferred Investment (including funds used to repay the Preferred Investment, whether from a refinancing, asset sale or otherwise) are derived (a) from transactions that do not violate United States law nor, to the extent such funds originate

86

outside the United States, the laws of the jurisdiction in which they originated; and (b) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(g)    None of Common Member nor any Related Party, nor, to the best of Common Member's knowledge, any holder of a direct interest in Common Member, nor any Person providing funds to Common Member (a) is under investigation by any Governmental Authority of the United States or the European Union for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws; (b) has been assessed civil or criminal penalties under any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws; and (c) has had any of its/his/her funds seized or forfeited in any action under any Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions and Export Control Laws

(h)    Common Member shall provide Preferred Investor with any information that Preferred Investor deems necessary from time to time and on Preferred Investor's request in order to ensure compliance with this Article 15 and the other provisions of this Agreement relating to the Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions and Export Control Laws and any other Legal Requirements concerning bribery, corruption, money laundering, trade restrictions, and similar activities.

## ARTICLE 16
## INTERESTS AND CERTIFICATES

(a)    Common Member's obligations under the Transaction Documents are secured by, among other things, the Pledge Agreements.

(b)    Notwithstanding anything in this Agreement to the contrary, the following provisions shall apply for the benefit of, and with respect to, Preferred Investor and its successors and assigns for so long as the Preferred Investment remains outstanding:

(i)    neither the execution, delivery and performance by Common Member of the Pledge Agreement, nor the exercise by Preferred Investor of its rights and remedies thereunder (including foreclosure of the limited liability company interests in Company held by Common Member (the "**Common Member Interests**")), nor any transfer to Preferred Investor or its successors and assigns of title to any of the Common Member Interests, shall constitute a breach or violation of the provisions of this Agreement or give rise to any right of first refusal or option to purchase under this Agreement or, to the fullest extent permitted by law, in and of itself, cause a dissolution, winding up or termination of the Company;

(ii)    Preferred Investor (or its designee or assignee) shall, upon a foreclosure, sale or other transfer of or realization on the Common Member Interests pursuant to the Pledge Agreement or any of the other Transaction Documents, (A) automatically be admitted to the Company as a substitute member with respect to the Common Member Interests effective immediately prior to such foreclosure, sale or other transfer, upon execution of a counterpart

87

signature page to this Agreement, (B) have the right to exercise any and all voting rights allowed to the holder of any Common Member Interests, (C) automatically succeed to all rights, powers and interests of Common Member under this Agreement, including without limitation, all of Common Member's rights to profits and losses of the Company, all of Common Member's rights to receive distributions of the Company's assets, and to any and all economic rights, voting rights, consent rights, management rights, control rights, rights to status as a member and other rights of Common Member hereunder, and all other rights, powers and privileges that are otherwise allowed to the holder of any Common Member Interests, and (D) following such admission, automatically succeed to all other rights or interests of Common Member hereunder (all of the foregoing, collectively, the "**Membership Rights**").  Simultaneous with such admission, any non-member manager of the Company and any officer appointed by any such non-member manager shall automatically be removed (and shall be deemed to have resigned) without any further action on the part of Preferred Investor or any other Person and shall have no further rights with respect to the Company.  Immediately following the admission of Preferred Investor (or its designee or assignee) as a substitute member, the existing Common Member shall cease to be a member of the Company;

(iii)    neither Common Member nor any other subsequent owner of Common Member Interests in the Company shall be entitled to resign or withdraw from the Company or to assign, encumber, or convey any interest in the Company (except in favor of Preferred Investor);

(c)    The Common Member's limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of Delaware and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code).

(d)    Upon the issuance of the Common Member's limited liability company interests in the Company to any Person without any further act, vote or approval of any member, officer or any Person, the Company shall issue one or more non-negotiable certificates in the name of such Person.  The limited liability company interests in the Company shall be evidenced by certificates in the form of Schedule 9 hereto (a "**Certificate**"), and each such Certificate shall be executed by an officer or authorized representative or Common Member.

(e)    Without any further act, vote or approval of any member or any Person, the Company shall issue a new Certificate in place of any Certificate previously issued if the holder of the limited liability company interests in the Company represented by such Certificate, as reflected on the books and records of the Company:

(i)    makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Certificate has been lost, stolen or destroyed;

(ii)    requests the issuance of a new Certificate before the Company has notice that such previously issued Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(iii)    if requested by the Company, delivers to the Company a bond, in form and substance satisfactory to the Company, with such surety or sureties as the Company may direct, to indemnify the Company against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Certificate; and

(iv)    satisfies any other reasonable requirements imposed by the Company.

(f)    Upon a member's transfer in accordance with the provisions of this Agreement of any or all limited liability company interests in the Company represented by a Certificate, the transferee of such limited liability company interests in the Company shall deliver such Certificate to the Company for cancellation (executed by such transferee on the reverse side thereof), and the Company shall thereupon issue a new Certificate to such transferee for the percentage of limited liability company interests in the Company being transferred and, if applicable, cause to be issued to such member a new Certificate for that percentage of limited liability company interests in the Company that were represented by the canceled Certificate and that are not being transferred.

(g)    The Company shall maintain books for the purpose of registering the transfer of limited liability company interests in the Company.  A transfer of limited liability company interests in the Company shall be effected by the Company's registering the transfer upon delivery of an endorsed certificate representing the limited liability company interests being transferred.

(h)    Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the UCC, such provision of Article 8 of the UCC shall be controlling.

**[SIGNATURE PAGES FOLLOW]**

89

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

<u>**MANAGING MEMBER**</u>

NIED OWNERSHIP LLC,
a Delaware limited liability company

By: _____
Name: Michael Niederst
Title:   Authorized Representative

[NMR Pref - Signature Page to LLC Agreement]

**<u>COMMON MEMBER</u>**

NIED OWNERSHIP LLC,
a Delaware limited liability company

By: _____
    Name:  Michael Niederst
    Title:   Authorized Representative

[NMR Pref - Signature Page to LLC Agreement]

**PREFERRED INVESTOR**

PCRED II HOLDING XVIII LLC,
a Delaware limited liability company



By: _____
    Name: Ravi S. Anand
    Title: Authorized Person

[NMR Pref - Signature Page to LLC Agreement]

**EXHIBIT A**

**OWNERSHIP CHART**

A-1

# Organizational Chart for Aston Park MF, LLC



# Organizational Chart for LWAD Phase I, LLC





# Organizational Chart for MRAD Phase I, LLC

**MRAD Phase I, LLC**
a Florida limited liability company
Member Managed

**Marden Ridge Apartment Ventures, LLC** (100%)
a Florida limited liability company
MRAD Holdings, Inc. – Managing Member

**MRAD Holdings, Inc.** (1%)
a Florida corporation
Michael Niederst - President

**Marden Ridge Apartment Development, LLC** (99%)
a Florida limited liability company
Member Managed

**NMRAD, LLC** (100%)
a Florida limited liability company
MDN Ownership, LLC — Manager

**Nied Member, LLC** (100%)
a Delaware limited liability company
Nied Ownership LLC — Managing Member

**PICRED II Holding XVIII LLC**
a Delaware limited liability company
(100% of Preferred Membership Interests)

**Nied Ownership LLC**
a Delaware limited liability company
MDN Ownership, LLC — Managing Member
(100% of Common Membership Interests)

**MDN Ownership, LLC** (50%)
an Ohio limited liability company
Michael Niederst — Manager

**DBN Ownership LLC** (50%)
an Ohio limited liability company
David Niederst — Manager

**Adrina Ann Niederst, Trustee under the Irrevocable Trust Agreement for David Bernard Niederst FBO Michael David Niederst dated December 30, 2015**
(100%)

**Adrina Niederst, Trustee under Irrevocable Trust Agreement of David Niederst (2014 David Niederst Family Legacy Trust) dated April 1, 2014**
(100%)

# Organizational Chart for MRAD Phase II, LLC

**MRAD Phase II, LLC**
a Florida limited liability company
Marden Ridge Apartment Development, LLC - Manager

**Summer House Apartment Ventures, LLC** (100%)
a Florida limited liability company
Marden Ridge Apartment Development, LLC – Manager

**Marden Ridge Apartment Development II, LLC** (100%)
a Florida limited liability company
(Member Managed)

**NMRAD II, LLC** (100%)
a Florida limited liability company
MDN Ownership, LLC – Manager

**Nied Member, LLC** (100%)
a Delaware limited liability company
Nied Ownership LLC – Managing Member

**PICRED II Holding XVIII LLC**
a Delaware limited liability company
(100% of Preferred Membership Interests)

**Nied Ownership LLC**
a Delaware limited liability company
MDN Ownership, LLC – Manager
(100% of Common Membership Interests)

**DBN Ownership LLC** (50%)
an Ohio limited liability company
David Niederst – Manager

**MDN Ownership, LLC** (50%)
an Ohio limited liability company
Michael Niederst – Manager

**Adrina Niederst, Trustee under Irrevocable Trust Agreement of David Niederst (2014 David Niederst Family Legacy Trust) dated April 1, 2014**
(100%)

**Adrina Ann Niederst, Trustee under the Irrevocable Trust Agreement for David Bernard Niederst FBO Michael David Niederst dated December 30, 2015**
(100%)

# Organizational Chart for MWAD Phase II, LLC



# Organizational Chart for RRAD Phase I, LLC



# Organizational Chart for VIAD Phase I, LLC



# Organizational Chart for VIAD Phase II, LLC

**VIAD Phase II, LLC**
a Florida limited liability company
(Member Managed)

**Venice Isles Apartment Development II, LLC** (100%)
a Florida limited liability company
(Michael Niederst, Manager)

**NVIAD II, LLC,**
a Florida limited liability company (MDN Ownership, LLC – Manager)
(83.52%)

**WPC Ventures, LLC**,
a Florida limited liability company
(WPC Management Partners, LLC – Manager)
(5.51%)

**Nied Capital Multifamily Fund I GP LLC,** a Florida limited liability company
(Michael Niederst and Ian McCook – Managers)
(2.97%)

**Lakepoint Energy LLC**,
an Ohio limited liability company
(2.00%)

**LLEED Investments, LLC**, a Florida limited liability company
(Leman Porter, Manager)
(4.00%)

**Brian J. Stulak**
(2.00%)

**Nied Member, LLC,**
a Delaware limited liability company (Nied Ownership, LLC – Managing Member)
(100%)

**PICRED II Holding XVIII LLC**,
a Delaware limited liability company
(100% of Preferred Membership Interests)

**Nied Ownership LLC**, a Delaware limited liability company
(MDN Ownership, LLC, Manager)
(100% of Common Membership Interests)

**DBN Ownership, LLC**  (50%)
an Ohio limited liability company
David Niederst, Manager

**MDN Ownership, LLC**  (50%)
an Ohio limited liability company
Michael Niederst, Manager

**Adrina Niederst, Trustee under Irrevocable Trust Agreement of David Niederst (2014 David Niederst Family Legacy Trust) dated April 1, 2014**
(100%)

**Adrina Ann Niederst, Trustee under the Irrevocable Trust Agreement for David Bernard Niederst FBO Michael David Niederst dated December 30, 2015**
(100%)

A-1

**EXHIBIT B**

**INTENTIONALLY OMITTED**

A-1

**EXHIBIT C**

**<u>PROCEDURE FOR DETERMINING FAIR MARKET VALUE</u>**

The following provisions set forth the procedure for determining Fair Market Value referred to in the limited liability company agreement to which this Exhibit is attached. Each capitalized term used herein shall have the meaning set forth for the same elsewhere in this Agreement.

(a)     <u>Definition</u>. "**Fair Market Value**" means the price (as determined pursuant to this Exhibit) at which all of the Properties would be sold for cash by the Company as a willing seller, not compelled to sell, to a willing buyer, not compelled to buy, on a free and clear basis, unencumbered by any financing (including, without limitation, any deeds of trust, mortgages, ground leases in connection with sale/leaseback financing or other security instruments securing any financing). The Fair Market Value of the Property shall not take into account (or be reduced by) any closing costs (including attorneys' fees, title insurance costs, loan prepayment costs, transfer taxes, market brokers' fees and recordation costs) that would customarily be paid by the seller; <u>provided</u>, <u>however</u>, that with respect to Shared Control Subsidiaries, "Fair Market Value" shall be adjusted to reflect the Company's actual beneficial interest therein.

(b)     <u>Valuation Procedure</u>.

