**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

NIED OWNERSHIP LLC,

Chapter 11
Case No. 6:26-bk-03232-TPG

Debtor.
_______________________________/

**ACRE CFPORTFOLIO LLC'S SECOND SUPPLEMENTAL OBJECTION TO CONFIRMATION OF THE DEBTOR'S CHAPTER 11 PLAN**

ACRE CFPORTFOLIO LLC ("ACRE"), the Debtor's sole secured creditor, hereby files this second supplemental objection (the "Second Supplemental Objection") in further support of the *Objection to Confirmation of the Debtor's Chapter 11 Plan* [Docket No. 131] (the "Initial Confirmation Objection" and its S*upplemental Objection to Confirmation of the Debtor's Chapter 11 Plan* [Docket No. 156] (the "First Supplementation Confirmation Objection", and together with the Initial Confirmation Objection and the Second Supplemental Objection, the "Confirmation Objections").[1] In support hereof, ACRE respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Plan promises ACRE two things: full payment if the Refinancing Transaction closes and, if not, dismissal. Developments since the first confirmation hearing on July 16, 2026 (the "July 16 Hearing") show that both promises will fail. The mortgage lender for Arya at Windermere (a property the Debtor values at $49.9 million to $83.5 million) has scheduled a UCC Article 9 foreclosure sale of 100% of the equity interests in the entity that owns Arya at Windermere **before** the Plan's Effective Date and before the dismissal remedy becomes available. Making matters worse, the Updated OWS Term Sheets provide less financing on materially more onerous terms; and the Debtor's own sources-and-uses framework reveals a shortfall of approximately [redacted] with no committed funding source.[2] Even if the Refinancing

---

[1] Capitalized terms used but not otherwise defined in this Second Supplemental Objection shall have the meanings ascribed to such terms in the *Debtor's Chapter 11 Plan of Reorganization* [Docket No. 67], as amended by the *Notice of Amendments to Chapter 11 Plan of Reorganization* [Docket No. 151] (collectively, the "Plan").

[2] The updated OWS Facility term sheets (the "Updated OWS Term Sheets") can be found in ACRE's Supplemental Exhibit List [Docket No. 186] (the "ACRE Supplemental Exhibit List"), Ex. 93-95. A summary of change between the prior versions and the current versions are set forth in **Exhibit 1** hereto. Additionally, ACRE has prepared its own sources and uses, which is attached as **Exhibit 2**. ACRE's sources and uses incorporates payoff information received on August 20, 2026, the actual estimated amount of ACRE's claim through August 31, 2026, default interest that is due and payable, and the reduced source amount from the Updated OWS Preferred Equity Term Sheet. As ACRE will show at the August 27, 2026 hearing, the Debtor's sources and uses omits the true payoff amounts, overstates the sources, and should not be relied upon. Obtaining the true payoff amounts has been tedious and the Debtor withheld such information until it was forced to produce it by ACRE's Motion to Compel. *See* Docket No. 182. Even so, the

Transaction closes, the Plan does not ensure that ACRE will be paid in full or that sufficient funds will be reserved to satisfy its claim. The Plan therefore is not feasible, does not leave ACRE unimpaired, and improperly delays ACRE's remedies while the value of its collateral disappears.

2. ACRE sought dismissal months ago. On May 12, 2026, ACRE filed its *Motion to Dismiss Chapter 11 Case or, in the Alternative, for Relief from the Automatic Stay* [Docket No. 23] (the "Motion to Dismiss") because the Debtor had no viable path to reorganization, and the value of its indirect interests in the Portfolio was exposed to continuing property-level defaults and foreclosure proceedings. ACRE responded by agreeing to have that motion heard together with confirmation on July 2, because the issues overlapped: whether the Debtor could consummate a feasible refinancing, pay its creditors, and justify continuing this case. Now, that procedural accommodation is being used to deny ACRE relief while the collateral supporting its claim disappears.