(i)     Within a reasonably appropriate time period so as to allow the determination of the Fair Market Value prior to, or in connection with, an Appraisal Trigger Event or at any other time at the sole election of the Preferred Investor, the Preferred Investor shall designate an appraiser (I) (who shall be an MAI appraiser with at least ten (10) years of experience in valuing properties that are substantially similar in use to the Property and that are in the same metropolitan area as the Property, or (II) set forth on <u>Schedule 3</u>, ((I) and (II), each a "**Qualified Appraiser**") to determine the Fair Market Value); the Qualified Appraiser shall prepare a written evaluation of the Fair Market Value (including supporting data and calculations and an explanation of the Qualified Appraiser's methodology) (the "**Appraisal**") within such thirty (30) day period and provide copies thereof to all Members simultaneously.

(ii)     In calculating the Fair Market Value of each Property, the Qualified Appraiser shall apply the following principals:

(A)     land will be valued at cost prior to the commencement of any construction or development thereon;

(B)     with respect to any Property that is under construction or development, it will be valued on an "as completed" basis;

(C)     with respect to any Property where occupancy is less than the Occupancy Threshold, it will be valued on an "as stabilized" basis; and

(D)     with respect to any Property where occupancy is equal to or greater than the Occupancy Threshold, it will be valued on as "as-is" basis.

(c)     Costs.  The costs each Appraisal shall be borne by each of the Common Member and the Preferred Investor, as follows:

(i)     The following Appraisals shall be at the sole cost and expense of Common Member:

(A)     the first Appraisal in any calendar year that is not otherwise the responsibility of Common Member under this clause (c)(i);

(B)     any Appraisal obtained prior to, or in connection with, the commencement of any construction or development work with respect to any Property;

(C)     any Appraisal that identifies that there has been a breach of any Performance Covenant;

(D)     any Appraisal obtained in connection with a Property Sale or Capital Transaction;

(E)     any Appraisal obtained following a Common Member Event of Default; and

(F)     any Appraisal obtained in connection with the exercise of any Extension Option.

(ii)     Any other Appraisals shall be at the sole cost and expense of Preferred Investor.

(d)     Conclusive Determination.  The determination of Fair Market Value under this Exhibit shall be conclusive and binding upon Preferred Investor and the Common Member.

A-2

**EXHIBIT D**

**INITIAL APPROVED ANNUAL BUDGET**

[To be attached]

**2023 Operating Budget**

## MRAD Phase I, LLC

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent Income | 4100 | $464,600 | $464,600 | $464,600 | $469,155 | $469,155 | $469,155 | $473,710 | $473,710 | $473,710 | $478,265 | $478,265 | $478,265 | **$5,657,189** |
| **Total Rental Income** | | $464,600 | $464,600 | $464,600 | $469,155 | $469,155 | $469,155 | $473,710 | $473,710 | $473,710 | $478,265 | $478,265 | $478,265 | **$5,657,189** |
| Vacancy Loss | 4120 | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | **($300,000)** |
| **Total Vacancy Loss** | | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | ($25,000) | **($300,000)** |
| Concessions | 4150 | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | ($2,487) | **($29,844)** |
| One-Time Concession | 4154 | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | ($1,500) | **($18,000)** |
| Resident Referral Conc | 4157 | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | ($150) | **($1,800)** |
| Employee Discount | 4158 | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | ($1,713) | **($20,550)** |
| Bad Debt Collections | 4160 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | **$18,000** |
| **Total Concessions** | | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | ($4,350) | **($52,194)** |
| Pet Fee Income | 4210 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | **$14,400** |
| Late Fee Income | 4215 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | **$42,000** |
| NSF Fee Income | 4220 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | **$4,200** |
| Cable TV Income | 4225 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | $20,100 | **$241,200** |
| Renter's Insurance | 4226 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | $1,224 | **$14,688** |
| Valet Services | 4227 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | $7,600 | **$91,200** |
| Storage Fee Income | 4232 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | **$30,000** |
| Transfer Fee | 4235 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Notice Fee | 4245 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Month To Month Fee | 4250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Furniture Rental Income | 4255 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Application Fee | 4265 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | $1,875 | **$22,500** |
| Termination Fee | 4290 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | $4,100 | **$49,200** |
| Trash Reimbursement | 4325 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Water/Sewer Reimburse | 4330 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | $11,750 | **$141,000** |
| Interest Income | 4390 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Damages | 4400 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | **$48,000** |
| **Total Late Fees & Other Income** | | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | $58,699 | **$704,388** |
| **Total Revenue** | | $493,950 | $493,950 | $493,950 | $498,504 | $498,504 | $498,504 | $503,059 | $503,059 | $503,059 | $507,614 | $507,614 | $507,614 | **$6,009,383** |
| Website Expense | 5120 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | **$9,420** |
| Apartment Publications | 5130 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | $2,800 | **$33,600** |
| Resident Functions | 5140 | $1,350 | $1,350 | $1,350 | $1,350 | $1,350 | $1,500 | $1,500 | $1,350 | $1,350 | $1,350 | $1,500 | $1,500 | **$16,800** |

**2023 Operating Budget**

**MRAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Printing Expense | 5150 | $550 | $50 | $50 | $550 | $50 | $50 | $550 | $50 | $50 | $550 | $50 | $50 | **$2,600** |
| Signage | 5170 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | **$300** |
| Resident Referral Fees | 5180 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | **$7,200** |
| Move In Gift Expense | 5185 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | **$3,600** |
| Other Marketing Expense | 5190 | $400 | $400 | $1,000 | $400 | $400 | $400 | $400 | $1,000 | $400 | $400 | $400 | $400 | **$6,000** |
| **Total Marketing & Promotion** | | **$6,810** | **$6,310** | **$6,910** | **$6,810** | **$6,310** | **$6,460** | **$6,960** | **$6,910** | **$6,310** | **$6,810** | **$6,460** | **$6,460** | **$79,520** |
| | | | | | | | | | | | | | | |
| Appliances | 5205 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | $3,800 | **$45,600** |
| Appliances Repair | 5206 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| Carpet Replacement | 5210 | $1,500 | $1,500 | $1,500 | $1,500 | $2,700 | $2,700 | $2,700 | $2,700 | $1,500 | $1,500 | $1,500 | $1,500 | **$22,800** |
| Carpet Cleaning | 5215 | $500 | $500 | $500 | $500 | $700 | $700 | $700 | $700 | $500 | $500 | $500 | $500 | **$6,800** |
| Other Cleaning Expense | 5220 | $500 | $500 | $500 | $800 | $800 | $800 | $800 | $800 | $800 | $500 | $500 | $500 | **$7,800** |
| Painting Supplies | 5230 | $200 | $200 | $1,750 | $200 | $200 | $200 | $200 | $200 | $1,750 | $200 | $200 | $200 | **$5,500** |
| Painting Subcontractor | 5231 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | **$12,000** |
| Lighting Fixtures | 5240 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | **$900** |
| Flooring/Tile | 5245 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | **$3,600** |
| Misc Unit Supplies/Maint | 5250 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | **$14,400** |
| Mats | 5301 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | **$3,600** |
| Fitness Center | 5305-011 | $175 | $0 | $0 | $175 | $0 | $0 | $0 | $175 | $0 | $0 | $0 | $175 | **$700** |
| Pool | 5305-015 | $720 | $720 | $720 | $720 | $720 | $720 | $720 | $720 | $720 | $720 | $720 | $720 | **$8,640** |
| Tanning Supplies | 5305-023 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $350 | $150 | **$2,000** |
| Electrical Repair | 5309 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| Elevator Repair | 5311 | $300 | | | $300 | | | $300 | | | $300 | | | **$1,200** |
| Elevator Certification | 5312 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $600 | $0 | $0 | $0 | **$600** |
| Elevator Service | 5313 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | **$3,600** |
| Equipment Rental | 5315 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Fire Protection/Safety Eq | 5317 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $5,200 | $400 | $400 | **$9,600** |
| HVAC Repairs & Maint | 5319 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | $3,300 | **$39,600** |
| Key and Lock Expense | 5323 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | **$1,200** |
| Other Int Bldg Maint | 5325 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Other Ext Bldg Maint | 5327 | $240 | $240 | $240 | $26,000 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | **$28,640** |
| Bed Bug Control | 5332 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Pest Control | 5333 | $807 | $807 | $807 | $807 | $807 | $807 | $807 | $807 | $807 | $807 | $807 | $2,500 | **$11,377** |
| Plumbing Repairs & Maint | 5335 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$6,000** |
| Roof Repair | 5339 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | **$900** |
| Window/Door Repair | 5343 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $175 | **$1,000** |
| Window Treatments | 5345 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | **$1,440** |
| Furniture Rental | 5346 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |

## 2023 Operating Budget

**MRAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Maintenance & Repairs Building** | | $17,037 | $16,562 | $18,112 | $43,097 | $18,262 | $18,262 | $18,562 | $18,437 | $19,012 | $21,662 | $16,762 | $18,530 | **$244,297** |
| | | | | | | | | | | | | | | |
| Electric - Vacant | 5415 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | **$15,600** |
| Electric - Common Area | 5417 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | **$51,600** |
| Water | 5422 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | **$61,200** |
| Sewer | 5423 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | **$114,000** |
| Telephone Local Service | 5430 | $925 | $925 | $925 | $925 | $925 | $925 | $925 | $925 | $925 | $925 | $925 | $925 | **$11,100** |
| Cable Expense | 5460 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | **$55,200** |
| Internet - Office | 5470 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | **$132,000** |
| **Total Utilities** | | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | $36,725 | **$440,700** |
| | | | | | | | | | | | | | | |
| Grounds Landscaping | 5510 | $6,500 | $6,500 | $6,500 | $6,500 | $6,500 | $6,500 | $6,500 | $6,500 | $6,500 | $6,500 | $9,500 | $6,500 | **$81,000** |
| Trash Removal | 5530 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | **$96,000** |
| Equip. Supply & Maint. | 5560 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Vehicle Expense | 5570 | $75 | $1,200 | $75 | $75 | $75 | $0 | $75 | $75 | $75 | $75 | $75 | $75 | **$1,950** |
| Other Grounds Expense | 5590 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| **Total Grounds Expense** | | $14,775 | $15,900 | $14,775 | $14,775 | $14,775 | $14,700 | $14,775 | $14,775 | $14,775 | $14,775 | $17,775 | $14,775 | **$181,350** |
| | | | | | | | | | | | | | | |
| Payroll Labor | 5610 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | $27,000 | **$324,000** |
| Bonus Expense- Commissions | 5625 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | $1,900 | **$22,800** |
| Workers Comp Expense | 5640 | $570 | $570 | $570 | $570 | $570 | $570 | $570 | $570 | $570 | $570 | $570 | $570 | **$6,840** |
| Employee Training/Educ | 5660 | $1,125 | $150 | $150 | $150 | $150 | $150 | $1,125 | $150 | $150 | $150 | $150 | $150 | **$3,750** |
| Outsource Labor - Securit | 5685 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Employee Relations | 5665 | $400 | $400 | $400 | $400 | $400 | $400 | $1,500 | $400 | $400 | $400 | $400 | $1,500 | **$7,000** |
| Health Insurance | 5680 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Building Cleaning Service | 5687 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Employee Credit Check | 5690 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Uniforms | 5695 | $750 | $275 | $275 | $750 | $275 | $275 | $750 | $275 | $275 | $750 | $275 | $275 | **$5,200** |
| **Total Labor Expense** | | $31,745 | $30,295 | $30,295 | $30,770 | $30,295 | $30,295 | $32,845 | $30,295 | $30,295 | $30,770 | $30,295 | $31,395 | **$369,590** |
| | | | | | | | | | | | | | | |
| Management Fees | 5800 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | **$147,600** |
| **Total Management Fees** | | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | $12,300 | **$147,600** |
| | | | | | | | | | | | | | | |
| Office Supplies | 5710 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | **$1,200** |
| Postage | 5715 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$1,800** |
| Dues and Subscriptions | 5720 | $500 | $0 | $0 | $600 | $300 | $200 | $0 | $0 | $0 | $0 | $0 | $0 | **$1,600** |
| Occupancy Expense | 5720-005 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Travel Expense | 5726 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Copier Expense | 5730 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | **$600** |
| Computer Hardware Expense | 5740 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |

**MRAD Phase I, LLC**

## 2023 Operating Budget

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Computer Software Expense | 5745 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | $3,100 | **$37,200** |
| Credit Checks | 5750 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| Bank Charges | 5760 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | **$8,400** |
| Other Admin Expenses | 5790 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Administrative Expense** | | $4,800 | $4,300 | $4,300 | $4,900 | $4,600 | $4,500 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | **$53,200** |
| | | | | | | | | | | | | | | |
| Property Tax | 5910 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | $55,352 | **$664,224** |
| Loans Fee Expense | 5915 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | **$24,000** |
| Insurance-Property | 5925 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | $18,000 | **$216,000** |
| **Total Taxes & Insurance** | | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | $75,352 | **$904,224** |
| | | | | | | | | | | | | | | |
| Eviction Fees | 6011 | $1,800 | $1,800 | $1,800 | $1,800 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | **$18,400** |
| Other Professional Fees | 6030 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Other Expenses** | | $1,800 | $1,800 | $1,800 | $1,800 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | **$18,400** |
| | | | | | | | | | | | | | | |
| **Total Expenses** | | $201,344 | $199,544 | $200,569 | $226,529 | $200,019 | $199,994 | $203,219 | $200,494 | $200,469 | $204,094 | $201,369 | $201,237 | **$2,438,881** |
| | | | | | | | | | | | | | | |
| **Net Income (Loss)** | | $292,606 | $294,406 | $293,381 | $271,975 | $298,485 | $298,510 | $299,840 | $302,565 | $302,590 | $303,520 | $306,245 | $306,377 | **$3,570,502** |

**LWAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent Income | 4100 | $555,004 | $555,004 | $555,004 | $560,418 | $560,418 | $560,418 | $565,833 | $565,833 | $565,833 | $571,248 | $571,248 | $571,248 | $6,757,508 |
| **Total Rental Income** | | $555,004 | $555,004 | $555,004 | $560,418 | $560,418 | $560,418 | $565,833 | $565,833 | $565,833 | $571,248 | $571,248 | $571,248 | **$6,757,508** |
| | | | | | | | | | | | | | | |
| Vacancy Loss | 4120 | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($445,044) |
| **Total Vacancy Loss** | | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | ($37,087) | **($445,044)** |
| | | | | | | | | | | | | | | |
| Concessions | 4150 | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($2,100) | ($25,200) |
| One-Time Concession | 4154 | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($500) | ($6,000) |
| Resident Referral Conc | 4157 | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($300) | ($3,600) |
| Employee Discount | 4158 | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($4,600) | ($55,200) |
| Bad Debt Collections | 4160 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $9,600 |
| **Total Concessions** | | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | ($6,700) | **($80,400)** |
| | | | | | | | | | | | | | | |
| Pet Fee Income | 4210 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $54,000 |
| Late Fee Income | 4215 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $60,000 |
| NSF Fee Income | 4220 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $500 | $200 | $2,700 |
| Cable TV Income | 4225 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $26,775 | $321,300 |
| Renter's Insurance | 4226 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $16,800 |
| Valet Services | 4227 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $11,000 | $132,000 |
| Storage Fee Income | 4232 | $700 | $700 | $700 | $700 | $700 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $9,800 |
| Transfer Fee | 4235 | $300 | $0 | $300 | $0 | $0 | $300 | $0 | $0 | $300 | $0 | $0 | $300 | $1,500 |
| Notice Fee | 4245 | | | | | | | | | | | | | $0 |
| Application Fee | 4265 | $1,000 | $1,000 | $1,000 | $3,000 | $3,000 | $4,000 | $4,500 | $5,000 | $5,000 | $3,000 | $2,000 | $1,000 | $33,500 |
| New Key/Lock Income | 4280 | | | | | | | | | | | | | $0 |
| Termination Fee | 4290 | $6,000 | $6,000 | $6,000 | $6,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $6,000 | $6,000 | $6,000 | $102,000 |
| Pool Pass | 4295 | | | | | | | | | | | | | $0 |
| Water/Sewer Reimburse | 4330 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $180,000 |
| Damages | 4400 | $1,500 | $2,000 | $2,000 | $1,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,000 | $2,000 | $1,500 | $1,500 | $24,000 |
| **Total Late Fees & Other Income** | | $73,375 | $73,575 | $73,875 | $75,075 | $82,075 | $83,575 | $83,775 | $84,275 | $84,075 | $75,775 | $74,575 | $73,575 | **$937,600** |
| | | | | | | | | | | | | | | |
| **Total Revenue** | | $584,592 | $584,792 | $585,092 | $591,706 | $598,706 | $600,206 | $605,821 | $606,321 | $606,121 | $603,236 | $602,036 | $601,036 | **$7,169,664** |
| | | | | | | | | | | | | | | |
| Website Expense | 5120 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $10,800 |
| Apartment Publications | 5130 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $60,000 |
| Resident Functions | 5140 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $21,600 |
| Printing Expense | 5150 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Corporate Suite Expense | 5165 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Signage | 5170 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $3,600 |
| Move In Gift Expense | 5185 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $2,400 |

**LWAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Marketing Expense | 5190 | $2,500 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | **$10,200** |
| **Total Marketing & Promotion** | | $10,700 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | $8,900 | **$108,600** |
| | | | | | | | | | | | | | | |
| Carpet | 5210 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | **$24,000** |
| Carpet Cleaning | 5215 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | **$10,800** |
| Other Cleaning Expense | 5220 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | **$12,000** |
| Painting Supplies | 5230 | $1,500 | $1,200 | $1,200 | $600 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | **$14,100** |
| Painting Subcontractor | 5231 | $1,200 | $1,200 | $1,200 | $1,350 | $1,350 | $1,350 | $1,350 | $1,350 | $1,350 | $1,200 | $1,200 | $1,200 | **$15,300** |
| Lighting Fixtures | 5240 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Misc Unit Supplies/Maint | 5250 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | **$12,000** |
| Mats | 5301 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | **$2,880** |
| Pool | 5305-015 | $690 | $690 | $690 | $690 | $690 | $690 | $690 | $690 | $690 | $690 | $690 | $690 | **$8,280** |
| Electrical Repair | 5309 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$1,800** |
| Equipment Rental | 5315 | $2,200 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$2,200** |
| Fire Protection/Safety Eq | 5317 | $400 | $400 | $400 | $400 | $6,607 | $400 | $400 | $400 | $400 | $1,027 | $400 | $400 | **$11,634** |
| HVAC Repairs & Maint | 5319 | $500 | $500 | $1,100 | $5,500 | $1,100 | $1,000 | $1,100 | $1,000 | $1,100 | $500 | $500 | $500 | **$14,400** |
| Key and Lock Expense | 5323 | $150 | $150 | $150 | $900 | $150 | $150 | $150 | $150 | $900 | $150 | $150 | $150 | **$3,300** |
| Pest Control | 5333 | $862 | $862 | $862 | $862 | $862 | $862 | $862 | $862 | $862 | $862 | $862 | $862 | **$10,344** |
| Other Ext Bldg Maint | 5327 | $600 | $600 | $29,000 | $3,102 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$33,302** |
| Other Int Bldg Maint | 5325 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Plumbing Repairs & Maint | 5335 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | $120 | **$1,440** |
| **Total Maintenance & Repairs Building** | | $13,512 | $11,012 | $40,012 | $18,814 | $17,369 | $11,062 | $11,162 | $11,062 | $11,912 | $11,039 | $10,412 | $10,412 | **$177,780** |
| | | | | | | | | | | | | | | |
| Electric - Vacant | 5415 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | **$21,600** |
| Electric - Common Area | 5417 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | **$66,000** |
| Water | 5422 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | $4,600 | **$55,200** |
| Sewer | 5423 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | $11,800 | **$141,600** |
| Telephone Local Service | 5430 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | $240 | **$2,880** |
| Cable Expense | 5460 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | **$138,000** |
| Internet - Office | 5470 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Utilities** | | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | $35,440 | **$425,280** |
| | | | | | | | | | | | | | | |
| Grounds Landscaping | 5510 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | $8,674 | **$104,088** |
| Trash Removal | 5530 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | **$67,200** |
| Equip. Supply & Maint. | 5560 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Vehicle Expense | 5570 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |

# LWAD Phase I, LLC

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Grounds Expense | 5590 | $2,250 | $150 | $8,000 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$11,750** |
| **Total Grounds Expense** | | $16,524 | $14,424 | $22,274 | $14,424 | $14,424 | $14,424 | $14,424 | $14,424 | $14,424 | $14,424 | $14,424 | $14,424 | **$183,038** |
| | | | | | | | | | | | | | | |
| Payroll Labor | 5610 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | **$396,000** |
| Bonus Expense- Commissions | 5625 | $5,300 | $2,800 | $2,800 | $5,300 | $2,800 | $2,800 | $5,300 | $2,800 | $2,800 | $5,300 | $2,800 | $2,800 | **$43,600** |
| Workers Comp Expense | 5640 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | **$7,200** |
| Employee Training/Educ | 5660 | $0 | $1,688 | $0 | $0 | $0 | $0 | $700 | $0 | $0 | $0 | $0 | | **$2,388** |
| Employee Relations | 5665 | $480 | $480 | $480 | $480 | $480 | $480 | $1,500 | $480 | $480 | $480 | $480 | $1,500 | **$7,800** |
| Employee Credit Check | 5690 | $20 | $20 | $20 | $20 | $20 | $20 | $20 | $20 | $20 | $20 | $20 | $20 | **$240** |
| Uniforms | 5695 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | $400 | **$4,800** |
| **Total Labor Expense** | | $39,800 | $38,988 | $37,300 | $39,800 | $37,300 | $37,300 | $41,520 | $37,300 | $37,300 | $39,800 | $37,300 | $38,320 | **$462,028** |
| | | | | | | | | | | | | | | |
| Management Fees | 5800 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | **$198,000** |
| **Total Management Fees** | | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | $16,500 | **$198,000** |
| | | | | | | | | | | | | | | |
| Office Supplies | 5710 | $375 | $375 | $375 | $375 | $375 | $375 | $375 | $375 | $375 | $375 | $375 | $375 | **$4,500** |
| Postage | 5715 | $180 | $180 | $180 | $180 | $180 | $180 | $180 | $180 | $180 | $180 | $180 | $180 | **$2,160** |
| Dues and Subscriptions | 5720 | $162 | $637 | $162 | $162 | $162 | $682 | $162 | $162 | $162 | $162 | $162 | $220 | **$2,997** |
| Occupancy Expense | 5720-005 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Meals & Entertainment | 5725 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Travel Expense | 5726 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Copier Expense | 5730 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | **$600** |
| Computer Hardware Expense | 5740 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | **$300** |
| Computer Software Expense | 5745 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | $4,570 | **$54,840** |
| Credit Checks | 5750 | $580 | $580 | $580 | $580 | $580 | $580 | $580 | $580 | $580 | $580 | $580 | $580 | **$6,960** |
| Bank Charges | 5760 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | **$28,800** |
| Other Admin Expenses | 5790 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Administrative Expense** | | $8,342 | $8,817 | $8,342 | $8,342 | $8,342 | $8,862 | $8,342 | $8,342 | $8,342 | $8,342 | $8,342 | $8,400 | **$101,157** |
| | | | | | | | | | | | | | | |
| Property Tax | 5910 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | $61,000 | **$732,000** |
| Loans Fee Expense | 5915 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | **$54,000** |
| Insurance-Property | 5925 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | **$228,000** |
| **Total Taxes & Insurance** | | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | $84,500 | **$1,014,000** |
| | | | | | | | | | | | | | | |
| Eviction Fees | 6011 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | **$21,600** |
| Consulting Fees | 6015 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | **$20,400** |
| Accounting Fees | | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$6,000** |
| Other Professional Fees | 6030 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Other Expenses** | | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | **$48,000** |

**LWAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Expenses** | | $229,318 | $222,581 | $257,268 | $230,720 | $226,775 | $220,988 | $224,788 | $220,468 | $221,318 | $222,945 | $219,818 | $220,896 | **$2,717,883** |
| **Net Income (Loss)** | | $355,274 | $362,211 | $327,824 | $360,986 | $371,931 | $379,218 | $381,033 | $385,853 | $384,803 | $380,290 | $382,218 | $380,140 | **$4,451,781** |