3. The most immediate threat to ACRE and the Debtor's bankruptcy estate is no longer theoretical. On July 20, 2026, Portfolio level lender NewPoint JV Sub CB, LLC ("NewPoint") issued a notice scheduling a September 22 public sale of the pledged equity interests of the entity that owns Arya at Windermere.[3] The Arya at Windermere borrower is not a debtor, and the foreclosure is not stayed by this Chapter 11 Case. The Debtor's own valuation report values

true payoff amounts are incomplete and despite many representations at the hearing that the Debtor was prepared to close on August 31, 2026, the Debtor's response makes clear that it has not scheduled a closing date, presumably because it lacks the funding to consummate the Plan. *See* Docket No. 192 ("The Debtor has a closing call with the lenders providing the financing (OWS and BSP) to select a closing date and understands that the remaining payoff statements will be provided by the existing lenders after the closing date is determined.")

[3] *See* ACRE Supplemental Exhibit List, Ex. 96 (the "UCC Sale Notice"). Notably, NewPoint is an affiliate of Benefit Street Partners, which is allegedly ready, willing and able to fund up to $435 million (i.e., the so-called BSP Facility) under the Debtor's Plan.

Arya at Windermere at $49.9 million on an as-is basis and $83.5 million on an as-stabilized basis.[4] If the foreclosure proceeds, Arya at Windermere will leave the Portfolio, materially reduce the value supporting ACRE's claim, eliminate an expected source of Refinancing Proceeds, and jeopardize the broader Refinancing Transaction. ACRE agreed to test dismissal and confirmation together; it did not agree to wait while the very harm identified in its Motion to Dismiss materialized.

4. The Updated OWS Term Sheets referred to during but produced by the Debtor **after** the July 16 Hearing compound that risk.[5] They reduce the proposed preferred-equity investment from [redacted]. Not one of the Updated OWS Term Sheets had been executed at the time they were produced. The preferred-equity term sheet expires on [redacted]—before the continued confirmation hearing—and the property-level loan applications expire on [redacted]. At bottom, these are not firm commitments capable of supporting confirmation.

5. The Refinancing Transaction is also substantially underfunded. Applying the revised financing amounts to the Debtor's own sources-and-uses framework, ACRE calculates approximately [redacted] of required uses against only [redacted] of proposed financing sources. A [redacted] shortfall. Surprisingly, Mr. Niederst claims that his family will make

[4] *See* Report by Nathan Lynch regarding value of properties in portfolio, attached as Exhibit 42 to the Debtor's Exhibit List [Docket No. 163] (the "Debtor Exhibit List").

[5] Given the changes made by OWS, it is not at all surprising that the Debtors produced the new OWS Term Sheets after the July 16 Hearing, although Michael Niederst claimed to have received them on the eve of trial.

up the difference. Yet, neither the Plan nor the financing documents obligate the Niederst family or anyone else to provide such funding. The Debtor has offered nothing, in writing, to evidence the Niederst family guaranty that Michael Niederst testified to at the July 16 Hearing. Thus, even if every proposed lender funds the maximum amount contemplated, the Debtor has not established that it possesses sufficient committed capital to consummate the Refinancing Transaction and to perform under the Plan.

6. Nor would a closing necessarily provide ACRE the treatment the Plan promises. The Plan designates ACRE as unimpaired and promises full payment of its Allowed ACRE Secured Claim, but its reserve mechanism does not ensure that sufficient funds will remain available to satisfy the interest, fees, costs, and charges that continue to accrue until ACRE is actually paid. As explained in *ACRE CFPortfolio LLC's Motion to Compel Debtor to Establish and Fund a Segregated Cash Reserve Pending a Determination of the Allowed Amount of its Secured Claim* [Docket No. 176] (the "Reserve Motion"), unless ACRE is paid in full at closing or a sufficient reserve is funded to satisfy the full amount ultimately allowed, the Plan impairs ACRE's claim while denying ACRE a vote and the protections afforded to an impaired, nonaccepting secured creditor.