## 2023 Operating Budget

**RRAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent Income | 4100 | $480,022 | $480,022 | $480,022 | $480,022 | $480,022 | $480,022 | $480,022 | $537,944 | $537,944 | $537,944 | $537,944 | $537,944 | **$6,049,874** |
| **Total Rental Income** | | $480,022 | $480,022 | $480,022 | $480,022 | $480,022 | $480,022 | $480,022 | $537,944 | $537,944 | $537,944 | $537,944 | $537,944 | **$6,049,874** |
| Vacancy Loss | 4120 | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($5,379) | ($5,379) | ($5,379) | ($5,379) | ($5,379) | **($60,499)** |
| **Total Vacancy Loss** | | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($4,800) | ($5,379) | ($5,379) | ($5,379) | ($5,379) | ($5,379) | **($60,499)** |
| Concessions | 4150 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| One-Time Concession | 4154 | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | ($200) | **($2,400)** |
| Bad Debt Collections | 4160 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$6,000** |
| Employee Discount | 4158 | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | ($700) | **($8,400)** |
| **Total Concessions** | | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | ($400) | **($4,800)** |
| Pet Fee Income | 4210 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $3,800 | $700 | $700 | $700 | $700 | **$11,500** |
| Late Fee Income | 4215 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | **$48,000** |
| NSF Fee Income | 4220 | $346 | $346 | $346 | $346 | $346 | $346 | $346 | $346 | $346 | $346 | $346 | $346 | **$4,152** |
| Renter's Insurance | 4226 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | $2,030 | **$24,360** |
| Valet Services | 4227 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | $9,020 | **$108,240** |
| Parking Income | 4230 | $600 | $600 | $600 | $600 | $600 | $600 | $48,620 | $48,620 | $600 | $600 | $600 | $600 | **$103,240** |
| Notice Fee | 4245 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Application Fee | 4265 | $375 | $375 | $375 | $375 | $375 | $25,000 | $25,000 | $15,000 | $375 | $375 | $375 | $375 | **$68,375** |
| New Key/Lock Income | 4280 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$1,800** |
| Vending Income | 4350 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | **$600** |
| Utility Fee - Tenant | 4285 | $6,630 | $6,630 | $6,630 | $6,630 | $6,630 | $6,630 | $20,310 | $20,310 | $6,630 | $6,630 | $6,630 | $6,630 | **$106,920** |
| Termination Fee | 4290 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | $8,176 | **$98,112** |
| Trash Reimbursement | 4325 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | **$900** |
| Damages | 4400 | $250 | $250 | $250 | $250 | $250 | $4,000 | $5,000 | $4,000 | $250 | $250 | $250 | $250 | **$15,250** |
| Other Misc. Income | 4900 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | **$2,340** |
| **Total Late Fees & Other Income** | | $32,597 | $32,597 | $32,597 | $32,597 | $32,597 | $60,972 | $123,672 | $115,772 | $32,597 | $32,597 | $32,597 | $32,597 | **$593,789** |
| **Total Revenue** | | $507,419 | $507,419 | $507,419 | $507,419 | $507,419 | $535,794 | $598,494 | $647,937 | $564,762 | $564,762 | $564,762 | $564,762 | **$6,578,364** |
| Website Expense | 5120 | $1,900 | $1,900 | $3,560 | $1,900 | $1,900 | $2,500 | $3,500 | $4,500 | $2,200 | $1,900 | $1,900 | $1,900 | **$29,560** |
| Apartment Publications | 5130 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | $2,930 | **$35,163** |
| Resident Functions | 5140 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $4,000 | $4,000 | $9,000 | $3,000 | $3,500 | $4,000 | $4,000 | **$46,500** |
| Printing Expense | 5150 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$6,000** |
| Signage | 5170 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$1,800** |
| Move In Gift Expense | 5185 | $100 | $100 | $100 | $100 | $100 | $1,500 | $1,500 | $3,000 | $100 | $100 | $100 | $100 | **$6,900** |

## 2023 Operating Budget

**RRAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Marketing Expense | 5190 | $4,500 | $800 | $800 | $1,400 | $1,200 | $800 | $800 | $800 | $800 | $1,400 | $800 | $800 | **$14,900** |
| **Total Marketing & Promotion** | | $13,080 | $9,380 | $11,040 | $9,980 | $9,780 | $12,380 | $13,380 | $20,880 | $9,680 | $10,480 | $10,380 | $10,380 | **$140,823** |
| | | | | | | | | | | | | | | |
| Carpet | 5210 | $0 | $0 | $0 | $0 | $0 | $1,000 | $2,000 | $5,000 | $1,000 | $0 | $0 | $0 | **$9,000** |
| Appliances | 5205 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$1,800** |
| Appliances Repair | 5206 | $810 | $810 | $810 | $810 | $810 | $810 | $986 | $810 | $810 | $810 | $810 | $810 | **$9,896** |
| Carpet Cleaning | 5215 | $150 | $150 | $150 | $150 | $150 | $150 | $1,000 | $7,000 | $500 | $150 | $150 | $150 | **$9,850** |
| Other Cleaning Expense | 5220 | $700 | $100 | $100 | $700 | $100 | $100 | $7,900 | $21,000 | $800 | $100 | $100 | $100 | **$31,800** |
| Painting Supplies | 5230 | $100 | $100 | $100 | $100 | $100 | $500 | $4,500 | $500 | $100 | $100 | $100 | $100 | **$6,400** |
| Painting Subcontractor | 5231 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Misc Unit Supplies/Maint | 5250 | $600 | $600 | $600 | $600 | $600 | $800 | $4,000 | $1,000 | $800 | $600 | $600 | $600 | **$11,400** |
| Mats | 5301 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Pool | 5305-015 | $750 | $750 | $750 | $1,900 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | **$10,150** |
| Electrical Repair | 5309 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | **$360** |
| Elevator Certification | 5312 | $375 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$375** |
| Elevator Service | 5313 | $400 | $3,409 | $400 | $400 | $400 | $400 | $3,409 | $400 | $400 | $400 | $400 | $400 | **$10,818** |
| HVAC Repairs & Maint | 5319 | $500 | $500 | $500 | $500 | $750 | $750 | $750 | $750 | $750 | $500 | $500 | $500 | **$7,250** |
| Key and Lock Expense | 5323 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | **$4,080** |
| Fire Protection/Safety Eq | 5317 | $500 | $950 | $500 | $500 | $4,650 | $500 | $500 | $950 | $500 | $500 | $950 | $500 | **$11,500** |
| Pest Control | 5333 | $347 | $347 | $347 | $2,400 | $347 | $347 | $347 | $347 | $347 | $347 | $347 | $347 | **$6,217** |
| Plumbing Repairs & Maint | 5335 | $850 | $100 | $100 | $850 | $100 | $100 | $850 | $100 | $100 | $850 | $100 | $100 | **$4,200** |
| Furniture Rental | 5346 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Other Bldg Exterior Maint. | 5327 | $5,000 | $0 | $0 | $0 | $0 | $15,000 | $0 | $0 | $0 | $0 | $0 | $0 | **$20,000** |
| **Total Maintenance & Repairs Building** | | $11,852 | $8,586 | $5,127 | $9,680 | $9,527 | $21,977 | $27,762 | $39,377 | $7,627 | $5,877 | $5,577 | $5,127 | **$158,096** |
| | | | | | | | | | | | | | | |
| Electric - Vacant | 5415 | $18,500 | $18,500 | $18,500 | $18,500 | $18,500 | $22,000 | $22,000 | $22,000 | $22,000 | $18,500 | $18,500 | $17,500 | **$235,000** |
| Electric - Common Area | 5417 | $5,750 | $5,200 | $5,400 | $5,700 | $5,850 | $6,000 | $6,700 | $5,850 | $6,100 | $5,700 | $6,000 | $6,000 | **$70,250** |
| Water | 5422 | $1,050 | $1,000 | $975 | $1,000 | $1,050 | $925 | $965 | $775 | $1,200 | $1,000 | $1,000 | $1,000 | **$11,940** |
| Sewer | 5423 | $2,350 | $2,250 | $2,175 | $2,325 | $2,350 | $2,100 | $2,175 | $1,750 | $2,500 | $2,500 | $2,500 | $2,500 | **$27,475** |
| Telephone Local Service | 5430 | $334 | $334 | $334 | $334 | $334 | $334 | $334 | $334 | $334 | $334 | $334 | $334 | **$4,008** |
| Cable Expense | 5460 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Internet - Office | 5470 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | $1,459 | **$17,508** |
| **Total Utilities** | | $29,443 | $28,743 | $28,843 | $29,318 | $29,543 | $32,818 | $33,633 | $32,168 | $33,593 | $29,493 | $29,793 | $28,793 | **$366,181** |
| | | | | | | | | | | | | | | |
| Grounds Landscaping | 5500 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | $4,939 | **$59,268** |
| Trash Removal | 5530 | $3,000 | $2,750 | $3,200 | $2,100 | $2,950 | $4,000 | $3,500 | $4,000 | $3,500 | $3,100 | $3,100 | $3,100 | **$38,300** |
| Vehicle Expense | 5570 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | $150 | **$1,800** |
| Other Grounds Expense | 5590 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| **Total Grounds Expense** | | $8,289 | $8,039 | $8,489 | $7,389 | $8,239 | $9,289 | $8,789 | $9,289 | $8,789 | $8,389 | $8,389 | $8,389 | **$101,768** |

## 2023 Operating Budget

## RRAD Phase I, LLC

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll Labor | 5610 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $33,000 | $35,000 | $65,000 | $33,000 | $33,000 | $33,000 | $33,000 | **$430,000** |
| Bonus Expense- Commissions | 5625 | $950 | $950 | $950 | $3,000 | $950 | $1,000 | $1,000 | $25,000 | $950 | $950 | $3,000 | $950 | **$39,650** |
| Workers Comp Expense | 5640 | $683 | $683 | $683 | $683 | $683 | $683 | $683 | $683 | $683 | $683 | $683 | $683 | **$8,196** |
| Employee Training/Educ | 5660 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Employee Relations | 5665 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $500 | $500 | $750 | **$4,900** |
| Health Insurance | 5680 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | **$3,600** |
| Outsource Labor - Securit | 5685 | $5,102 | $5,102 | $5,102 | $5,102 | $5,262 | $5,102 | $5,262 | $5,102 | $5,262 | $5,102 | $5,102 | $5,102 | **$61,704** |
| Employee Credit Check | 5690 | $45 | $45 | $45 | $45 | $45 | $45 | $45 | $45 | $45 | $45 | $45 | $45 | **$540** |
| Uniforms | 5695 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | $195 | **$2,343** |
| **Total Labor Expense** | | $40,875 | $40,875 | $40,875 | $42,925 | $41,035 | $40,925 | $43,085 | $96,925 | $41,035 | $41,025 | $43,075 | $41,275 | **$553,933** |
| | | | | | | | | | | | | | | |
| Management Fees | 5800 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | **$13,000** |
| **Total Management Fees** | | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | $13,000 | **$156,000** |
| | | | | | | | | | | | | | | |
| Office Supplies | 5710 | $744 | $100 | $100 | $100 | $100 | $744 | $100 | $100 | $100 | $100 | $100 | $744 | **$3,132** |
| Postage | 5715 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| Dues and Subscriptions | 5720 | $0 | $0 | $400 | $0 | $0 | $315 | $1,500 | $315 | $1,688 | $0 | $581 | $2,835 | **$7,634** |
| Computer Hardware Expense | 5740 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | **$2,580** |
| Computer Software Expense | 5745 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | **$24,000** |
| Bank Charges | 5760 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | **$4,200** |
| **Total Administrative Expense** | | $3,509 | $2,865 | $3,265 | $2,865 | $2,865 | $3,824 | $4,365 | $3,180 | $4,553 | $2,865 | $3,446 | $6,344 | **$43,946** |
| | | | | | | | | | | | | | | |
| Property Tax | 5910 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | $6,680 | **$80,160** |
| Insurance-Property | 5925 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | **$144,000** |
| **Total Taxes & Insurance** | | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | $18,680 | **$224,160** |
| | | | | | | | | | | | | | | |
| Eviction Fees | 6011 | $619 | $619 | $619 | $619 | $619 | $619 | $619 | $619 | $619 | $619 | $619 | $619 | **$7,428** |
| Consulting Fees | | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | **$16,800** |
| Accounting Fees | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | **$30,000** |
| Other Professional Fees | 6030 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Other Expenses** | | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | $4,519 | **$54,228** |
| | | | | | | | | | | | | | | |
| **Total Expenses** | | $143,247 | $134,687 | $133,838 | $138,356 | $137,188 | $157,412 | $167,213 | $238,018 | $141,477 | $134,328 | $136,859 | $136,507 | **$1,799,135** |
| | | | | | | | | | | | | | | |
| **Net Income (Loss)** | | $364,171 | $372,731 | $373,580 | $369,062 | $370,230 | $378,381 | $431,280 | $409,918 | $423,285 | $430,433 | $427,902 | $428,254 | **$4,779,229** |