7. The Plan's dismissal provision likewise provides no protection against the immediate erosion of ACRE's collateral. If a confirmation order is entered on August 27 and becomes final approximately fourteen days later, the Effective Date would occur on or about September 10. The Plan would then give the Debtor another forty-five days—until approximately October 25—to close the Refinancing Transaction before dismissal. By then, NewPoint's foreclosure will have removed Arya at Windermere from the Portfolio. Time is running out for

both the Debtor and for ACRE, which has not been adequately protected during the course of these proceedings.

8. The Debtor should not receive the benefit of confirmation while avoiding paying ACRE in full or allowing it to exercise remedies before losing the value of Arya at Windermere, a Portfolio property with a value of between $49.9 and $83.5 million. The Plan should not be confirmed, and the Chapter 11 Case should be dismissed immediately with prejudice. At a minimum, any confirmation order must require that: (a) upon closing, the Debtor either pay ACRE in full or fund the Reserve in the amount requested by ACRE in the Reserve Motion; and (b) if the Refinancing Transaction does not close by August 31, 2026, this Chapter 11 Case be dismissed immediately with prejudice, without any further hearing or an additional forty-five-day period during which ACRE's collateral may be further depleted.

**ARYA AT WINDERMERE OUT-OF-COURT EQUITY FORECLOSURE**

9. Throughout this case, ACRE has warned that the Portfolio—the twelve Central Florida properties in which the Debtor holds an indirect interest through Nied Member, LLC—is subject to rapid erosion because the ten property-level borrowers are in default under their respective mortgage loans and are not protected by the automatic stay. *See* Motion to Dismiss ¶¶ 8-9, 12, 29–30. As of the Petition Date, three Portfolio properties were already subject to judicial foreclosure proceedings. *Id* ¶¶ 12, 30. Although those foreclosures remain pending, the same threat has now materialized in a more immediate form with respect to a fourth property.

10. Specifically, NewPoint has issued a UCC Sale Notice scheduling a September 22, 2026, public sale of the pledged equity interests in the entity that owns Arya at Windermere. NewPoint is the mortgage lender for Arya at Windermere under a loan with an outstanding principal balance of approximately $35 million and holds both a mortgage lien on the property and

a pledge of the equity interests in the property-owning entity. NewPoint is now exercising its UCC Article 9 remedies against those equity interests. If NewPoint's foreclosure proceeds as scheduled, ownership of the property-owning entity will be lost and Arya at Windermere will leave the Portfolio in September. The Debtors ascribe a valuation of $49.9 million on an as-is basis and $83.5 million on an as-stabilized basis for the Arya at Windermere property (implying an equity value of approximately $15 million to $49 million for ACRE's benefit). A foreclosure sale of this asset would substantially degrade the Portfolio and the collateral securing ACRE's claim.

**UPDATED OWS TERM SHEETS**

11. At the July 16 confirmation hearing, Mr. Niederst testified that he had received updated term sheets for the OWS Facility by email, but he had not opened them. He nevertheless represented that they contained "the same terms as what's in here, just with new dates." Confirmation Hr'g Tr. at 138:18–139:1. That representation was false. A summary of changes negatively impacting the Refinancing Transactions is attached at **Exhibit 1**.

12. Beyond reducing the proceeds available to fund ACRE's and other claims, the Updated OWS Term Sheets impose materially tighter economics than the versions previously admitted into evidence.[6] Among other things, they [redacted] The Updated OWS Preferred Equity Term Sheet is particularly onerous: it raises the [redacted], increases the [redacted]

[6] The updated OWS preferred equity term sheet is Ex. 93 to the ACRE Supplemental Exhibit List (the "Updated OWS Preferred Equity Term Sheet"), the updated loan application to refinance the Arya at Windermere loan is Ex. 94 to the ACRE Supplemental Exhibit List (the "Updated Arya at Windermere Loan Application"), and the updated loan application to refinance the Vale East loan is Ex. 95 to the ACRE Supplemental Exhibit List (the "Updated Vale East Loan Application").