## 2023 Operating Budget

**VIAD Phase I, LLC**

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent Income | 4100 | $646,735 | $646,735 | $646,735 | $653,075 | $653,075 | $653,075 | $659,416 | $659,416 | $659,416 | $665,756 | $665,756 | $665,756 | **$7,874,945** |
| **Total Rental Income** | | **$646,735** | **$646,735** | **$646,735** | **$653,075** | **$653,075** | **$653,075** | **$659,416** | **$659,416** | **$659,416** | **$665,756** | **$665,756** | **$665,756** | **$7,874,945** |
| | | | | | | | | | | | | | | |
| Vacancy Loss | 4120 | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | ($65,000) | **($780,000)** |
| **Total Vacancy Loss** | | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($65,000)** | **($780,000)** |
| | | | | | | | | | | | | | | |
| Concessions | 4150 | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | ($1,650) | **($19,800)** |
| One-Time Concessions | 4154 | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | **($12,000)** |
| Resident Referral Conc | 4157 | $0 | ($300) | $0 | $300 | $0 | $0 | $0 | ($300) | $0 | $0 | $0 | $0 | **($300)** |
| Employee Discount | 4158 | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | ($1,200) | **($14,400)** |
| Bad Debt Collections | 4160 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | **$18,000** |
| **Total Concessions** | | **($2,350)** | **($2,650)** | **($2,350)** | **($2,050)** | **($2,350)** | **($2,350)** | **($2,350)** | **($2,650)** | **($2,350)** | **($2,350)** | **($2,350)** | **($2,350)** | **($28,500)** |
| | | | | | | | | | | | | | | |
| Pet Fee Income | 4210 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | **$54,000** |
| Late Fee Income | 4215 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | **$21,600** |
| NSF Fee Income | 4220 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | **$1,200** |
| Cable TV Income | 4225 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| Renter's Insurance | 4226 | $1,400 | $1,400 | $1,400 | $1,600 | $1,600 | $1,600 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | **$19,800** |
| Valet Services | 4227 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | $8,500 | **$102,000** |
| Garages | 4230 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | $4,800 | **$57,600** |
| Storage Fee Income | 4232 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | $3,200 | **$38,400** |
| Transfer Fee | 4235 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| Month To Month Fee | 4250 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | **$15,600** |
| Application Fee | 4265 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | $3,250 | **$39,000** |
| Internet Income | 4275 | $20,000 | $20,000 | $20,000 | $21,000 | $21,000 | $21,000 | $23,000 | $23,000 | $23,000 | $23,000 | $23,000 | $23,000 | **$261,000** |
| New Key/Lock Income | 4280 | $75 | $0 | $0 | $0 | $75 | $0 | $0 | $75 | $0 | $0 | $0 | $75 | **$300** |
| Termination Fee | 4290 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | **$90,000** |
| Trash Reimbursement | 4325 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | **$1,200** |
| Water/Sewer Reimburse | 4330 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | **$168,000** |
| Damages | 4400 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | **$54,000** |
| **Total Late Fees & Other Income** | | **$75,225** | **$75,150** | **$75,150** | **$76,350** | **$76,425** | **$76,350** | **$78,550** | **$78,625** | **$78,550** | **$78,550** | **$78,550** | **$78,625** | **$926,100** |
| | | | | | | | | | | | | | | |
| **Total Revenue** | | **$654,610** | **$654,235** | **$654,535** | **$662,375** | **$662,150** | **$662,075** | **$670,616** | **$670,391** | **$670,616** | **$676,956** | **$676,956** | **$677,031** | **$7,992,545** |
| | | | | | | | | | | | | | | |
| Website Expense | 5120 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | $340 | **$4,080** |
| Apartment Publications | 5130 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | **$51,600** |
| Resident Functions | 5140 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | **$15,600** |
| Printing Expense | 5150 | $150 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$150** |
| Corporate Suite Expense | 5165 | $0 | $0 | $0 | $50 | $0 | $0 | $0 | $50 | $0 | $0 | $0 | $0 | **$100** |

**2023 Operating Budget**

# VIAD Phase I, LLC

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Signage | 5170 | $500 | $0 | $0 | $0 | $0 | $500 | $0 | $0 | $0 | $0 | $0 | $0 | **$1,000** |
| Move In Gift Expense | 5185 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Other Marketing Expense | 5190 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | $750 | **$9,000** |
| **Total Marketing & Promotion** | | **$7,590** | **$6,940** | **$6,940** | **$6,990** | **$6,940** | **$7,440** | **$6,940** | **$6,990** | **$6,940** | **$6,940** | **$6,940** | **$6,940** | **$84,530** |
| | | | | | | | | | | | | | | |
| Appliances | 5205 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | **$8,400** |
| Appliances Repair | 5206 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Turnover Expense Carpet | 5210 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | **$30,000** |
| Carpet Cleaning | 5215 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | **$9,600** |
| Other Cleaning Expense | 5220 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | **$18,000** |
| Painting Supplies | 5230 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | **$10,800** |
| Painting Subcontractor | 5231 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | **$31,200** |
| Misc Unit Supplies/Maint | 5250 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | **$14,400** |
| Mats | 5301 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | **$7,200** |
| Fitness Center | | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | **$4,200** |
| Pool | 5305-015 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | $900 | **$10,800** |
| Electrical Repair | 5309 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | **$300** |
| Elevator Repair | 5311 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$6,000** |
| Elevator Certification | 5312 | $0 | $0 | $0 | $0 | $0 | $450 | $0 | $0 | $0 | $0 | $0 | $0 | **$450** |
| Elevator Service | 5313 | $615 | $615 | $615 | $615 | $615 | $615 | $615 | $615 | $615 | $615 | $615 | $615 | **$7,380** |
| Fire Protection/Safety Eq | 5317 | $500 | $500 | $500 | $3,500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$9,000** |
| HVAC Repairs & Maint | 5319 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | $2,100 | **$25,200** |
| Key and Lock Expense | 5323 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | $75 | **$900** |
| Other Int Bldg Maint | 5325 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | **$600** |
| Other Ext Bldg Maint | 5327 | $200 | $200 | $6,000 | $200 | $200 | $200 | $6,000 | $200 | $200 | $6,000 | $200 | $200 | **$19,800** |
| Pest Control | 5333 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | **$6,000** |
| Plumbing Repairs & Maint | 5335 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| **Total Maintenance & Repairs Building** | | **$17,065** | **$17,065** | **$22,865** | **$20,065** | **$17,065** | **$17,515** | **$22,865** | **$17,065** | **$17,065** | **$22,865** | **$17,065** | **$17,065** | **$225,630** |
| | | | | | | | | | | | | | | |
| Electric - Vacant | 5415 | $2,500 | $2,500 | $2,500 | $2,200 | $2,200 | $2,200 | $2,000 | $2,000 | $2,000 | $1,900 | $1,900 | $1,900 | **$25,800** |
| Electric - Common Area | 5417 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | $5,100 | **$61,200** |
| Water | 5422 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | **$60,000** |
| Sewer | 5423 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | **$120,000** |
| Telephone Local Service | 5430 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | $1,400 | **$16,800** |
| Alarm System Expense | 5450 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | **$600** |
| Internet - Office | 5470 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | $8,700 | **$104,400** |
| **Total Utilities** | | **$32,750** | **$32,750** | **$32,750** | **$32,450** | **$32,450** | **$32,450** | **$32,250** | **$32,250** | **$32,250** | **$32,150** | **$32,150** | **$32,150** | **$388,800** |
| | | | | | | | | | | | | | | |
| Grounds Landscaping | 5510 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | $5,500 | **$66,000** |
| Trash Removal | 5530 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | **$48,000** |

**2023 Operating Budget**

## VIAD Phase I, LLC

| | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vehicle Expense | 5570 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | **$1,200** |
| Other Grounds Expense | 5590 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | **$24,000** |
| **Total Grounds Expense** | | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | $11,600 | **$139,200** |
| | | | | | | | | | | | | | | |
| Payroll Labor | 5610 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | $34,500 | **$414,000** |
| Bonus Expense- Commissions | 5625 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | **$26,400** |
| Workers Comp Expense | 5640 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | **$8,400** |
| Employee Training/Educ | 5660 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | **$1,200** |
| Employee Relations | 5665 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | **$3,600** |
| Temp Employee Services | 5670 | $2,000 | $2,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$4,000** |
| Health Insurance | 5680 | $760 | $760 | $760 | $760 | $760 | $760 | $760 | $760 | $760 | $760 | $760 | $760 | **$9,120** |
| Employee Credit Check | 5690 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | **$600** |
| Uniforms | 5695 | $130 | $130 | $130 | $130 | $130 | $130 | $130 | $130 | $130 | $130 | $130 | $130 | **$1,560** |
| **Total Labor Expense** | | $40,740 | $40,740 | $38,740 | $38,740 | $38,740 | $38,740 | $38,740 | $38,740 | $38,740 | $38,740 | $38,740 | $38,740 | **$468,880** |
| | | | | | | | | | | | | | | |
| Management Fees | 5800 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | **$204,000** |
| **Total Management Fees** | | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | $17,000 | **$204,000** |
| | | | | | | | | | | | | | | |
| Office Supplies | 5710 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | **$2,400** |
| Postage | 5715 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | $250 | **$3,000** |
| Dues and Subscriptions | 5720 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | $350 | **$4,200** |
| Travel Expense | 5726 | | | | | | | | | | $100 | | | **$100** |
| Computer Hardware Expense | 5740 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | $100 | | $100 | $100 | **$1,100** |
| Computer Software Expense | 5745 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | **$48,000** |
| Credit Checks | 5750 | $380 | $380 | $380 | $380 | $380 | $380 | $380 | $380 | $380 | $380 | $380 | $380 | **$4,560** |
| Bank Charges | 5760 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | **$24,000** |
| Other Admin Expenses | 5790 | $0 | | | | | | | | | | | | **$0** |
| **Total Administrative Expense** | | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | $7,280 | **$87,360** |
| | | | | | | | | | | | | | | |
| Property Tax | 5910 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | $28,100 | **$337,200** |
| Loans Fee Expense | 5915 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | $1,352 | **$16,224** |
| Insurance-Property | 5925 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | **$264,000** |
| **Total Taxes & Insurance** | | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | $51,452 | **$617,424** |
| | | | | | | | | | | | | | | |
| Eviction Fees | 6011 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | $600 | **$7,200** |
| Consulting Fees | 6015 | $125 | $125 | $125 | $125 | $125 | $125 | $125 | $125 | $125 | $125 | $125 | $125 | **$1,500** |
| Accounting Fees | | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | $2,300 | **$27,600** |
| Other Professional Fees | 6030 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$0** |
| **Total Other Expenses** | | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | $3,025 | **$36,300** |

| VIAD Phase I, LLC | GL | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | 2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2023 Operating Budget** | | | | | | | | | | | | | | |
| **Total Expenses** | | $188,502 | $187,852 | $191,652 | $188,602 | $185,552 | $186,502 | $191,152 | $185,402 | $185,352 | $191,052 | $185,252 | $185,252 | **$2,252,124** |
| **Net Income (Loss)** | | $466,108 | $466,383 | $462,883 | $473,773 | $476,598 | $475,573 | $479,464 | $484,989 | $485,264 | $485,904 | $491,704 | $491,779 | **$5,740,421** |

WPC Anticipated Draw
Schedule - Aston Park

| | Project/Contract Duration (Days) | | 665 Months | 21.86061801 |
| | REVISED | | 825 Months | 27.12031558 |

Contract Amount $ 57,413,108

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Month | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 1/25/2022 | 2/25/2022 | 3/25/2022 | 4/25/2022 | 5/25/2022 | 6/25/2022 | 7/25/2022 | 8/25/2022 | Date | 9/25/2022 | 10/25/2022 | 11/25/2022 | 12/25/2022 | 1/25/2023 | 2/25/2023 | 3/25/2023 |
| % | 0.0% | 0.0% | 2.0% | 2.1% | 2.2% | 2.3% | 2.4% | 2.4% | % | 2.4% | 2.5% | 3.0% | 5.0% | 6.0% | 7.0% | 7.5% |
| Accumulated % | 0.0% | 0.0% | 2.0% | 4.1% | 6.3% | 8.6% | 11.0% | 13.4% | Accumulated % | 15.8% | 18.3% | 21.3% | 26.3% | 32.3% | 39.3% | 46.8% |
| Projected Draw Per Month | $ - | $ - | $ 1,154,654.00 | $ 1,205,675.27 | $ 1,263,088.38 | $ 1,320,501.48 | $ 1,377,914.59 | $ 1,377,914.59 | Projected | $ 1,377,914.59 | $ 1,435,327.70 | $ 1,722,393.24 | $ 2,870,655.40 | $ 3,444,786.48 | $ 4,018,917.56 | $ 4,305,983.10 |
| Accumulated $ | $ - | $ - | $ 1,154,654.00 | $ 2,360,329.27 | $ 3,623,417.64 | $ 4,943,919.13 | $ 6,321,833.72 | $ 7,699,748.31 | Accumulated $ | $ 9,077,662.90 | $ 10,512,990.60 | $ 12,235,383.84 | $ 15,106,039.24 | $ 18,550,825.72 | $ 22,569,743.28 | $ 26,875,726.38 |
| less retention | $ - | $ - | $ 115,465.40 | $ 120,567.53 | $ 126,308.84 | $ 132,050.15 | $ 137,791.46 | $ 137,791.46 | less retention | $ 137,791.46 | $ 143,532.77 | $ 172,239.32 | $ 287,065.54 | $ 344,478.65 | $ 401,891.76 | $ 430,598.31 |
| Acmltd retention | $ - | $ - | $ 115,465.40 | $ 236,032.93 | $ 362,341.76 | $ 494,391.91 | $ 632,183.37 | $ 769,974.83 | Acmltd retention | $ 907,766.29 | $ 1,051,299.06 | $ 1,223,538.38 | $ 1,510,603.92 | $ 1,855,082.57 | $ 2,256,974.33 | $ 2,687,572.64 |