[redacted], and increases the [redacted], while converting the [redacted]. It also requires [redacted]. The Updated Arya at Windermere Loan Application likewise raises the [redacted], increases the [redacted], and shortens the [redacted] The Updated Vale East Loan Application similarly increases the [redacted].

13. These more burdensome economic terms are coupled with new execution risks. The Updated OWS Term Sheets condition closing on the [redacted]. None of the Updated OWS Term Sheets had been executed when produced by the Debtor. Taken together, these changes confirm that the financing on which the Plan depends is not only smaller and more expensive than previously represented, but also meaningfully less certain and further from closing than the record before the Court at the July 16 hearing suggested.

**REFINANCING SHORTFALL**

14. The Refinancing Transactions do not provide enough proceeds to pay off ACRE, the Debtor's other creditors, and the property-level lenders in full; the evidence shows that they will be short by approximately $[redacted].[7] The Debtor's testimony and other evidence

[7] *See* **Exhibit 2**. The shortfall may even be higher. ACRE assumes that the Debtor is able to close on facilities with One Florida Bank for $[redacted] and $[redacted]. The term sheets for One Florida Bank facilities were produced to ACRE on August 21, 2026 and are non-binding. These were not contemplated sources in the Plan and were not

presented at the July 16 Hearing only heightened ACRE's concerns regarding the Plan's feasibility. The evidence showed that, even assuming the Refinancing Transaction can be consummated—an assumption ACRE disputes—the anticipated proceeds would be insufficient to achieve the Plan's stated objectives of refinancing the existing mortgage indebtedness encumbering the Portfolio and funding distributions to creditors. At the outset, the Debtor's sources and uses (the "Sources and Uses") reflects a $6.2 million "plug" representing an admitted funding shortfall.[8] Confirmation Hr'g Tr. at 170:19–171:25; Sources and Uses. More significantly, the Sources and Uses omit accrued interest from the mortgage balances, even though several of the Debtor's subsidiaries have failed to make interest payments for several months and multiple lenders are charging interest at default rates. Sources and Uses; Confirmation Hr'g Tr. at 147:5–18, 149:2–20, 150:5–18. The Sources and Uses also assumed an $89 million payment to ACRE, even though Mr. Niederst acknowledged that ACRE's claim had increased above that amount merely through the passage of time, and ACRE asserts that its claim will total approximately $97.7 million by August 31, 2026. *Id.* at 151:18–152:11, 170:25–171:3; Reserve Motion, Ex. 1.[9] And, the Sources and Uses does not account for approximately $2 million in additional amounts asserted by American Momentum Bank, which the Debtor apparently intends to challenge through a claim objection. *Id.* at 149:2–20, 166:3–166:23, 172:4–7.[10]

---

produced by the Debtor until ACRE saw them in the sources and uses provided to ACRE on August 21, 2026 naming the facilities.

[8] Debtor Exhibit List, Ex. 43.

[9] While the updated sources and uses produced by the Debtor on August 21, 2026 have a [redacted] payoff amount, this is also short of ACRE's claim as of August 31, 2026.

[10] While the Debtor's updated sources and uses show an additional [redacted] owed to American Momentum Bank, the Debtor does not include this additional amount as part of the "uses".

15. While the Debtor provided updated sources and uses on August 21, 2026, they did not cure the substantial shortfall that the Debtor faces. These deficiencies produce a likely funding shortfall of approximately [redacted] as set forth in **Exhibit 2**.