| Month | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 4/25/2023 | 5/25/2023 | 6/25/2023 | 7/25/2023 | 8/25/2023 | 9/25/2023 | 10/25/2023 | 11/25/2023 | 12/25/2023 | 1/25/2024 | 2/25/2024 | 3/25/2024 | 4/25/2024 | 5/25/2024 | | |
| % | 8.0% | 7.5% | 7.0% | 6.5% | 5.5% | 4.5% | 3.5% | 3.0% | 2.5% | 2.0% | 1.5% | 1.0% | 0.5% | 0.2% | | |
| Accumulated % | 54.8% | 62.3% | 69.3% | 75.8% | 81.3% | 85.8% | 89.3% | 92.3% | 94.8% | 96.8% | 98.3% | 99.3% | 99.8% | 100.0% | | |
| Projected | $ 4,593,048.64 | $ 4,305,983.10 | $ 4,018,917.56 | $ 3,731,852.02 | $ 3,157,720.94 | $ 2,583,589.86 | $ 2,009,458.78 | $ 1,722,393.24 | $ 1,435,327.70 | $ 1,148,262.16 | $ 861,196.62 | $ 574,131.08 | $ 287,065.54 | $ 108,434.38 | $ - | |
| Accumulated $ | $ 31,468,775.02 | $ 35,774,758.12 | $ 39,793,675.68 | $ 43,525,527.70 | $ 46,683,248.64 | $ 49,266,838.50 | $ 51,276,297.28 | $ 52,998,690.52 | $ 54,434,018.22 | $ 55,582,280.38 | $ 56,443,477.00 | $ 57,017,608.08 | $ 57,304,673.62 | $ 57,413,108.00 | $ 108,434.38 | |
| less retention | $ 459,304.86 | $ 430,598.31 | $ 401,891.76 | $ 373,185.20 | $ 315,772.09 | $ 258,358.99 | $ 200,945.88 | $ 172,239.32 | $ 143,532.77 | $ 114,826.22 | $ 86,119.66 | $ 57,413.11 | $ 28,706.55 | $ 10,843.44 | 0.18886693% | |
| Acmltd retention | $ 3,146,877.50 | $ 3,577,475.81 | $ 3,979,367.57 | $ 4,352,552.77 | $ 4,668,324.86 | $ 4,926,683.85 | $ 5,127,629.73 | $ 5,299,869.05 | $ 5,443,401.82 | $ 5,558,228.04 | $ 5,644,347.70 | $ 5,701,760.81 | $ 5,730,467.36 | $ 5,741,310.80 | | |

Total Soft Costs          19,650,000.00
*Per Development Budget
*Not broken down monthly for future draws
*90% of soft costs paid to date (2/16/23) per developer

**Anticipated Draw Schedule**

**Analysis Start Date** 18-Mar-22 $-

| Budget Item: | Adjusted Amount: | 18-Mar-22 Closing Draw | 31-Mar-22 1 | 30-Apr-22 2 | 31-May-22 3 | 30-Jun-22 4 | 31-Jul-22 5 | 31-Aug-22 6 |
|---|---|---|---|---|---|---|---|---|
| Acquisition | $5,680,000 | $5,680,000.00 | $- | $- | $- | $- | $- | $- |
| Hard costs | $42,000,000 | $2,998,692.62 | $1,598,598.15 | $1,692,230.42 | $2,603,109.26 | $3,008,439.15 | $1,934,228.47 | $2,161,137.82 |
| FF&E | $582,633 | | | $8,968.70 | $109,079.50 | | $2,096.99 | $- |
| Permits & Impact Fees | $5,282,231 | $45,803.76 | $4,573,668.61 | | | $11,681.97 | | $- |
| Soft Costs | $3,556,725 | $2,720,033.61 | $42,813.93 | $36,352.30 | $34,634.31 | $25,514.00 | $33,290.65 | $67,109.22 |
| *Contingency | $2,729,371 | $- | $- | $- | $- | $- | $- | $- |
| Deferred Fees | $3,100,000 | $1,550,000.00 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 |
| Interest Reserve | $1,069,041 | $- | $- | $- | $2,536.50 | $12,258.78 | $20,633.88 | $34,933.08 |
| *Subtotal:* | $64,000,000.00 | $12,994,529.99 | $6,301,191.80 | $1,823,662.53 | $2,835,470.68 | $3,144,005.01 | $2,076,361.10 | $2,349,291.23 |
| *Running Hard Costs:* | | $2,998,692.62 | $4,597,290.77 | $6,289,521.19 | $8,892,630.45 | $11,901,069.60 | $13,835,298.07 | $15,996,435.89 |
| *Running Project Costs:* | | $12,994,529.99 | $19,295,721.79 | $21,119,384.32 | $23,954,855.00 | $27,098,860.01 | $29,175,221.11 | $31,524,512.34 |
| *Average Running Interest* | *2.61%* | | | *0.00%* | *0.67%* | *2.02%* | *2.39%* | *3.40%* |

| 30-Sep-22 | 31-Oct-22 | 30-Nov-22 | 31-Dec-22 | 31-Jan-23 | 28-Feb-23 | 31-Mar-23 | 30-Apr-23 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|
| $- | $- | $- | $- | $- | $- | $- | $- |
| $3,249,435.82 | $3,574,379.40 | $3,369,664.94 | $3,246,771.28 | $3,172,559.37 | $2,605,728.76 | $1,932,976.97 | $1,536,716.69 |
| $60,000.00 | $122,500.00 | $- | $- | $- | $- | $182,500.00 | $97,487.81 |
| $- | $- | | $- | $- | $- | $- | |
| $107,290.87 | $97,838.54 | $78,014.23 | $65,830.70 | $57,571.77 | $53,322.10 | $36,931.86 | $27,998.04 |
| $327,524.47 | $382,111.88 | $382,111.88 | $382,111.88 | $382,111.88 | $382,111.88 | $382,111.88 | $40,940.56 |
| $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 | $86,111.11 |
| $42,690.35 | $52,733.17 | $63,594.83 | $73,054.08 | $81,736.15 | $89,799.28 | $95,990.02 | $99,816.86 |
| $3,873,052.61 | $4,315,674.10 | $3,979,496.99 | $3,853,879.05 | $3,780,090.28 | $3,217,073.12 | $2,716,621.83 | $1,889,071.06 |
| $19,245,871.71 | $22,820,251.11 | $26,189,916.05 | $29,436,687.33 | $32,609,246.69 | $35,214,975.45 | $37,147,952.42 | $38,684,669.11 |
| $35,397,564.94 | $39,713,239.04 | $43,692,736.03 | $47,546,615.08 | $51,326,705.36 | $54,543,778.48 | $57,260,400.31 | $59,149,471.37 |
| 3.51% | 3.44% | 3.38% | 3.31% | 3.24% | 3.17% | 3.11% | 3.02% |

| 31-May-23 | 30-Jun-23 | 31-Jul-23 | 31-Aug-23 | 30-Sep-23 | 31-Oct-23 | 30-Nov-23 | | |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 | Total Funded | |
| $- | $- | $- | $- | $- | $- | $- | $5,680,000.00 | OK |
| $981,364.35 | $770,014.16 | $561,560.33 | $474,986.44 | $384,739.02 | $142,666.59 | $- | $42,000,000.00 | OK |
| $- | $- | $- | $- | $- | $- | $- | $582,633.00 | OK |
| $- | $- | $- | $- | $- | $651,076.47 | $- | $5,282,230.81 | OK |
| $21,081.50 | $16,196.00 | $11,622.02 | $9,716.98 | $7,794.96 | $5,767.07 | $- | $3,556,724.64 | OK |
| $11,372.38 | $11,372.38 | $11,372.38 | $11,372.38 | $11,372.38 | $11,372.38 | $- | $2,729,370.55 | OK |
| $86,111.11 | $86,111.11 | $86,111.11 | $86,111.13 | $- | $- | $- | $3,100,000.00 | OK |
| $101,231.96 | $103,949.90 | $106,147.38 | $107,830.97 | $109,302.99 | $110,553.94 | $- | $1,308,794.13 | INCOMPLETE |
| $1,201,161.31 | $987,643.54 | $776,813.21 | $690,017.89 | $513,209.35 | $921,436.45 | $- | $64,239,753.10 | |
| $39,666,033.47 | $40,436,047.63 | $40,997,607.95 | $41,472,594.39 | $41,857,333.41 | $42,000,000.00 | $42,000,000.00 | | |
| $60,350,632.68 | $61,338,276.22 | $62,115,089.44 | $62,805,107.33 | $63,318,316.68 | $64,239,753.13 | $64,239,753.13 | | |
| 2.93% | 2.93% | 2.93% | 2.93% | 2.93% | 2.93% | 0.00% | | |

Aspen @ Maitland West
      2022 Property Tax Paid      $ 101,319.18  (early discount period )
      Loan                      $4,000,000  Principal balance

VIAD Phase II LLC - Reflections
      Development Cost to Date     230,746.71
      Property Tax            N/A           Split from VIAD Phase I LLC in 2022, 2023 will be first tax year

**EXHIBIT E**

## NOTICE ADDRESSES

### Common Member

Nied Member, LLC
485 N. Keller Road, Suite 520
Maitland, Florida 32751
Attention:  Michael Niederst
Email:  mniederst@nmresidential.com

With a copy to:

Kohrman Jackson & Krantz LLP
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114
Attention:  Peggy Beistel
Email:  pbeistel@kjk.com

### Preferred Investor

PCRED II Holding XVIII LLC
c/o PIMCO
1633 Broadway, 44th Floor
New York, New York 10019
Attention: CRE Debt Asset Management
Reference: Nied Facility
Email: NiedFacility-Notices@pimco.com

with a copy to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  I. Erwin Dweck
Email:  edweck@milbank.com

**EXHIBIT F**

**COMMON MEMBER CAPITAL CONTRIBUTION AND PREFERRED INVESTOR PREFERRED INVESTMENT**

1.  Initial Preferred Investment.  As of the Closing Date, the Initial Preferred Investment is the total amount set forth below, which total amount is comprised of the following amounts:

| | |
|---|---|
| Summer House | $14,862,854.00 |
| Aston Park | $10,500,000.00 |
| Aspen @ Maitland West | $4,637,146.00 |
| **TOTAL Initial Preferred Investment** | $30,000,000.00 |

2.  Common Member Capital Contribution.  As of the Closing Date, the Capital Contribution of the Common Member is the total amount set forth below, which total amount is comprised of the following amounts:

| | |
|---|---|
| Summer House | $14,862,854.00 |
| Aston Park | $10,500,000.00 |
| Aspen @ Maitland West | $4,637,146.00 |
| **TOTAL** | $30,000,000.00 |

B-1

**EXHIBIT G**

**SALES PROCEDURES**

At any time after the occurrence and during the continuance of a Common Member Event of Default, Preferred Investor shall be entitled to exercise the Orderly Sale Right in accordance with the procedures set forth below:

(a)      Prior to exercising the Orderly Sale Right, Preferred Investor shall give at least ten (10) Business Days prior written notice to Common Member indicating that that the Preferred Investor is electing to exercise the Orderly Sale Right (an "**Orderly Sale Notice**"; and the date that the Orderly Sale Notice is given, the "**Election Date**").

(b)      Within twenty (20) Business Days following delivery of the Election Notice, Common Member may elect to either (i) pursue a sale in accordance with the Sales Procedures set forth in this Exhibit G (an "**Orderly Sale**") or (ii)  exercise its right set forth in Section 3.7(z)(iii), (iv) or (v), (ii) to cure the applicable Common Member Event of Default, or (iii) redeem the Preferred Investor by paying the Required Redemption Amount in full.  If Common Member elects to prosecute an Orderly Sale, then:

(i)      No later than 30 days following the Election Date, Common Member cause the Company to contract with a national brokerage company with either (1) a broker who has at least ten (10) years of experience marketing properties such as the Property to market each Property on engagement terms and conditions satisfactory to Preferred Investor in its reasonable discretion or (2) a Pre-Approved Broker.