16. The Debtor's position is that it is "very possible" that trapped cash and escrowed reserves could cover that shortfall because the Debtor's subsidiaries' mortgage lenders have been sweeping large amounts of cash each month. *Id.* at 172:4–21. This "trapped cash" appeared nowhere in the Sources and Uses.[11] Mr. Niederst further testified that, if the trapped cash and escrowed reserves proved insufficient, the Niederst family would fund the remaining shortfall. *Id.* at 167:20–22, 173:3–14. When asked, however, whether the family's commitment had been reduced to writing, Mr. Niederst identified no such writing. *Id.* at 173:3–14. The record contains no evidence substantiating either of the purported solutions to the shortfall.[12]

**ACRE'S CLAIM**

17. As detailed further in the Reserve Motion, ACRE's claim as of August 31, 2026 is approximately $97.7 million. The Plan provides that the Allowed ACRE Secured Claim shall be determined either "by agreement between the Debtor and ACRE" or "a Final Order of the Bankruptcy Court." Plan § 5.04(1). The Plan further provides that the Allowed ACRE Secured Claim "shall be paid in full in Cash from the Refinancing Proceeds upon the closing of the Refinancing Transaction," and that, "[t]o the extent the Allowed ACRE Secured Claim has not been adjudicated as of closing," the Debtor's bankruptcy counsel "shall reserve in its trust account an amount from the Refinancing Proceeds equal to the lesser of (x) ACRE's asserted claim amount

[11] While the Debtor provided updated sources of uses with some money stating that the lenders have approximately [redacted] of rents held in lender accounts, these rents do not make a dent in the shortfall.

[12] It also appears that Mr. Niederst is not paying the allowed administrative expenses of the Debtor's counsel, who has filed a motion to withdraw from their representation of the Debtor, another reason that the Plan cannot be confirmed. *See* Docket No. 193.

and (y) such other amount as the Bankruptcy Court may order pending resolution of such dispute." *Id*. § 5.04(2). Class 2, which consists solely of the Allowed ACRE Secured Claim, is considered unimpaired under the Plan and is therefore conclusively presumed to have accepted the Plan. *Id*. § 5.04(3). As detailed in the Reserve Motion, the Debtors do not propose providing the necessary consideration to pay ACRE in full.

## OBJECTION

### I. The Plan Is Not Feasible Because the Updated OWS Term Sheets Exacerbate the Existing Funding Shortfall and Create Additional Execution Risk

18. ACRE incorporates the feasibility arguments set forth in its Confirmation Objection. *See* Confirmation Objection ¶¶ 35–44. Section 1129(a)(11) requires feasibility to be firmly rooted in objective facts, not a "visionary scheme" dependent on uncertain future events. *In re JRV Indus., Inc.*, 344 B.R. 679, 683 (Bankr. M.D. Fla. 2006); *In re D & G Invs. of W. Fla., Inc.*, 342 B.R. 882, 886 (Bankr. M.D. Fla. 2006). Where, as here, every distribution under a plan depends on future financing, the debtor must present evidence of a sufficiently firm financing commitment. *See In re Aspen Vill. at Lost Mountain Assisted Living, LLC*, 609 B.R. 555, 568 (where a plan depends on post-petition financing, feasibility cannot be satisfied without evidence of a firm commitment of financing). Nonbinding proposals subject to unresolved diligence, credit approval, and material closing conditions do not satisfy that burden.

19. The Updated OWS Term Sheets are not evidence of committed financing. Each expressly disclaims any [redacted] None has been executed, and the Debtor has produced no evidence that the required acceptance payments were timely made. More fundamentally, the Updated OWS

Preferred Equity Term Sheet expires by its terms on [redacted]—before the continued confirmation hearing—unless the transaction closes or OWS agrees to extend it.

20. The Updated OWS Term Sheets also contain conditions that cannot be reconciled with the Debtor's August 31 target closing date. The Arya and Vale East Loan Applications require the [redacted]. In addition, the Updated OWS Preferred Equity Term Sheet requires [redacted]. And the Arya and Vale East loans are [redacted], meaning the scheduled Arya at Windermere foreclosure threatens both financings.