(ii)      No later than 90 days following the Election Notice, Common Member shall cause the Company to select a purchaser for each Property.  Preferred Investor shall have the exclusive right, power and authority of behalf the Company and any Subsidiary to reject any offer or accept any offer to the extent that any such offer would not, in Preferred Investor's reasonable discretion, result in a redemption in full of the Required Redemption Amount;

(iii)      No later than 120 days following the Election Notice, Common Member may enter into a binding purchase and sale agreement for the sale of each Property. Preferred Investor shall have the exclusive right, authority and power to approve any purchase and sale agreement and/or any documents, affidavits or certificates to be executed in connection therewith Any earnest money provided in connection with any such purchase and sale agreement may, at Preferred Investor's election, be held directly by Preferred Investor or be collaterally assigned to Preferred Investor as additional security for the Preferred Investment pursuant to a tri-party agreement with the applicable escrow agent, Property Owner and Preferred Investor.

(iv)      Not later than 180 days following the Election Notice, Common Member shall consummate the sale of each applicable Property.

The failure to satisfy the milestones set forth in any of clauses (i), (ii), (iii) and (iv) above, an "**Orderly Sale Milestone Failure**".

(c)     All aspects of any Orderly Sale (other than as expressly set forth herein) shall be on terms solely reasonably determined by Common Member in consultation with Preferred Investor.

(d)     Notwithstanding the foregoing, in no event shall the consummation of any sale of any Property yield Net Capital Transaction Proceeds in an amount less than the most recent Fair Market Value of the applicable Property set forth in the most recent Appraisal for the applicable Property.

**EXHIBIT H**

**TERMINATION OF MANAGING MEMBER**

(a)    If Preferred Investor delivers a Termination Notice to Managing Member pursuant to Section 11.2(i) hereof, then provisions of this Exhibit H shall apply.

(b)    Procedure.  The Termination Notice shall specify with particularity the basis for the same and shall become effective as of the date of the Termination Notice.

(c)    Effect of Termination Notice.  If a Termination Notice is served upon Managing Member, then the following shall occur:

(i)    Preferred Investor shall, by written (which may be by email) notice (which may be included in the Termination Notice) to Managing Member, be entitled to designate Preferred Investor or an Affiliate of Preferred Investor ("**Designee**") as the managing member of the Company (and in connection therewith, Preferred Investor may Transfer any portion of its interest in the Company to Designee), with all the power and authority previously possessed by Managing Member as managing member under this Agreement (and for the avoidance of doubt, Preferred Investor and/or its Designee shall continue to have all the power and authority of Preferred Investor under this Agreement), and effective immediately after the designation of Preferred Investor or such Designee, Managing Member's interest in the Company shall be automatically converted from that of a managing member to that of a member with no power, authority or right to vote, approve or act for or bind the Company (or any Subsidiary) with respect to any matter in connection therewith or their respective operations, including, without limitation, any Major Decision (any Person acting as a managing member, as so terminated, the "**Terminated Managing Member**").

(ii)    Any sums distributable or payable to the Terminated Managing Member, Guarantor or any Affiliate of any of the foregoing shall be offset against any damages or payments due the Company or Preferred Investor from the Terminated Managing Member, Guarantor or any Affiliate of any of the foregoing (1) under this Agreement and/or (2) under any other Transaction Document and/or (3) under any other agreement or document entered into with the Terminated Managing Member, Guarantor or any Affiliate of any of the foregoing, and shall be paid instead to the Company or Preferred Investor in such order as Preferred Investor shall determine in its sole discretion.  Preferred Investor's claims to any such distributions, account or funds shall be prior to the Company's claims.

(iii)    The Terminated Managing Member shall execute and acknowledge any required amendments and/or restatements to this Agreement reflecting the foregoing, in such form and content as Preferred Investor may reasonably prescribe to effectuate the intent of this Exhibit H, and in furtherance thereof, to the fullest extent permitted by law, the Terminated Managing Member hereby irrevocably and unconditionally constitutes and appoints preferred Investor and Designee its attorney-in-fact, coupled with an interest, to execute on behalf of such Terminated Managing Member all such amendments in the place

and stead of such Terminated Managing Member with the same force and effect as executed thereby.

(iv)     Managing Member shall forthwith:  (1) deliver to Preferred Investor a final accounting; (2) surrender and deliver to Preferred Investor (for the benefit of the Company) all rents and income, including purchase agreement deposits, of the Property or any Company Property and other monies of the Company or any Subsidiary held by, or under the control of Managing Member or any Common Related Party; (3) deliver to Preferred Investor, as received, any monies due the Company or any Subsidiary after such removal; (4) surrender and deliver to Preferred Investor (for the benefit of the Company) all amounts held on deposit in the accounts of the Company or any Subsidiary and all signing authority over such accounts; and (5) deliver to Preferred Investor all materials and supplies, keys, plans, specifications, purchase contracts, sale contracts, and documents, all other accounting papers and records of the Company and any Subsidiary, and all books and records, receipts for deposits, bills and other materials in the possession of Managing Member or any Common Related Party that relate to the Company, any Subsidiary or any Property.

(v)     Promptly upon request by Preferred Investor, Managing Member shall execute and deliver to Preferred Investor a notice to third parties involved with each Property in form reasonably satisfactory to Preferred Investor to the effect that Managing Member is no longer the managing member of the Company (and, as applicable, each applicable Subsidiary).

(vi)     Managing Member and each Common Related Party shall comply with the Covenant of Cooperation with respect the covenants and other requirements set forth in this Exhibit H.

(vii)     Terminated Managing Member shall not be entitled to any reimbursement of expenses or any indemnification from the Company.

(viii)     Nothing in the Termination Notice or the foregoing provisions of this Exhibit H shall be deemed to limit the obligations of the Terminated Managing Member under this Agreement.

(d)     Cumulative Remedies.  Preferred Investor's right to deliver a Termination Notice and the attendant rights under this Exhibit H shall be in addition to, and not in lieu of, any other remedy available to Preferred Investor under this Agreement, at law or, to the fullest extent permitted by law, in equity (including, the collection of monetary damages, the enforcement of this Agreement in equity or the appointment of a receiver for all or part of the Company Property) in the event of breach by Managing Member of its obligations under this Agreement or any other Transaction Document.

B-1

**EXHIBIT I**

**FORM OF SUBORDINATION AGREEMENT**

<u>**SUBORDINATION OF MANAGEMENT AGREEMENT**</u>

This **SUBORDINATION OF MANAGEMENT AGREEMENT** is executed as of [_____], 2023, by and among **NIED MEMBER, LLC**, a Delaware limited liability company ("**Company**"), **NIED OWNERSHIP LLC**, a Delaware limited liability company (together with its successors and permitted assigns, "**Common Member**"), and the entities identified on <u>Exhibit A</u> attached hereto and incorporated herein (each, individually, a "**Manager**" and collectively, the "**Managers**"), for the benefit of **PCRED II HOLDING XVIII LLC**, a Delaware limited liability company (together with its successors and assigns, "**Preferred Investor**").

<u>**R E C I T A L S**</u>

**I.**     The entities identified on <u>Exhibit B</u> attached hereto and incorporated herein (each, individually, an "**Owner**" and collectively, the "**Owners**") and the Managers have entered into the management agreements identified on <u>Exhibit C</u> attached hereto and incorporated herein (each, individually, an "**Agreement**" and collectively, the "**Agreements**"), covering the leasing and management of the properties identified on <u>Exhibit D</u> attached hereto and incorporated herein (individually or collectively as the context may require, the "**Premises**").

**II.**     Pursuant to the terms of that certain Limited Liability Company Agreement of the Company by and among Common Member and Preferred Investor ("**Preferred Equity Agreement**"), Preferred Investor has agreed to make a preferred equity investment to the Company for the purposes specified in the Preferred Equity Agreement, which purposes include owning subsidiaries that may engage in the investment in the Premises.

**III.**     Preferred Investor has required that each of the Managers consent to the subordination of its right, title and interest in each respective Agreement.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, and for valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     **Acknowledgment**.  Each Manager represents and warrants to Preferred Investor that its respective Agreement is currently in full force and effect, and no event of default or default on the part of either respective Manager or Owner exists.

2.     **Subordination**.  Each Manager agrees that its respective Agreement and all rights and duties thereunder shall be and remain and are hereby expressly made subordinate and inferior in all respects to the rights, privileges and powers of Preferred Investor under, and pursuant to the terms, covenants and provisions of, the Preferred Equity Agreement and also agrees that the rights, privileges and powers of Preferred Investor under the Preferred Equity Agreement shall be and remain prior and superior to each and every Agreement and to all of the rights of the undersigned thereunder regardless of how often or in what manner the Preferred Equity Agreement may be renewed, extended, changed or altered.

3.      **Attorney-In-Fact**.  The Company hereby irrevocably appoints Preferred Investor as the Company's attorney-in-fact, from and after the occurrence of a Common Member Event of Default (as defined in the Preferred Equity Agreement) and while such Common Member Event of Default thereafter continues, which appointment is coupled with an interest and is therefore irrevocable, with full power of substitution in the name of the Company, to cause the Owners to do all things and to execute and deliver all documents and receipt for all monies which are necessary or desirable in the performance or enforcement of the Agreements.

4.      **Succession to Ownership**.  Each Manager agrees that if (a) a Common Member Event of Default should occur pursuant to the Preferred Equity Agreement and/or (b) Preferred Investor (including any nominee or designee of Preferred Investor) replaces Common Member as the Managing Member (as defined in the Preferred Equity Agreement) of the Company (a "**Control Shift**"), then, at the option and in the discretion of Preferred Investor exercised by written notice to any of the Managers, either: (i) any or all of the Agreements shall be terminated; and/or (ii) any or all of the Agreements shall remain in full force and effect, and Preferred Investor, on behalf of the Company and the applicable Owner, shall have the right to enforce the rights of the Owner under any Agreement.  With respect to any such Agreement, in the event Preferred Investor elects the option specified in clause (ii) of the immediately preceding sentence, then the respective Manager will perform its duties and obligations for the applicable Owner under the respective Agreement in accordance with the terms and provisions of such Agreement; provided, however, that (A) the applicable Owner shall not be responsible for the payment of any fees that are due and payable to such Manager under such Agreement, for, during or with respect to any period of time prior to the date Preferred Investor has exercised a Control Shift; (B) each applicable Owner shall not be subject to any claims, offsets or defenses which such Manager may have against such Owner; (C) each applicable Owner shall not be bound by any amendment to or modification of the Agreement made without the written consent of Preferred Investor; (D) each applicable Owner shall have no obligation to repair or restore all or any portion of the Premises in the event of damage or destruction to, or condemnation of, any portion of the Premises or any component thereof; and (E) Preferred Investor shall have no personal liability to such Manager for any of the duties and obligations of such Owner under such Agreement.  Furthermore, in the event Preferred Investor terminates any such Agreement pursuant to this paragraph 4, Preferred Investor shall not be liable to any Manager for any damages of any sort or any termination fees, reimbursements or liquidated damages pursuant to such Agreement.

5.      **Transition**.  In the event Preferred Investor terminates any such Agreement on behalf of each applicable Owner pursuant to paragraph 4, above, then, in order to ensure an orderly transition of management of the Premises, each respective Manager agrees as follows:

(a)      Following such Manager's receipt of notice from Preferred Investor that Preferred Investor is terminating such Agreement on behalf of each applicable Owner, on the date of termination specified in such notice, such Manager shall surrender and turn over to the Company all accounts, receipts and funds of the respective Owner pertaining to the Premises, including, without limitation, all operating accounts, reserve accounts, debt service accounts, income accounts, payroll accounts (other than to the extent of existing obligations of such Manager to employees), and all other bank accounts, receipts or deposits of every kind or nature.

SUBORDINATION

(b)      Such Manager shall deliver to Preferred Investor all information in the possession, custody or control of such Manager relating to the occupancy, leasing and operation of the Premises.

6.      **Rights of Preferred Investor Cumulative**.  The rights of Preferred Investor under this Subordination of Management Agreement shall be in addition to any other rights and remedies available to Preferred Investor under the terms of the Preferred Equity Agreement.

7.      **Amendments and Assignments**.  Without the prior written consent of Preferred Investor, Managers shall not modify or amend any Agreement, consent to any mutual termination of any Agreement by any Owner and Manager, or transfer or assign any of any Manager's rights and interests under any Agreement.

8.      **Default of Owner(s)**.  Each Manager shall transmit to Preferred Investor a copy of any notice or statement of default under the respective Agreement transmitted to the respective Owner by such Manager, and in the event such Owner shall fail to cure any such default within any applicable cure period provided in such Agreement, such Manager shall not terminate such Agreement on account of such default unless and until such Manager shall have given Preferred Investor written notice of such Owner's failure to cure such default and afforded Preferred Investor thirty (30) days from its receipt of such notice, within which time Preferred Investor shall have the right, but not the obligation, to cure such default; provided, however, that if the default is of such a nature that more than thirty (30) days are required to cure such default, then Preferred Investor shall be afforded a reasonable time to cure such default provided that Preferred Investor undertakes promptly to cure such default and thereafter diligently continues such cure to completion; provided, further, however, that Preferred Investor shall have no obligation to cure any such default.  The provisions of this paragraph shall apply only to defaults, or events or circumstances which would constitute defaults, occurring prior to the date on which Preferred Investor succeeds to the interest of any Owner in and to any Premises, and from and after such date, the provisions of the respective Agreement shall govern the giving of notice to, and curing of defaults by, Preferred Investor.