21. The updated terms also make the existing funding deficit worse. They reduce the proposed preferred-equity investment from [redacted], eliminating [redacted] of anticipated proceeds. They further require at least [redacted] for Arya at Windermere and [redacted] for Vale East. The Updated Arya at Windermere Loan Application also increases the [redacted]. Yet the Debtor has produced no binding commitment requiring the Niederst family or anyone else to supply the required equity, liquidity, or substantially larger amount necessary to consummate the entire Refinancing Transaction.

22. In short, the Updated OWS Term Sheets provide less usable financing, require millions of dollars of additional uncommitted capital, and impose conditions that cannot be

satisfied by August 31 on their stated terms. They do not cure the feasibility problems identified in ACRE's Confirmation Objection; they compound them.

## II. Even Accepting the Debtor's Most Optimistic Assumptions, the Refinancing Transaction Faces an Approximately [redacted] Shortfall with No Committed Funding Source

23. Even if the Debtor receives every dollar of projected proceeds from the Refinancing Transaction, those proceeds will be insufficient to satisfy the Plan's required uses. A plan that lacks sufficient funding to pay the claims it promises to pay is not feasible. *See In re Whispering Pines Estate, Inc.,* 2008 BNH 16 at *6 (finding that "the Plan is not feasible because it does not provide sufficient funding to satisfy all the claims.").

24. Applying the Debtor's sources-and-uses framework, updated to reflect the latest term sheets, estimated property level mortgage debt, and ACRE's claim as of August 31, 2026, the Refinancing Transaction requires approximately [redacted] Those uses include approximately [redacted] million to repay the property-level senior loans, approximately $97.7 million to satisfy ACRE's claim, and approximately [redacted] for other claims, liens, reserves, fees, and closing costs. By contrast, the proposed financings provide only $[redacted] million in proceeds: $435 million from BSP, $76.05 million from the OWS property-level loans, $40 million from the OWS preferred-equity facility, [redacted] from the One Florida Bank Facilities, and $[redacted] from the OFB MWAD Land Loan, resulting in a [redacted] shortfall. Neither the Plan nor the Updated OWS Term Sheets provide a committed source for that amount.

25. Mr. Niederst testified that trapped cash and escrowed reserves might cover some of the deficit and that his family would fund any remainder. Confirmation Hr'g Tr. at 167:20–22, 172:4–21, 173:3–14. He did not quantify the purportedly available cash, establish that it could be released by the property-level lenders, or identify any written commitment from the Niederst family. *Id.* at 173:3–14.

26. A hope that sufficient cash will become available, backed only by an unwritten promise that insiders will cover any remaining deficit, is not evidence that the Debtor can perform the Plan. Because the Refinancing Transaction lacks committed funding sufficient to satisfy the Plan's required uses, the Plan is not feasible under section 1129(a)(11).

## III. Any Confirmation Order Must Provide for Immediate Dismissal or Stay Relief if the Refinancing Transaction Does Not Close by August 31, 2026

27. ACRE sought dismissal months ago because the Debtor lacked a viable path to reorganization and the value supporting ACRE's claim was exposed to continuing property-level defaults and foreclosures. *See* Motion to Dismiss ¶¶ 29–32, 39; *Pre-Trial Memorandum of Case Law in Support of ACRE's Motion to Dismiss Chapter 11 Case, or in the Alternative, for Relief from the Automatic Stay* [Docket No. 132] ¶¶ 46–47, 53. ACRE agreed to have that motion heard with confirmation because both matters turned on whether the Debtor could timely consummate the Refinancing Transaction and pay ACRE in full. That procedural accommodation should not now be used to prejudice ACRE by extending the stay while the collateral supporting its claim disappears.