9.      **Exhibit Updates**.  In connection with any Investment Opportunity (as defined in the Preferred Equity Agreement) effectuated under and in accordance with the Preferred Equity Agreement, Exhibits A, B, C and D attached hereto and incorporated herein may be updated, as applicable, with any new required party being permitted to execute a joinder hereto, in form and substance acceptable to Preferred Investor.

10.     **Governing Law**.    This Subordination of Management Agreement shall be governed by, and construed, interpreted and enforced in accordance with the laws of New York (excluding conflict of laws principles).

11.     **Successor and Assigns**.  This Subordination of Management Agreement shall be binding upon the Managers and each of their successors, legal representatives and assigns and shall inure to the benefit of Preferred Investor and its successors, legal representatives and assigns (including any person or entity which succeeds to the interest of Preferred Investor under the Preferred Equity Agreement).  Notwithstanding any provision of any Agreement to the contrary, in the event Preferred Investor transfers and conveys its interest in any Premises, Preferred Investor

(without the consent of any Owner or any Manager) may transfer and assign its right, title and interest in and to any Agreement to the transferee of any Premises, and upon such transfer and assignment, any obligations and liabilities of Preferred Investor under any such Agreement shall terminate and shall thereafter be the responsibility of such transferee, and such transferee shall thereafter be subject to all transfer restrictions contained in such Agreement.

12.    **Counterparts**.  This agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK, SIGNATURE PAGE FOLLOWS]*

**COMPANY:**

**NIED MEMBER, LLC**, a Delaware limited
liability company

By: _____

          Name:    Michael Niederst
          Title:     Authorized Representative

STATE OF _____    )
                              )    SS:
COUNTY OF _____    )

       The foregoing instrument was acknowledged before me by means of [ ] physical presence or [ ] online notarization, this ___ day of _____, 2023 by Michael Niederst as Authorized Representative of **NIED MEMBER, LLC** a Delaware limited liability company, on behalf of the limited liability company.  He is personally known to me or produced _____ as identification and did not take an oath.

                                Notary: _____
      [NOTARIAL SEAL]         Print Name:
                                  NOTARY PUBLIC, STATE OF _____
                                  My commission expires _____

Signature Page to
Subordination of Management Agreement

                   SUBORDINATION

**MANAGER:**

**NM RESIDENTIAL, LLC**, a Florida limited
liability company

By: _____
      Name:   Michael Niederst
      Title:    Authorized Representative

STATE OF _____   )
                         )   SS:
COUNTY OF _____  )

      The foregoing instrument was acknowledged before me by means of [ ] physical presence or [ ] online notarization, this ___ day of _____, 2023 by Michael Niederst as Authorized Representative of **NM RESIDENTIAL, LLC** a Florida limited liability company, on behalf of the limited liability company.  He is personally known to me or produced _____ as identification and did not take an oath.

                          Notary: _____
    [NOTARIAL SEAL]        Print Name:
                          NOTARY PUBLIC, STATE OF _____
                          My commission expires _____

Signature Page to
Subordination of Management Agreement

## **EXHIBIT A**

### **Managers**

1. NM Residential, LLC, a Florida limited liability company

## **EXHIBIT B**

### **Owners**

1.  VIAD Phase I, LLC, a Florida limited liability company

2.  MRAD Phase I, LLC, a Florida limited liability company

3.  MRAD Phase II, LLC, a Florida limited liability company

4.  LWAD Phase I, LLC, a Florida limited liability company

5.  Aston Park MF, LLC, a Delaware limited liability company

6.  RRAD Phase I, LLC, a Florida limited liability company

**EXHIBIT C**

**Management Agreements**

1. Leasing and Property Management Agreement, dated as of July 9, 2018, by and between VIAD Phase I, LLC and NM Residential, LLC, as amended by that certain First Amendment.

2. Leasing and Property Management Agreement, dated as of June 11, 2018, by and between MRAD Phase I, LLC and NM Residential, LLC.

3. Leasing and Property Management Agreement, dated as of December 8, 2021, by and between MRAD Phase II, LLC and NM Residential, LLC.

4. Leasing and Property Management Agreement, dated as of July 2, 2019, by and between LWAD Phase I, LLC and NM Residential, LLC.

5. Leasing and Property Management Agreement, dated as of April 22, 2022, by and between Aston Park MF, LLC and NM Residential, LLC.

6. 12-1-2020, Leasing and Property Management Agreement, dated as of December 1, 2020, by and between RRAD Phase I, LLC and NM Residential LLC.

Exhibit C - 1                SUBORDINATION

## **EXHIBIT D**

### **Premises**

1.  Venice Isles Apartments

2.  Marden Ridge

3.  Summer House at Lake Apopka

4.  Serenity at Lake Wales

5.  Aston Park

6.  Vale East Student Living

## SCHEDULE 1

### Existing Indebtedness

| Entity | Lender | Principal |
|---|---|---|
| MRAD Phase I LLC | Pimco | $53,000,000.00 |
| VIAD Phase I LLC | Pimco | $73,000,000.00 |
| LWAD Phase I LLC | Pimco | $60,000,000.00 |
| RRAD Phase I LLC | American Momentum Bank | $42,828,412.76 |
| MWAD Phase II LLC | Huntington National Bank | $4,000,000.00 |
| MRAD Phase II LLC | Huntington National Bank | $44,325,000.00 |
| Aston Park MF, LLC | Huntington National Bank | $59,000,000.00 |

## SCHEDULE 2

### Pre-Approved Brokers

- *Marcus & Millichap / IPA*
- *CBRE*
- *JLL*
- *Foundry*
- *Newmark*
- *Berkadia*
- *Colliers*
- *Eastdil*
- *Walker & Dunlop*

## **SCHEDULE 3**

### **Pre-Approved Appraiser**

- *Colliers*
- *Crown*
- *CBRE*
- *Cushman & Wakefield*
- *Partner Engineering and Science*
- *JLL*
- *Newmark*

## SCHEDULE 4

## Shared Control Subsidiaries

- *Aston Park Member, LLC*

## SCHEDULE 5

### Pre-Approved Affiliate Contracts

A. That certain Leasing and Property Management Agreement made and effective as of December 8, 2021 by and between MRAD Phase II, LLC and NM Residential, LLC (the "**MRAD II PMA**");

B. Any leasing and property management agreement with respect to any Property with NR Residential, LLC as the property manager that is substantially identical to the MRAD II PMA; provided that, (i) if the aforesaid agreement is with respect to 250 units or greater, than the fee is the greater of 2.5% of monthly gross revenue and $9,000 / month, (ii) if the aforesaid agreement is with respect to less than 250 units, than the fee is the greater of 3.0% of monthly gross revenue and $9,000 / month.  Any deviation from the foregoing shall be subject to Preferred Investor's consent, not to be unreasonably conditioned, withheld or delayed.

C. That certain Development Services Agreement dated as of March 15th, 2022 made and entered into by MRAD Phase II, LLC and NM Residential, LLC.

## **SCHEDULE 6**

## **RESTRICTED TRANSFEREES**

- Fortress

## SCHEDULE 7

## INVESTMENT OPPORTUNITY CARVEOUT

None

## SCHEDULE 8

## ANTICIPATED REFINANCE ASSETS

| PROPERTY | Address | Unit Count | Other Pertinent Information |
|---|---|---|---|
| 949 Cleveland Street LLC | 949 Cleveland Street, Clearwater, FL 33755 | 257 | 12,000 square foot retail food hall |
| MWAD Phase I LLC | 9301 Summit Centre Way, Orlando, FL 32810 | 315 | |
| AWAD Phase I LLC | 1231 Arya Way, Ocoee, FL 34761 | 148 | Active Adult community |
| DALD Phase I LLC | 846 Signature Dr, Debary, FL 32763 | 106 | Assisted living, memory care and independent living |

Schedule 9

## FORM OF CERTIFICATE

**Number [001]**                       **ORGANIZED UNDER THE LAWS OF THE STATE OF DELAWARE**                   **100% of Common Member Interests**

**NIED MEMBER, LLC**, a Delaware limited liability company

This is to certify that         **NIED OWNERSHIP, LLC**, a Delaware limited liability company         is the owner of

**\*\*\* ONE HUNDRED PERCENT of Common Member Interests (100%) \*\*\***

**FULLY PAID AND NON-ASSESSABLE INTERESTS OF**
**NIED MEMBER, LLC**, a Delaware limited liability company

transferable on the books of the Limited Liability Company by the holder hereof in person or by duly authorized Attorney, upon surrender of this Certificate, properly endorsed.

This certificate evidences an interest in **NIED MEMBER, LLC, a Delaware limited liability company** (the "*Company*") and shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and, to the extent permitted by applicable law, Article 8 of the Uniform Commercial Code of each other applicable jurisdiction. Each common member interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. THE TRANSFER OF THIS CERTIFICATE AND/OR THE INTEREST EVIDENCED HEREBY IS RESTRICTED AS PROVIDED IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY (AS AMENDED FROM TIME TO TIME).

WITNESS, the signature of an officer of the Limited Liability Company.

Dated: _____, 2023

                                            **NIED MEMBER, LLC**, a Delaware limited liability company

                                            By: _____

                                                  Name:

                                                  Title:

**EQUITY INTEREST POWER**

FOR VALUE RECEIVED, **NIED OWNERSHIP, LLC**, a Delaware limited liability company, hereby sells, assigns and transfers unto _____ 100% of the common member interests of **NIED MEMBER, LLC**, a Delaware limited liability company, represented by membership certificate Number [001] herewith, and does hereby irrevocably constitute and appoint _____ as attorney to transfer the said membership interests on the books of **NIED MEMBER, LLC**, a Delaware limited liability company, with full power of substitution in the premises.

Dated: _____, 20___

<div style="margin-left:50%">

**NIED OWNERSHIP, LLC**, a Delaware limited liability company

By: _____
    Name:
    Title:

</div>

**Exhibit 3**

**Proposed Order**

5

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

www.flmb.uscourts.gov

IN RE:                                                   Chapter 11 Case

NIED OWNERSHIP LLC,                       Case No. 6:26-bk-3232-TPG


Debtor.

_____/

**ORDER GRANTING ACRE CFPORTFOLIO LLC'S**
**MOTION TO COMPEL DEBTOR TO ESTABLISH AND FUND**
**A SEGREGATED CASH RESERVE PENDING A DETERMINATION**
**OF THE ALLOWED AMOUNT OF ITS SECURED CLAIM**

**THIS MATTER** having come before the Court upon *ACRE CFPortfolio LLC's Motion to Compel Debtor to Establish and Fund a Segregated Cash Reserve Pending a Determination of the Allowed Amount of Its Secured Claim* [Docket No. •] (the "Motion"); and the Court having considered the Motion, any response thereto, and the arguments of counsel; and finding good cause for the relief requested therein; it is hereby

**ORDERED** that:

1.      The Motion is **GRANTED**.

2.      Upon the closing of the Refinancing Transaction[11], the Debtor shall deposit no less than $117,888,630.37 into a segregated escrow account maintained at Berger Singerman LLP, or such other escrow account as may be agreed upon by the Debtor and ACRE (the "Reserve"), pending determination of the Allowed ACRE Secured Claim by this Court or by written agreement of the Debtor and ACRE.

---

[11] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Plan, as applicable.

6

3. Upon the earlier of (a) written agreement of ACRE and the Debtor on the allowed amount of the Allowed ACRE Secured Claim, or (b) entry of a Final Order of this Court determining the amount of the Allowed ACRE Secured Claim, the Reserve (or such portion thereof as equals the amount of the Allowed ACRE Secured Claim) shall be immediately released to ACRE from the Reserve without further order of this Court.

4. This Order is without prejudice to ACRE's rights to seek additional amounts in the Reserve or otherwise, including, but not limited to, pursuant to Fed. R. Bankr. P. 8007(a)(1) or M.D. Fla. L.B.R. 8007-1(a), sufficient to cover the continuing interest and ACRE's reasonable legal fees and other expenses, including, but not limited to, interest, legal fees and expenses expected to accrue through final disposition of any appeal or otherwise.

5. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

(*Counsel for ACRE is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file proof of service within three days of entry of this order.*)