28. The Plan itself concedes that failure to close entitles ACRE to relief. Section 8.03 provides that, if the Debtor fails to close the Refinancing Transaction within forty-five days after the Effective Date, ACRE may file a notice "upon which this bankruptcy case shall be dismissed without further notice, hearing, or order of the Court." Plan § 8.03. Debtor's counsel confirmed at the July 16 hearing: "And if we can't do it, it gets dismissed." July 16, 2026 Hr'g Tr. 21:1–2. The Court similarly observed that, if the Debtor could not close, "it's basically stay relief, dismissed, and it goes back to ACRE," which Debtor's counsel expressly confirmed. *Id.* at 21:3–5. As the Court summarized: "So if you get [the refinancing transaction] done, then the Debtor reorganizes. And if you don't get that done, ACRE essentially wins." *Id.* at 22:5–7.

29. The dismissal provision was the express *quid pro quo* for allowing the Debtor additional time to pursue the Refinancing Transaction. Mr. Niederst testified that his confidence in completing the refinancing within the Plan's timeline was the reason the Debtor agreed to dismissal if it could not close timely. *Id.* at 98:11–17. He further testified that August 31 was the target closing date and that he was confident the Debtor could close by then. *Id.* at 136:20–137:2. If the Court confirms the Plan, ACRE asks only that, if the Debtor cannot close by its own target date, ACRE receive the dismissal relief that the Debtor already agreed must follow.

30. The continuation of the confirmation hearing materially changed the bargain presented at the July 16 Hearing. The Plan defines the Effective Date as the first Business Day after the Confirmation Order becomes a Final Order. Plan § 1.47. At the July 16 Hearing, the Debtor understood that the forty-five-day period would provide approximately sixty additional days to close. July 16, 2026 Hr'g Tr. 134:12–135:6, 136:14–19. But the confirmation hearing was continued for forty-two days. If a confirmation order is entered on August 27 and becomes final approximately fourteen days later, the Plan's existing mechanism could prevent ACRE from obtaining dismissal until approximately October 25—nearly two months after the Debtor's own target closing date.

31. That delay is not neutral. Arya at Windermere is scheduled for foreclosure on September 22, and the Arya at Windermere and Vale East Loan Applications expire on [redacted]. The Arya at Windermere borrower is not a debtor, and the scheduled foreclosure is not stayed by this Chapter 11 Case. If the foreclosure proceeds, a property worth $49.9 million on an as-is basis and $83.5 million on an as-stabilized basis will leave the Portfolio, permanently reducing the value of the pledged equity securing ACRE's claim. The Court cannot restore that value through a dismissal order entered after the foreclosure has occurred.

32. The Plan's existing timeline therefore improperly gives the Debtor a risk-free option at ACRE's expense. *See In re Dekom,* No. 19-30082-KKS, 2020 Bankr. LEXIS 1880 at *17 (Bankr. N.D. Fla Apr. 6, 2020) ("Courts have [] found bad faith where the plan shifts the risk of loss to one or more creditors and the debtor retains the collateral without paying for insurance, maintenance, or taxes."); *In re Kim*, No. 09-13736, 2010 Bankr. LEXIS 2384 (Bankr. N.D. Cal. July 19, 2010) ("A plan of reorganization may not unfairly shift the risk of failure to the secured creditor."); *Participacoes v. Constrazza Int'l, Inc. (In re Universal Towers Constr., Inc.)*, 641 B.R. 691, 704 (M.D. Fla. 2022) ("The principles behind corporate and bankruptcy laws generally do not favor shifting the risk of loss from shareholders to creditors, even if the shareholders are blameless.").

33. The Debtor receives additional time to pursue nonbinding financing, while ACRE alone bears the risk that the Portfolio will deteriorate during that period. If the financing succeeds, the Debtor reorganizes. If it fails, the Debtor proposes to return ACRE to its remedies only after a valuable property may have been lost and the financing documents may have expired. That is not the bargain presented at the July 16 Hearing, and it is not an equitable basis for continuing to restrain ACRE.

34. Nor is ACRE protected against that loss. A secured creditor's protected interest includes its right to have its collateral remain available to satisfy its claim, and that interest is not adequately protected when the collateral depreciates during the stay. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs*., 484 U.S. 365, 370 (1988) ("It is common ground that the 'interest in property' referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay"). Here, the

Debtor has offered no cash payments, replacement liens, guaranty, or other protection against the loss of Arya at Windermere. A right to obtain dismissal or stay relief only after the collateral has disappeared is an illusory remedy.

35. If the Refinancing Transaction does not close by August 31, the premise for continuing this Chapter 11 Case also disappears. The Debtor will have no committed financing, no ability to make the distributions required under the Plan, and no demonstrated alternative path to reorganization. Those circumstances establish cause for dismissal under section 1112(b) and, at minimum, relief from the automatic stay under section 362(d).

36. Accordingly, to the extent the Court confirms the Plan, confirmation should be conditioned on the Debtor closing the Refinancing Transaction and either paying ACRE in full or fully funding the Reserve (as defined in the Reserve Motion) by August 31, 2026. If the Debtor fails to do so, this Chapter 11 Case should be dismissed immediately, without further notice, hearing, or order of the Court. Alternatively, the automatic stay should terminate immediately so that ACRE may exercise its rights before further collateral value is lost. Anything less would permit the Debtor to use the delay caused by the continued confirmation hearing to deprive ACRE of the very relief the Plan promises.

## IV. The Plan Does Not Leave ACRE Unimpaired Because It Fails to Preserve ACRE's Right to Full Payment

37. Although the Plan designates ACRE's claim as unimpaired, section 1124(1) requires the Plan to leave unaltered all of ACRE's legal, equitable, and contractual rights—including its right to payment in full. The Plan does not do so. If ACRE's claim remains disputed at closing, the proposed Reserve is capped at the lesser of ACRE's asserted claim or another amount ordered by the Court and does not account for the interest, fees, costs, and charges that will continue to accrue until ACRE is actually paid. As explained more fully in the Reserve

Motion, that mechanism creates a material risk that ACRE will receive less than the full amount ultimately allowed. Unless ACRE is paid in full at closing or the Reserve is sufficient to satisfy its claim when allowed, the Plan impairs ACRE's claim while denying ACRE the right to vote or the protections applicable to an impaired, nonaccepting secured creditor.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in ACRE's Confirmation Objections, the Court should deny confirmation of the Plan. Alternatively, the Court should deny confirmation unless the Debtor modifies the Plan, and the Confirmation Order expressly provides, that (a) upon closing of the Refinancing Transaction, the Debtor must either pay ACRE in full or fully fund the Reserve requested in the Reserve Motion; and (b) if the Refinancing Transaction does not close by August 31, 2026, this Chapter 11 Case will be dismissed with prejudice or the automatic stay will terminate immediately, without further notice or hearing.

Dated: August 21, 2026.

/s/ *Lara Roeske Fernandez*
Lara Roeske Fernandez, Esq.
Florida Bar No. 88500
lfernandez@trenam.com
**TRENAM, KEMKER, SCHARF, BARKIN, FRYE, O'NEILL & MULLIS, P.A.**
101 E Kennedy Boulevard, Suite 2700
Tampa, FL 33602
Telephone: (813) 223-7474

*Counsel for ACRE CFPortfolio LLC*

/s/ *Chad A. Dale*
Charles A. Dale, Esq. (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110-2600
Telephone: (617) 519-9600
Email: cdale@proskauer.com
Dylan J. Marker, Esq. (admitted *pro hac vice*)
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3000
Email: dmarker@proskauer.com

*Counsel for ACRE CFPortfolio LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026 a true and correct copy of the foregoing has been served via CM/ECF on all CM/ECF registered participants.

/s/ *Lara Roeske Fernandez*
Lara Roeske Fernandez

# EXHIBIT 1

# EXHIBIT 2